1      IN THE UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF NORTH CAROLINA

3

UNITED STATES OF AMERICA      )
4                             )  Case No. 1:10CR32-1
     vs.                      )
5                             )  Greensboro, North Carolina
ROBIN SNIPES PERRY,           )
6                             )  July  27, 2010
                              )
7                             )  9:04 a.m.
     Defendant.               )
8    _____)

9

10            TRANSCRIPT OF TRIAL - DAY 2

11      BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.

12            UNITED STATES DISTRICT JUDGE

13
APPEARANCES:
14
For the Government:   FRANK JOSEPH CHUT, AUSA
15                    Office of the U.S. Attorney
                      101 S. Edgeworth Street, 4th Floor
16                    Greensboro, North Carolina 27401

17

18  For the Defendant:    STACEY D. RUBAIN, Esq.
                      JAMES QUANDER, Esq.
19                    Quander & Rubain
                      301 N. Main Street, Suite 2020
20                    Winston-Salem, North Carolina 27101

21

22  Court Reporter:       Joseph B. Armstrong, RMR, FCRR
                      324 W. Market, Room 101
23                    Greensboro, NC  27401

24        Proceedings reported by stenotype reporter.
      Transcript produced by Computer-Aided Transcription.
25

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1                        I N D E X

2    Opening statement by Mr. Chut                         35

3    Opening statement by Ms. Rubain                       37

4
     WITNESSES FOR THE GOVERNMENT:
5
     RICHARD CHARLES RUMBAUGH
6      Direct Examination By Mr. Chut                       42
       Cross-Examination By Ms. Rubain                      65
7      Redirect Examination By Mr. Chut                     81
       Recross-Examination By Ms. Rubain                    86
8      Redirect Examination By Mr. Chut                     88

9    DAVID LEE CHICE
       Direct Examination By Mr. Chut                       91
10
     BARRON DANIEL
11     Direct Examination By Mr. Chut                      115
       Cross-Examination By Ms. Rubain                     144
12     Redirect Examination By Mr. Chut                    160
       Recross-Examination By Mr. Rubain                   164
13     Redirect Examination By Mr. Chut                    165

14   DAVID LEE CHICE (Continued)
       Direct Examination, Continued By Mr. Chut           166
15     Cross-Examination By Ms. Rubain                     196
       Redirect Examination By Mr. Chut                    220
16     Recross-Examination By Ms. Rubain                   232
       Redirect Examination By Mr. Chut                    234
17
     SUSAN M. LUTHY
18     Direct Examination By Mr. Chut                      237
       Cross-Examination By Mr. Chut                       266
19     Redirect Examination By Mr. Chut                    273

20   EXHIBITS:                                           RCVD

21   GX 1    Order Form                                   123
     GX 2    Corporate Gift Cheque Order Form             129
22   GX 3    Corporate Gift Cheque Order Form             129
     GX 4    Corporate Gift Cheque Order Form             129
23   GX 5    Corporate Gift Cheque Order Form             129
     GX 6    Corporate Gift Cheque Order Form             129
24   GX 7    American Express invoices                    130
     GX 8    Three Accordion Files                        132
25

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1          Greensboro, North Carolina

2          July 27, 2010

3          (At 9:04 a.m., proceedings commenced.)

4          THE COURT:  All right.  Ms. Hall is going to pass

5    out my preliminary instructions as well as an alternate mail

6    fraud instruction, a draft.  I want to talk to you about

7    that briefly.

8          All right.  If you'll turn first to the

9    preliminary instructions on page 5.  The elements of the

10   offense more or less track the proposed instructions that

11   the Government has submitted.  I do think that the material

12   representation -- or false, material representation is an

13   element under Netter and needs to be -- will have to be

14   submitted to the jury.

15         But it concerns -- it doesn't concern me, but I

16   wonder charging the scheme to defraud and the material

17   misrepresentation as two separate elements gives me a little

18   bit of a sense that I'm telling the jury there are two

19   different things when, in reality, they're the one and the

20   same, scheme to defraud.

21         So I found an alternate instruction that has three

22   elements.  The first is the scheme or artifice for obtaining

23   money by means of false pretenses, representations, or

24   promises is in there, and then in defining that false or

25   fraudulent pretenses, representations, or promises, there's

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    a paragraph on page 2 of that instruction that defines that

2    as relates to a material fact and is known to be untrue or

3    conceals a material fact all with intent to defraud.

4            So the subtle difference is that the preliminary

5    instructions -- which I think are fine as they are.  There

6    are four elements in the instruction that I've given you.

7    There are three elements, but the materiality is a part of

8    the definition of the false or fraudulent scheme.

9            So I don't -- at this point, Ms. Rubain,

10   Mr. Quander, if you want to be heard on the preliminary

11   instructions, I'll hear you.  I think they're -- at least I

12   think they're accurate and will do for this.  But I would

13   like both parties to give some thought as to how the final

14   instruction should be worded.  Any comments, Ms. Quander --

15   Ms. Rubain and Mr. Quander?  I knew I was going to do that

16   again.

17           MS. RUBAIN:  Your Honor, the only suggestion that

18   I would have with respect to preliminary instruction

19   page 5 -- I see the Court's point about including the

20   materiality at two separate points and having four

21   individual elements.  I would suggest to the Court that

22   possibly the preliminary instructions track the instruction

23   that we have no objection to that Mr. Chut's submitted and

24   just for No. 1 take out that portion that says "by means of

25   false pretenses, representations, or promises," because that

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    is rather duplicative of what No. 2 says.

2              Or -- I'm just hesitant to not have the jury

3    instructed that the materiality element is a separate

4    element.  I don't want it lumped into one of the other

5    elements.  And I think -- since I don't have the alternate

6    instruction that the Court was reading from, I can't see

7    that.  But I think it lumped into the scheme planned element

8    of Count One -- or Element One of the mail fraud offense

9    versus setting out each and every individual element as

10   Mr. Chut's proposed instruction does:   Element 1, that the

11   defendant knowingly devised a scheme or artifice to defraud;

12   Element 2, that the scheme or artifice to defraud included

13   false, material representations and concealed a material

14   fact.

15             THE COURT:  I'm not quite sure I follow, because

16   Mr. Chut's proposed instructions have four elements, and

17   his -- I moved -- his fourth element is the scheme to

18   defraud employed false, material representations or

19   concealed a material fact.  All I've -- I've cut his

20   slightly because at this point in time I think that the

21   Government's got to prove some stuff, and I don't go too far

22   in my preliminary instructions other than bare bones.  I

23   like to wait and see what the proofs show at the end of the

24   day.  But I moved his fourth element around to my second

25   element.  But other than that, they're pretty much the same.

1          MS. RUBAIN:  I thought I heard the Court say you

2    were a little hesitant having it separated as another

3    element versus just leaving it in No. 1 of the Court's

4    proposed preliminary instruction.  My suggestion to the

5    Court was possibly on No. 1 just to remove that language

6    that says "by means of false pretenses, representations or

7    promises" and then just leave No. 2 as the Court has written

8    on the preliminary instruction.  I think that that sets out

9    accurately what the elements of the offense are.

10          In Mr. Chut's proposed instruction for his Element

11    One, he just stated the defendant devised or participated in

12    a scheme to defraud BD -- or Becton Dickinson of money and

13    property.  It doesn't say "by means of false pretenses,

14    representations, or promises."

15          THE COURT:  Okay.  That the defendant knowingly

16    and willfully devised a scheme to defraud Becton Dickinson &

17    Company of property and -- or money or property.

18          And, two, the scheme to defraud employed a false,

19    material representation or concealed a material fact.

20          Three, the defendant acted with intent to defraud.

21          And, four, for the purpose of executing the scheme

22    to defraud, the defendant sent in a matter or thing or

23    caused any matter or thing to be sent by the United States

24    Postal Service or by an interstate commercial carrier.

25          Is that okay?

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1            MS. RUBAIN:  Yes, Your Honor.

2            THE COURT:  All right.  Do you have the mail --

3    the 1341 instruction, the other one?

4            MS. RUBAIN:  I do.

5            THE COURT:  Okay.  You don't need to do anything

6    with that, but that's the -- what I was talking about for

7    purposes of the final instruction.  I think the -- I

8    think -- I'm not sure whether it's more -- easier for a jury

9    to understand the scheme to defraud and the materiality

10   issues if they are two separate elements or if it's a scheme

11   to defraud and in defining the term "scheme to defraud" you

12   tell the jury what they need to find, and that includes

13   materiality.  I'm just not sure which is easier for a jury

14   to work with as far as the instructions are concerned.  But

15   we'll address that during the final charge conference, and

16   I'll defer to whatever the parties think is easier to

17   understand on that.

18           Now, let's talk about the defendant's motion to

19   exclude evidence.  And, first of all, let me make sure we're

20   all talking about the same thing.  Mr. Chut, as I understand

21   the defendant's position, this evidence is not -- no notice

22   has been given, and so no one is contending that this

23   evidence is offered for 404(b) purposes.  Is that correct?

24           MR. CHUT:  That's correct, Your Honor.  This is

25   evidence of the prime charge, the scheme and artifice to

defraud that's explicitly charged in the indictment at
paragraph 7 through 13.  And, Your Honor, I filed a very
brief response last night; and as the cases mentioned that I
didn't have time to put in there -- I don't know if the
Court got my brief response.

THE COURT:  I got it.

MR. CHUT:  This is basically the charged conduct,
Your Honor.  It is the scheme and artifice to defraud that
is charged in paragraph 713 that the Government must prove
as an element of each count.  Those paragraphs are
incorporated in each count.  So no 404(b) notice is given
because it's not 404(b) evidence.  It's evidence of the
crime charged.

THE COURT:  All right.  Now, let me ask you.  The
last sentence of your motion says, "These cheques do not
constitute evidence of different crimes, but are evidence of
the same scheme and artifice to defraud."  Now, are you --
when you say "These cheques do the not constitute evidence
of different crimes...," if that is, in fact, the case, then
how do you come up with six separate counts in the
indictment if each cheque doesn't constitute a separate
crime?

MR. CHUT:  Each mailing is a separate crime under
federal law.  Each of these mailings, Your Honor, involve a
common scheme and artifice to defraud which is an element of

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    each separate crime.  So these are not cheques from some

2    different scheme to commit some other scheme to defraud.

3    These are all evidence of the same scheme which is a common

4    element of each of the separate predicate mailings. These

5    are all mailings in pursuit of the same scheme and artifice

6    to defraud, Your Honor.  And the law is such that the United

7    States is allowed -- the Government is allowed to introduce

8    evidence even on charged evidence, charges that are actually

9    charged, it's actually indicted, of the acts that constitute

10   the scheme and artifice to defraud.

11          And I'll point the Court to 989 F2.d 772, which is

12   United States versus Dula, which is a Fifth Circuit case,

13   and the Court there said:

14          "The defendants were charged with conducting

15        a continuing scheme to defraud, characterized by

16        [in this case] substitution of products, and it

17        was necessary for the Government to prove that the

18        defendants had intention to devise a scheme and

19        artifice to defraud.  In developing proof of

20        intent and motive, the prosecution may offer all

21        the surrounding circumstances that were relevant."

22          Also, Your Honor, the United States -- evidence of

23   the necessary element of a crime is not separate crime

24   evidence for 404, and there's a good case on that, United

25   States versus Solerno, 108 F.3d 730, which was actually a

1  RICO case where the Government was allowed to produce

2  evidence of -- need to prove the enterprise.  So these

3  are -- while they're similar predicate --

4          THE COURT:  Well, RICO's different category.  I'm

5  familiar with the RICO cases, and we're talking about a

6  slightly different thing here.

7          But back to the original proposition.  If each

8  cheque constitutes a separate crime, then why isn't the

9  uncharged -- why aren't the uncharged cheques separate

10 crimes that would fall under 404(b)?

11         MR. CHUT:  Well, first, Your Honor, they are --

12 they are charged.  It's a scheme and artifice to defraud

13 case with separate charged mailings.  Those particular

14 cheques are, in fact, charged in the scheme and artifice

15 section of Count One of the indictment.  So they are

16 charged.

17         While the Government has leeway to charge various

18 mailings pursuant to scheme and artifice to defraud, they

19 could be separate mailings based on the same scheme and

20 artifice to defraud.  The -- this is a scheme and artifice

21 to defraud case, Your Honor, with the right to clearly

22 charge that crime, scheme and artifice to all these mailings

23 arise from.

24         So, yes, there could be more counts, Your Honor,

25 but they would still come from the common scheme and

1    artifice and would include -- each of them would include the

2    element of prove -- the Government proving that scheme and

3    artifice, Your Honor.

4         THE COURT:  All right.  Let me ask my question a

5    little more directly.  She obtains a cheque in 2003.  No

6    mailing occurs in relation to that in any way, shape, form,

7    or fashion.  Is that a separate crime?

8         MR. CHUT:  If no mailing occurs?  Well, it would

9    not be mail fraud.  It might be evidence of a scheme and

10   artifice, though, Your Honor, for the element.  But in this

11   particular case, these cheques can't be gotten without them

12   being mailed.

13        THE COURT:  Okay.  Well, so then we've got

14   transactions that occurred relating back to 2003 --

15        MR. CHUT:  Yes, Your Honor.

16        THE COURT:  -- the Government intends to produce

17   evidence of.

18        MR. CHUT:  Yes, Your Honor.

19        THE COURT:  And your position is that each mailing

20   constitutes a separate crime.

21        MR. CHUT:  With a common element of the United

22   States is required to prove the scheme and artifice which is

23   charged in the indictment starting in September of 2003.

24        THE COURT:  All right.  If each mailing

25   constitutes a separate crime, then why isn't proof of a

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    mailing in 2003 a separate crime and, therefore, 404(b)

2    evidence as opposed to substantive evidence?

3              MR. CHUT:  Because under the law, Your Honor,

4    evidence of a common scheme is not 404(b) evidence, Your

5    Honor.  I guess that's the simplest question.  The law --

6    plus acts arising from the same extrinsic crime are not

7    404(b) evidence.  I guess that's the simplest answer.

8              The simple proposition of law, the law is clear

9    that that is not 404(b) evidence.  That is evidence of a

10   common scheme or of facts arising out of the same series of

11   transactions necessary to tell the story of the crime, one.

12   Two, in this particular case, it's -- while that would be a

13   separate count, Your Honor, it would still involve the same

14   common scheme.

15             THE COURT:  So the fact that it involves the same

16   common scheme now makes it substantive evidence as opposed

17   to extrinsic evidence?

18             MR. CHUT:  Yes, Your Honor.  I mean, it's not --

19   under the law, it's not under the purview of 404(b).  It's

20   not evidence that requires the occasion -- of course, Your

21   Honor, the cheques were turned over in discovery at the very

22   beginning of the case.  There's no issue of these being a

23   surprise in any way.  And until -- this motion was filed

24   9:30 on Sunday.  The United States wasn't aware this was

25   even going to be an issue.  The cheques were turned over

1    months ago obviously, Your Honor.

2            Yes, this would be evidence of the same common

3    scheme and artifice to defraud brought -- arising out of the

4    same series of transactions that's necessary to tell the

5    story.  It's extraordinarily probative, Your Honor.  The

6    counts charged are later in the scheme.  So, clearly, it

7    goes to her intent to obtain cheques for her own use as

8    opposed to being some mistake or accident.  But under the

9    law, Your Honor, it's not 404(b) evidence.

10           THE COURT:  But, see, now I hear you arguing both

11   substantive evidence and 404(b) evidence; and if it's 404(b)

12   evidence, we've got the additional question of whether or

13   not notice should have been given.  And as I understood the

14   way we started, it was the Government's contention it wasn't

15   404(b) evidence, it is substantive evidence of the offense

16   charged.

17           MR. CHUT:  That is the position of the Government,

18   Your Honor.

19           THE COURT:  All right.  Let me hear from

20   Ms. Rubain or Mr. Quander.  Is it substantive evidence or

21   404(b) evidence?

22           MS. RUBAIN:  Your Honor, we would contend since

23   there was no notice given it has to be substantive evidence.

24   And as my motion articulates, I don't believe that it should

25   come in in that it's not part of the same common scheme.

1    Mr. Chut is correct.  They did allege in their indictment

2    going back to September of 2003 that Ms. Perry converted

3    cheques belonging to Becton Dickinson for her own personal

4    use.

5            Your Honor, just to add a few more things before I

6    get into the meat of my argument.  Though we do have these

7    cheques that were signed and cashed by Ms. Perry, what we

8    don't have going back to 2003-2004 are the actual order

9    forms sent to American Express to generate the cheques.  The

10   only other piece of evidence we have in addition to the

11   cheques are the invoices that American Express sent to the

12   employer for payment of the cheques issued.

13           In the indicted conduct, we have the order forms,

14   we have the invoices, and we have cheques.  So what -- our

15   position is Mr. Chut seeks to introduce bank records showing

16   certain deposits and also these cheques going back to 2003.

17   You know, you don't have the necessary step filling in that

18   they're related to order forms sent by Ms. Perry to American

19   Express to get the cheques.  But I just want to add that to

20   show there was a different -- there was an initial hump that

21   we need to get over as well.

22           But when we talk about a common scheme or

23   artifice, really it's a course of action; and the jury

24   instruction clearly says that what the Government has to

25   show is it was a course of action.  In the Government's

15

indictment, they allege that the course of action was
without authorization Ms. Perry ordered cheques from
American Express and converted them to her own use, and they
alleged six separate incidents where she ordered cheques and
converted them.

         We have no dispute that they can admit those
cheques, that they can tie up to those specific mailings,
and those can be introduced.  But going back to 2003, 2004,
though the Government will only seek to introduce cheques
and bank records, we allege that that does not serve as
intrinsic evidence of a continuous series of transactions.
We allege that each of these transactions are separate and
distinct counts.  We don't want the jury confused as to
seeing a voluminous amount of money that came from cheques
that they don't know whether were ordered by Ms. Perry and
deposits in her account which they don't know where those
depose its came from.  That might confuse the issues of the
six individual specific counts of mail fraud that she's
actually being charged with.

         In addition, some of the conduct is outside the
statute.  We -- and again, you know, when I analyze this,
Judge Osteen, if we were at sentencing, I would not be able
to make this argument.  The Government could argue that this
may very well be relevant conduct for the Court to consider
in determining whether or not she should be enhanced at

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 15 of 280

1    certain levels.  But when we're talking about substantive

2    evidence introduced at trial going towards the elements that

3    the Government must prove, we contend that going back to

4    2003 admitting cheques where, again, you don't have the

5    order form showing that they were ordered by her are not

6    substantive evidence.  We would contend that that's prior

7    bad act evidence, we haven't been given notice, and it

8    should not come in.

9         THE COURT:  All right.  Now, in US versus Bolden,

10   which is a Fourth Circuit case, they quoted a Tenth Circuit

11   case, US versus Massey, that says this.

12        "A 'scheme to defraud' has a wider meaning

13        than an individual act of fraud.  A mail or wire

14        fraud scheme also encompasses a range of

15        activities that occur prior to and culminate in

16        mail and wire submissions.  Accordingly, in order

17        to sustain the Boldens' money laundering

18        convictions, there must simply have been

19        sufficient evidence for the jury to have inferred

20        that the [proceeds] came from a fraudulent scheme

21        and that the use of the mails furthered the

22        scheme."

23        That Massey case says:

24        "[The] 'scheme to defraud' has a wider

25        meaning than an individual act of fraud.  A scheme

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1          refers to the overall design to defraud one or

2          many by means of a common plan or technique.

3              Here, the scheme to defraud was the elaborate

4          European Loan Program run through JRE and the

5          Atlanta lenders.  Multiple 'clients' fell victim

6          to the fraudulent plan practiced by the defendants

7          under the aegis of one 'business.'"

8              So if that is, in fact, the case, then isn't proof

9   of the fraudulent scheme necessarily going to be broader

10  than each individual act of mailing and, therefore, the

11  Government's got some leeway or latitude to prove a broad

12  scheme followed by, in this case, six discrete acts that

13  each constitute a separate offense.

14          MS. RUBAIN:  Your Honor, yes, I agree with you.

15  And when we talk about the six distinct discrete acts,

16  that's the mailing.  The scheme comes in, alleging what the

17  Government would allege, is ordering the cheques.  That's

18  the scheme.  It's ordering the cheques.  So the Government

19  can introduce evidence showing that on a specific date

20  Ms. Perry sent an order form to American Express, and then

21  several days later she received cheques in the mail, and

22  then she converted them to her own use.

23          When we go back to 2003, we don't have that

24  evidence that on a specific date she submitted an order form

25  to American Express, and she received those cheques on a

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    specific date.  All we have are the cheques.  We have a

2    voluminous amount of cheques going back to 2003 showing

3    there are American Express Cheques made out to her, signed

4    by her, and we've got bank records.  We don't have the order

5    form.

6            And so, of course, I would agree with the Court

7    that the law says that mail fraud encompasses more than just

8    the mailing.  Of course.  The Government has to show a

9    scheme.  But the course of action in this case, the

10   Government's going to allege, is that she actually sent off

11   an order form to American Express and then received the

12   cheques.  We don't dispute that that evidence can come in.

13           That is not the evidence that I'm seeking to

14   exclude, having cheques going back two years where there's

15   not a related order form showing that this individual

16   actually ordered the cheques.  They're just going to be able

17   to bootstrap going back to two years saying, well, she was

18   doing this two years ago.  Well, we don't have the order

19   form.  We've just got the cheques and bank records.

20           THE COURT:  All right.  Mr. Chut, in the absence

21   of an order form or some testimony that she ordered them

22   without authorization, let's say that the -- there's

23   evidence she converted the money to her own personal use,

24   but we're missing the material misrepresentation prong.

25           MR. CHUT:  Well, we're missing, Your Honor, also

1  the fact that a substantial piece of evidence has been

2  provided to defense.  We have invoices bearing Ms. Snipes'

3  name for every single order of cheques, Your Honor.  The

4  United States intends to produce those for the entire scheme

5  period.  The United States will also provide testimony from

6  an American Express investigator that there's one way to get

7  these cheques.  So --

8          THE COURT:  Let me make sure I understand.  On the

9  cheques -- uncharged cheques, you've got an order form that

10  bears Ms. Snipes' name?

11         MR. CHUT:  I have an invoice form that the

12  testimony will be are created contemporaneously there --

13  soon after the order bearing Ms. Snipes' name saying

14  you've -- you know, the order was for so many thousands of

15  dollars of gift cheques, Robin Snipes, Becton Dickinson

16  Technology.  And the testimony will be that there's a

17  procedure to order these cheques.  There's not a variety of

18  ways you can get these.  You can order them --

19         THE COURT:  So what's the difference in the

20  evidence for the cheques that are charged as opposed to the

21  uncharged 2003?

22         MR. CHUT:  We have the particular order forms for

23  those cheques, Your Honor, that show her signature.  The

24  other cheques are a part of the scheme and artifice, but

25  it's not -- they're not being bootstrapped, Your Honor.  We

1   have particular invoices directed to Ms. Snipes, just like

2   we have matching invoices that match up with the order forms

3   directly to Ms. Snipes.  So they're not out there -- of

4   course, all the cheques, Your Honor, bear Ms. Snipes' name

5   at least once, usually twice, signed and counter-signed.

6         THE COURT:  So for the 2003 cheques, you have an

7   invoice from American Express that bears Ms. Snipes' name,

8   or you have an order from Becton Dickinson that bears it?

9         MR. CHUT:  I have -- if I could go through all of

10  it, Your Honor.  For the six particular counts, we have the

11  order form and the invoice.  For the cheques that aren't

12  part of the particular -- for cheques before the period of

13  the six orders, we have, of course, the cheques themselves,

14  which can be only obtained by ordering them from American

15  Express and having them sent via commercial carrier or mail.

16  And we also have the invoices back through September -- I

17  think it's 15th, 2003, that -- with one exception.  The very

18  first one her name is crossed out.  But on all the rest,

19  they bear the name Robin Snipes direct -- at the same

20  address that appeared on the other order form.

21        THE COURT:  You have an American Express invoice

22  that says Robin Snipes, Becton Dickinson & Company.

23        MR. CHUT:  Yes, sir, back to the beginning of the

24  scheme area.

25        THE COURT:  But you don't have the order form from

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  Becton Dickinson to American Express bearing Ms. Snipes'

2  name.

3           MR. CHUT:  Outside of the six charged counts, no,

4  Your Honor.

5           And, of course, Your Honor, we have the testimony

6  of the course of business that these are gift cheques in a

7  corporate program that can be ordered on an official AmEx

8  form which we'll introduce and then seek to introduce in

9  evidence and follow the same path.  There's not a variety of

10 ways to order these.  There's one way to order these.

11          THE COURT:  Ms. Snipes was an employee of Becton

12 Dickinson from 2003 to the present --

13          MR. CHUT:  Yes, Your Honor.

14          THE COURT:  -- or until her employment was

15 terminated?

16          MR. CHUT:  Yes, Your Honor.

17          THE COURT:  Ms. Rubain, anything in response to

18 that?

19          MS. RUBAIN:  Your Honor, one additional piece of

20 evidence that's missing as it relates to the '03 and '04

21 cheques, the Government does not intend to call Ms. Perry's

22 supervisor or manager that she had back then to testify that

23 she did not have authorization to order those cheques.  On

24 the witness list is her supervisor from the period of the

25 indicted conduct who, I assume, the Government will call to

1  testify as to whether or not she had that authority.  But

2  all we have from the uncharged period of time is the cheques

3  and the invoice.  We're missing the order form, and we're

4  missing any live testimony from a Becton Dickinson witness

5  who can testify whether or not she had authority to make

6  those purchases or convert them for her own use.

7            MR. CHUT:  May I respond, Your Honor?

8            THE COURT:  Um-hum.

9            MR. CHUT:  I only have one of the managers coming,

10 Your Honor, for the period of the mail orders.  However,

11 Your Honor, the United States has a variety of Becton

12 Dickinson witnesses to testify on the authority of

13 administrative assistants and other people ordering gift

14 cheques, and they will uniformly testify to a basic fact

15 that Becton Dickinson employees are not authorized to order

16 thousands of dollars of gift cheques and convert them to

17 their own use and write them to cash, etc., etc.

18            So I think as a basic fact, the United States will

19 provide perhaps even redundant evidence on there is no

20 authority for any Becton Dickinson personnel to order

21 thousands of dollars of gift cheques themselves.

22            The United States will present evidence from a

23 financial officer at Becton Dickinson that, in fact, her

24 cheque use was exponentially greater than the entire

25 facility's cheque use.  So I think that employment

1    authority, Your Honor, will be covered abundantly.

2            THE COURT:  Well, we'll see where we get on the

3    evidence.  I think ultimately -- we'll see how the evidence

4    comes in, how it shakes out.

5            But I do think -- let's see.  Starting as early as

6    1916 under the precursor to 1341, the Supreme Court held

7    that the law makes each act of putting a letter into the

8    post office a separate offense.  That's <u>Badders versus</u>

9    <u>United States</u>.  And I think the law is pretty clear that the

10   fraudulent scheme -- as I set out in Massey, the fraudulent

11   scheme has a wider meaning than the individual act of fraud

12   or even the individual act of putting a letter into the post

13   office or causing a mailing in some form as may be permitted

14   by statute.

15           Here, therefore, it seems to me that the

16   Government in proving a fraudulent scheme, that is, an

17   element of the offense, the Government is entitled to

18   present as relevant evidence, evidence of the scheme even if

19   it predates the mailings that occurred in 2005, I think, on

20   into January of '06 or something like that.  The dates of

21   the mailings as charged in the indictment.

22           So I find, first of all, that evidence of fraud

23   that occurred prior to the dates of the specific mailings

24   alleged in the indictment is substantive evidence as relates

25   to the counts, and, as is charged, that indictment itself

1    specifically charges a scheme dating back to 2003, and,

2    therefore, that evidence is relevant and material.

3            It seems to me that the question of what occurred

4    in those transactions may be subject to some dispute in the

5    case, that is, what inferences can be drawn by proof of an

6    invoice from American Express back to Becton Dickinson &

7    Company in the name of Robin Snipes Perry.  I think that --

8    but I think the fact that an invoice went back to the

9    company plus -- coupled with the fact that there may be

10   evidence presented -- or will be evidence presented that

11   Ms. Perry then negotiated those cheques goes to -- those

12   facts go to the weight of the evidence rather than the

13   admissibility of the evidence.  In other words, I think the

14   jury could infer, depending on how the evidence is

15   presented, that even though the Government doesn't have all

16   pieces of circumstantial evidence, they have presented some

17   circumstantial evidence of the existence of the scheme in

18   relation to what's occurred.

19           I do think that there is -- there can be some

20   cases in which -- I do recognize that there may be cases in

21   which we have a series of discrete acts that are separate

22   and apart from any continuing transaction.  But here given

23   the fact that at least considering what the evidence -- the

24   evidence the Government has proffered that there are a

25   series of transactions that are related to each other in

1  form, that is the ordering of American Express Cheques

2  and/or gift cheques and the conversion of those cheques to

3  Ms. Perry's own use and benefit.  And given that, here it

4  seems to me that the fraudulent scheme, at least for

5  purposes of admissibility, relates back -- as far back as

6  2003 based on the evidence the Government has proffered.

7          I'll therefore deny the motion in limine.  I don't

8  think -- since it is substantive evidence, I don't think

9  it's necessary to conduct a 403 analysis.  But here even if

10 it is, I find that balancing the factors as required under

11 Rule 403 leads me to the conclusion that this relevant

12 evidence is not unfairly prejudicial to the defendant and,

13 therefore -- of course, ultimately it depends on what the

14 specific evidence is; and if I need to revisit this based on

15 the evidence that's been presented to lay a foundation for

16 it, I will.  But at this point in time, I'll deny the motion

17 in limine.

18          MS. RUBAIN:  Your Honor, if you could just note my

19 exception for the record, please.

20          THE COURT:  I will note your exception for the

21 record on that.

22          All right.  Anything else we need to make up

23 before the jury comes in?

24          MR. CHUT:  No, Your Honor.  Thank you, Your Honor.

25          MS. RUBAIN:  No.

1          THE COURT:  All right.  We will --

2          THE CLERK:  We're missing two.

3          THE COURT:  We're missing two?

4          THE CLERK:  Yes.

5          THE COURT:  We'll take about a five -- we'll take

6    about a five-minute recess and see if our jurors are here.

7    You all can get ready, and we'll come back and swear the

8    jury and proceed with the preliminary instructions and the

9    opening statements in the case.

10          (At 9:37 a.m., break taken.)

11          (At 9:52 a.m., break concluded.)

12          MS. RUBAIN:  Thank you, Your Honor for allowing us

13    that indulgence.

14          THE COURT:  I don't know whether anybody checked

15    behind me or not, but I think yesterday when I went through

16    the witness list, there is some overlap.  I think I got it

17    right, but did anyone happen to check and make sure behind

18    me that I --

19          MS. RUBAIN:  Your Honor, you did name all of our

20    witnesses.  There were many that overlapped, but you did

21    name the additional three that we had.

22          THE COURT:  All right.  Very good.  All right.

23    Mr. Caple, if you'll bring the jury in, please.

24          (At 9:55 a.m., jurors arrive.)

25          THE COURT:  All right.  Ladies and gentlemen, as

1    you have noticed, the procedures have changed just a little

2    bit.  Now, that we've completed jury selection, as each of

3    you -- as the jury enters and leaves the courtroom during

4    the course of the day and at the beginning and end of each

5    day, we will all stand for you in recognition of the service

6    that each of you are providing individually as well as in

7    recognition of the fact that you are serving as the judges

8    in this case, that is, the judges of the facts in this case.

9            I'm going to ask Ms. Williamson to administer the

10   oath to each of you -- to you at this time.  If you will all

11   stand, please.

12           THE CLERK:  Please raise your right hand.  You,

13   and each of you, do solemnly swear or affirm that you will

14   well and truly try the issues between the United States and

15   the defendant and a true verdict give according to the

16   evidence and the instructions of the Court, so help you God

17   or this being your solemn affirmation?

18           THE JURORS:  I do.

19           THE CLERK:  Thank you.  You may be seated.

20           THE COURT:  All right.  Ladies and gentlemen, now

21   that you have been sworn, I would like to give you some

22   preliminary instructions to help you in your participation

23   in this trial.

24           It will be your duty to find from the evidence

25   what the facts are.  You, and you alone, are the judges of

the facts.  You will then have to apply to those facts the

law as I will give it to you.  You must follow that law

whether you agree with it or not.

Nothing that I may say or do during the course of

the trial is intended to indicate, nor should be taken by

you as indicating, what your verdict should be.

The evidence from which you will find the facts

will consist of the testimony of witnesses, documents, and

other things received into the record as exhibits and any

facts the lawyers agree or stipulate to or that the Court

may instruct you to find.

Certain things are not evidence and must not be

considered by you, such as:

1. Statements, arguments, and questions by

lawyers are not evidence.

2. Objections to questions are not evidence.

Lawyers have an obligation to their client to make

an objection when they believe evidence being

offered is improper under the rules of evidence.

You should not be influenced by the objection or

by the Court's ruling on it.  If the objection is

sustained, ignore the question.  If the objection

is overruled, treat the answer like any other.  If

you are instructed that some item of evidence is

received for a limited purpose only, you must

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 28 of 280

follow that instruction.

    3. Testimony that the Court has concluded or
told you to disregard is not evidence and must not
be considered.

    4. Anything you may have seen or heard
outside the courtroom is not evidence and must be
disregarded.  You are to decide the case solely on
the evidence presented here in this courtroom.

    5. From time to time, it will be necessary
for me to confer with lawyers at the bench.  The
bench conference is simply a means to cause you as
little inconvenience as possible.  You should not
attempt to listen to those conferences, nor should
you draw any inferences from them.  Those
conferences are for the purpose of assisting me in
determining proper trial procedure.

    There are two kinds of evidence:  Direct and
circumstantial.  Direct evidence is direct proof of a fact,
such as testimony of an eyewitness.  Circumstantial evidence
is proof of facts from which you may infer or conclude that
other facts exist.  I will give you further instructions on
these as well other matters at the end of the case, but keep
in mind that you may consider both kinds of evidence.

    As you know, this is a criminal case.  There are
three basic rules about a criminal case that you must keep

in mind:

First, the defendant is presumed innocent
until proven guilty.  The indictment against the
defendant brought by the Government is only an
accusation, nothing more.  It is not proof of
guilt or anything else.  The defendant, therefore,
starts out with a clean slate.

Second, the burden of proof is on the
Government until the very end of the case.  The
defendant has no burden to prove her innocence or
to present any evidence, or to testify.  Since the
defendant has the right to remain silent, the law
prohibits you in arriving at your verdict from
considering that the defendant may not have
testified.

Third, the Government must prove the
defendant's guilt beyond a reasonable doubt.  I
will give you further instructions on this point
later, but bear in mind that in this respect a
criminal case is different from a civil case.

In this case, the defendant is charged in a
six-count indictment.  I will give you detailed instructions
on the law at the end of the case, and those instructions
will be used in your deliberations and to reach a decision.
But in order to help you follow the evidence, I will now

give you a brief summary of the essential elements of the offense contained in the indictment.

In each of Counts One through Six of the indictment, the defendant, Robin Snipes Perry, is charged with a separate violation of 18 USC Section 1341.  In order to prove a violation of Title 18, United States Code, Section 1341, the United States must prove beyond a reasonable doubt all of the following facts as to each count of the indictment:

One: That the defendant knowingly and willfully devised a scheme to defraud Becton Dickinson & Company of money or property.

Two: That the scheme to defraud employed a false, material representation or concealed a material fact.

Three: That the defendant acted with the intent to defraud.

Four: For the purpose of executing the scheme to defraud, the defendant sent any matter or thing or caused any matter or thing to be sent by the United States Postal Service or by an interstate commercial carrier.

As I mentioned earlier, I will give you detailed instructions on the law at this end of the case, and those instructions will be used in your deliberations and to reach

1   a decision.  These instructions are given to you now solely

2   to help you follow the evidence in this case.

3           Now, a few words about your conduct as jurors.

4   First, I instruct you that during the trial, you are not to

5   discuss the case with anyone or permit anyone to discuss it

6   with you.  Until you retire to the jury room at the end of

7   the case to deliberate on your verdict, you simply are not

8   to talk about this case with anyone, including your family

9   and friends.  When you go home in the evening, just tell

10  them that the judge told you not to talk about the case

11  until it is over.

12          Second, do not read or listen to anything touching

13  on this case in any way.  If anyone should try to talk to

14  you about it, please bring that to my attention promptly.

15          Third, do not try to do any research or make any

16  investigation about this case on your own.  Furthermore, I

17  instruct each of you not to use the internet to investigate

18  or to communicate or receive any information that relates to

19  this case in any way.  Do not post, send, or receive any

20  information by Twitter, Facebook, cellular telephone, or any

21  other electronic means.

22          Finally, do not form an opinion until all the

23  evidence is in.  Keep an open mind until you start your

24  deliberations at the end of the case.

25          If you wish, you may take notes.  But if you take

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    notes, leave your notes in the jury box on your chair when

2    you leave at night.  Ms. Williamson will see to it that no

3    one looks at your notes in your absence.  And remember that

4    those are for your own personal use.  They are not to be

5    given or read to anyone else.

6            Generally, trial questioning should remain with

7    the lawyers representing the parties to this action.  It is

8    possible, however, that occasionally questions may arise in

9    a juror's mind which should be given consideration.  While

10   I'm not encouraging you to ask questions, it is quite proper

11   for me to give consideration to your questions if they

12   arise.  Therefore, if you have a question during the

13   presentation of evidence, you may write your question down

14   and hand it to the marshal.  He will deliver it to me, and I

15   will review it.  If it is proper under the rules, you will

16   get an answer.  But if it is not proper under the rules, you

17   must not be offended when I do not allow your question to be

18   answered.

19           Now, in connection with that, I'll tell you,

20   ladies and gentlemen, if you give your question to Mr. Caple

21   it, will get to me.  I will have it.  So do not be concerned

22   that I didn't get your question if there's no answer

23   forthcoming from your question at a later time.

24           Your duty is to determine what the facts are from

25   the evidence presented, and usually that should be presented

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  by the lawyers who are trained to ask material and relevant

2  questions.

3          The trial will now begin.  First, the United

4  States will make an opening statement, which is simply an

5  outline to help you understand the evidence as it comes in.

6  Next, the defendant's attorney may, but is not required to

7  make, an opening statement.  Opening statements are not

8  neither evidence nor arguments.  The Government will then

9  present its witnesses, and counsel for the defendant may

10 cross-examine those witnesses.  Following the Government's

11 case, the defendant may, if she wishes, to present witnesses

12 whom the Government may cross-examine.

13         After all the evidence is in, the attorneys will

14 present their closing arguments to summarize and interpret

15 the evidence for you, and I will instruct you as to the law.

16 After that, you will retire to deliberate on your verdict.

17         Now, ladies and gentlemen, the lawyers will first

18 have an opportunity to make opening statements to outline

19 what they expect the evidence to show.  These statements are

20 not to be considered by you as evidence in the case which

21 comes only from witnesses, exhibits, and stipulations.

22 Nevertheless, these statements are intended to help you

23 understand the evidence as it comes in, so I do ask that you

24 give the lawyers your close attention as I recognize them

25 for the purpose of making opening statements.

1          Mr. Chut, will there be an opening statement on

2   behalf of the United States?

3          MR. CHUT:  There will, Your Honor.

4          THE COURT:  You may proceed.

5          MR. CHUT:  Thank you, Your Honor.

6          Good morning, ladies and gentlemen.  Between 2003

7   and the beginning of the year 2006, this defendant, Robin

8   Snipes Perry, who also often used her maiden name, Robin

9   Snipes, was employed as administrative assistant and

10  coordinator at a company -- an international company, Becton

11  Dickinson, which produces medical devices and supplies.  And

12  you'll often here Becton Dickinson referred to as BD.  And

13  Ms. Perry worked at the BD facility in the Research Triangle

14  Park here in North Carolina.

15         The evidence in this case will show that during

16  that time period, she used her position to fraudulently,

17  without authority, order American Express Gift Cheques that

18  were used by the company as -- for spot awards and that by

19  taking advantage of her position, she ordered hundreds of

20  American Express Gift Cheques without authority in amounts

21  of ten of thousands of dollars and converted those to her

22  own use in a manner that was not known by or authorized by

23  her employer.  And the evidence will show these gift

24  cheques, in fact, were paid for by Becton Dickinson.

25         Now, an opening statement is, as Judge Osteen

1   indicated to you, a roadmap.  The purpose is to give you a

2   brief explanation or guide to what you can -- evidence you

3   can expect to hear in this matter.

4           In this case, you'll hear about some terms that

5   I'll be touching on briefly.  I've already mentioned that

6   Becton Dickinson is an international company that has an

7   office in Research Triangle Park.  You might here Becton

8   Dickinson referred to as "BD."

9           You'll also hear about the American Express Gift

10  Cheque Program, and you'll hear about that from both

11  witnesses from BD and a witness from American Express,

12  Barron Daniel, who is an investigator for American Express,

13  and those witnesses will explain how the program was

14  supposed to work and what, in fact, happened in this matter.

15          You'll hear from Ms. Perry's last manager, Rick

16  Rumbaugh who will tell you about what happened in the year

17  2005 and 2006 as to Ms. Perry and the American Express Gift

18  Cheque Program.

19          You'll hear from David Chice who is a financial

20  officer of Becton Dickinson about what he discovered in his

21  investigation.

22          You'll hear from other BD officers, Susan Luthy

23  and Tom Valenti, about their investigation of this

24  situation.

25          You'll hear from another administrative assistant

1    at BD about recordkeeping in the American Express Gift

2    Cheque Program and how the program is actually supposed to

3    work.

4              And you'll hear from Ken Matthews who is a

5    financial analyst with the United States Postal Inspection

6    Service, and he's going to testify to you about his analysis

7    of the records in the case.

8              And you'll have the opportunity to look at some of

9    these records yourself as -- and see the documentary

10   evidence, cheques, order forms, invoices bearing on

11   Ms. Perry's fraudulent ordering and conversion of American

12   Express Gift Cheques.

13             Please listen to the witnesses as they testify.

14   At the conclusion of all the evidence, I'll be back to make

15   our final argument.  Thank you.

16             THE COURT:  Ms. Rubain, will there be an opening

17   statement on behalf of Ms. Perry?

18             MS. RUBAIN:  Yes, Your Honor.

19             THE COURT:  You may proceed.

20             MS. RUBAIN:  Thank you.  May it please the Court,

21   Mr. Chut, Ms. O'Malley.  Good morning, ladies and gentlemen.

22             Ladies and gentlemen, as jurors, there are going

23   to be times when you will have to do some things that you

24   don't think seem right or that don't sit right with you, but

25   you're required to follow the law.  This is going to be one

1    of those occasions.

2              You will hear that from about 2001 to 2006 Robin

3    Perry was employed by BD, Becton Dickinson & Company, as an

4    administrative specialist and an administrative coordinator;

5    and you will hear that as administrative coordinator, one of

6    Ms. Perry's responsibilities was to order American Express

7    Gift Cheques; and you will hear that administrative

8    coordinators, like Ms. Perry, had this responsibility,

9    several at the BD location in the Research Triangle Park

10   campus.

11             You will hear that Ms. Perry, along with those

12   other administrative coordinators, ordered and maintained

13   gift cheques just like they did any other office supply,

14   like paper or toner or pens, and you will hear that those

15   administrative coordinators maintained the cheques in their

16   own personal area.

17             You will hear that those administrative

18   coordinators had the authority to order the cheques from the

19   American Express company and had the authority to receive

20   the cheques from American Express.  And you will hear that

21   Ms. Perry, like those other administrative coordinators,

22   used an American Express order form that was faxed to

23   American Express and that those cheques were then sent to

24   them.

25             You will hear that Ms. Perry had the authority to

1    submit the order form using a purchase order number that was

2    given to her by the Purchasing Department of her company,

3    and you will hear the process that Ms. Perry went through to

4    obtain that purchase order.

5            You will hear that she initiated a request in the

6    system.  It's going to be called the SAP system.  That's

7    BD's internal purchasing system.  And you will hear that

8    Ms. Perry, like the other administrative coordinators, had

9    the authority to go into the system and approve their

10   request for a purchase order, and that purchase order was

11   what was put on the American Express Gift Cheque form to

12   allow American Express to then send them the cheques.

13           And you will hear that the significance of that

14   purchase order number was that once the gift cheques were

15   sent to Ms. Perry or the other admins, BD then paid those

16   invoices.  And you will hear that the information that

17   needed to be put on those order forms was the individual

18   requester's name, and you'll hear that Ms. Perry always put

19   her name and some other identifying information and what

20   denominations of cheques she wished to order.

21           You will hear that at no point did Ms. Perry not

22   include her name or at no point did she include any false or

23   inaccurate information on those order forms.  And you will

24   hear after each time Ms. Perry ordered those gift cheques,

25   Becton Dickinson received an invoice for those gift cheques,

1    and they were paid.  And you will hear that Ms. Perry's

2    supervisor, Rick Rumbaugh, was aware that she ordered those

3    gift cheques and authorized payments of those gift cheques.

4              Now, ladies and gentlemen, Judge Osteen, as he

5    told you, will ultimately instruct you on the law of this

6    case, and you've heard in the preliminary instructions what

7    elements you will have to find that the Government has

8    proven beyond a reasonable doubt.

9              You will have to prove -- you will have to find

10   that the Government has proven to you that, No. 1, Ms. Perry

11   devised a scheme or plan to defraud BD out of their property

12   or money; and you will have to prove -- or you will have to

13   find that the Government has proven to you that that scheme

14   contained a false or material misrepresentation or concealed

15   a material fact; you will have to find that Ms. Perry used

16   the mail to further that scheme; and you will have to find

17   that Ms. Perry intended to defraud BD of its property or.

18             Now, ladies and gentlemen, what you will hear is

19   at all times relevant to the case herein, Ms. Perry had the

20   authority and the responsibility to order American Express

21   Gift Cheques on behalf of BD.  You will hear that at no

22   point during her employment with Becton Dickinson was her

23   authority or responsibility to order those gift cheques

24   taken away.

25             And you will hear that Ms. Perry ordered those

1   gift cheques for the use and benefit of Becton Dickinson.

2   But you will also hear that once those cheques had been

3   delivered and were stored and being maintained by Ms. Perry,

4   not only were some of them used for Becton Dickinson, but

5   she used some of them for herself.

6           Ladies and gentlemen, you're about to hear all the

7   evidence.  I ask you to listen, and at the appropriate time

8   I will come back and ask you to scrutinize everything that

9   you've heard from the witness stand.

10          And at the end of the case, I will have an

11  opportunity to make an argument to you based upon the

12  evidence that you've heard from the witness stand and the

13  documents that have been presented to you, and it will be at

14  that time that I ask you to find that the Government hasn't

15  met its burden of proof and to find Ms. Perry not guilty on

16  all counts.  Thank you.

17          THE COURT:  Mr. Chut, is the Government ready to

18  proceed with its evidence?

19          MR. CHUT:  It is, Your Honor.

20          THE COURT:  You may call your first witness.

21          MR. CHUT:  United States would call Rick Rumbaugh.

22          THE COURT:  All right.  Mr. Rumbaugh?

23          THE CLERK:  Please come forward and be sworn.

24  Please place your left hand on the Bible and raise your

25  right.  Do you solemnly swear that all the testimony you're

1    about to give in the case now before the Court will be the

2    truth, the whole truth, and nothing but the truth so help

3    you God?

4              MR. RUMBAUGH:  I do.

5              THE CLERK:  Please take the stand.

6                   RICHARD CHARLES RUMBAUGH,

7         Being first duly sworn at 10:18 a.m., testified under

8         oath as follows:

9                   D I R E C T   E X A M I N A T I O N

10   BY MR. CHUT:

11   Q.   Mr. Rumbaugh, could you please state your full name for

12   the court.

13   A.   Richard Charles Rumbaugh.

14   Q.   And where do you reside, sir?

15   A.   In Durham, North Carolina.

16   Q.   And how are you currently employed, sir?

17   A.   I'm employed as a principal enterprise architect with

18   Cisco Systems.

19   Q.   And what just briefly what is an architect?

20   A.   I'm a business consultant with other large customers.

21   So large commercial firms retain me to help them align

22   business strategy with technology choices.

23   Q.   So you work in the technological field?

24   A.   Yes, sir.

25   Q.   You're not an architect who designs buildings, but a

1   technologist?

2   A.    I do not design buildings, no, sir.

3   Q.    And what is your educational background, sir?

4   A.    I have a bachelor of science in physics and a Ph.D in

5   human physiology.

6   Q.    At some point were you employed at Becton Dickinson

7   Company?

8   A.    Yes, sir, I was.

9   Q.    And how long did you work for that company?

10  A.    Roughly, 22 years.

11  Q.    And what is the nature of Becton Dickinson's business?

12  A.    BD manufacturers medical devices and supplies,

13  syringes, needles, disposable items like that and

14  instrumentation.

15  Q.    And what did you do for Becton Dickinson?

16  A.    My last job there was as the Director of Global

17  Operations, meaning I ran the company's global data center

18  in Research Triangle Park.

19  Q.    And is that where you worked, Research Triangle Park?

20  A.    Yes, sir.

21  Q.    And did Becton Dickinson have a facility in Research

22  Triangle Park?

23  A.    It has a technology center and research center in RTP.

24  Q.    And approximately how many employees work there?

25  A.    150.

1   Q.   And what positions had you held prior to that last

2   position?

3   A.   I began my career as an engineer, mechanical engineer.

4   I was the manager of computer systems, and I was the manager

5   of the computer systems for the facility.  Then I became the

6   chief architect for the whole corporation.  Then my last

7   role was in charge of operations.

8   Q.   What -- is Becton Dickinson a national or international

9   company?

10  A.   It is an international company.

11  Q.   Now, in this last position you've testified about, what

12  were the nature of your responsibilities?

13  A.   I was responsible for the operation of the data center,

14  which is a large computer facility that was in that location

15  in RTP.  That computer facility served the company's

16  commercial data processing needs running the procurement

17  systems, the financial systems, and so forth.

18  Q.   How many employees did you supervise?

19  A.   About 20, I think, at most.

20  Q.   And in the year 2005 and into '06, did you have the aid

21  of an administrative assistant?

22  A.   Yes, sir.

23  Q.   And who was your administrative assistant?

24  A.   Robin Snipes Perry.

25  Q.   And how long did you work with Ms. Perry?

1    A.    I believe it was a little over a year.

2    Q.    And approximately when did she begin working with you?

3    A.    I think it was early 2005.

4    Q.    And was she already an employee of BD when she began

5    working with you?

6    A.    Yes, sir, she was.

7    Q.    And had she previously been working in RTP?

8    A.    Yes, sir.

9    Q.    And during that time period you testified about, did

10   you work with Ms. Perry on a daily basis?

11   A.    Yes, sir.

12   Q.    And what was her general role in working with you?

13   A.    She was administrative assistant to my group and to me

14   personally and to a larger IT organization housed in that

15   facility.

16   Q.    And you recognize Ms. Perry here today?

17   A.    Yes, sir.

18   Q.    And can you indicate where she's sitting?

19   A.    She's at the defendant's table.

20   Q.    And what were Ms. Perry's day-to-day responsibilities?

21   A.    Typical administrative assistant functions: scheduling

22   meetings, handling the phone calls, coordination of food

23   services for business functions, creation and production and

24   reproduction of routine business documents, technical

25   documents, and so forth.

1   Q.   And were you Ms. Perry's supervisor?

2   A.   Yes, sir.

3   Q.   And did you review her work for BD?

4   A.   Yes.

5   Q.   And generally in the time period of '05 and '06, how

6   did you rate her performance?

7   A.   I would rate her as a "meets expectations" or a little

8   bit better.

9   Q.   And did you trust during that time period Ms. Perry to

10  complete the tasks that you assigned her?

11  A.   Yes, sir.

12  Q.   And how would you describe your personal relationship

13  with Ms. Perry during that time period?

14  A.   We were very friendly, and I would say, in a

15  businesslike way, close.

16  Q.   And did you rely on Ms. Perry to complete her assigned

17  tasks?

18  A.   Yes, I did.

19  Q.   In '05 and '06, what was the main focus of your group's

20  efforts at Becton Dickinson?

21  A.   The main focus is we were constructing a new and larger

22  computer facility and moving the equipment from the old

23  facility to the new, which was kind of a complex and time

24  sensitive task.

25  Q.   And during that time period, was that your main focus?

1   A.    It was the main focus, yes.

2   Q.    Who did you rely on to take care of any administrative

3   issues during that time period?

4   A.    Ms. Snipes Perry.

5   Q.    Now, in your employment at Becton Dickinson and

6   supervising the department, were you familiar with an

7   American Express Gift Cheque Program?

8   A.    Yes, sir.

9   Q.    And what was the nature of that program?

10  A.    American Express Gift Cheques were used to reward

11  employees in rather modest amounts for hard work, extra

12  effort, good results, that sort of thing.

13  Q.    When you say "modest amounts," what do you mean by

14  that?

15  A.    I think from recollection, the lowest amount was $25.

16  The largest amount routinely given was about $250.  In some

17  cases larger amounts could be given with special permission.

18  Q.    And were -- there were gift cheques; were there also

19  gift cards?

20  A.    Yes.  In the latter part of that program, I believe

21  American Express switched from cheques to gift cards which

22  are similar in appearance to a credit card.

23  Q.    What was the -- did you ever have a chance to see one

24  of the gift cheques?

25  A.    Yes, I did.

1   Q.    And with a was the nature of the gift cheque?

2   A.    Gift cheque looks like a traveler's cheque sort of.

3   Q.    And what purpose did Becton Dickinson use the American

4   Express Gift Cheques for?

5   A.    As I said, they were used to reward employee behavior,

6   hard work, extra effort, spending overtime, that sort of

7   thing.

8   Q.    Was there a procedure for awarding the gift cheques?

9   A.    Yes.  Small awards, the $25 awards, could be given from

10  one employee to another.  They were called spot awards

11  for -- to thank them for some extra effort that you may have

12  done.  Large amounts larger than that would require a

13  manager to approve.  And above, I think, $250, you had to go

14  two levels of manager higher.

15  Q.    And who could nominate for the awards?  So the small

16  amount would be a peer-to-peer award.

17  A.    Small amounts were peer-to-peer large amounts were

18  managers to employees.

19  Q.    Could employees nominate themselves for awards?

20  A.    No, sir.

21  Q.    And based on your experience at Becton Dickinson as a

22  manager, what was the typical amount of these awards?

23  A.    About $100, I would say, was typical, but I gave more

24  in -- on occasion.

25  Q.    And what was that one occasion?

1   A.   On one occasion at the conclusion of the project I

2   mentioned and the relocation of the data center, we gave the

3   central team each $1,000.

4   Q.   And was that an unusual or unique occasion?

5   A.   That was a very unique occasion, and each employee was

6   provided with a $1,000 gift card.

7   Q.   And normally what would be the amounts awarded?

8   A.   From 100 to 250 dollars.

9   Q.   Once the award was approved, was there a procedure for

10  ordering the cheques?

11  A.   The cheques in my recollection were primarily ordered

12  by a coordinator in Human Resources and distributed to the

13  different departments.

14  Q.   And who were the cheques ordered from?

15  A.   I'm sorry, say that again.

16  Q.   Who were the cheques ordered from?

17  A.   American Express.

18  Q.   Did the order have to be approved?

19  A.   Yes, sir.

20  Q.   And who had to approve the order?

21  A.   Managers, or, depending on the amount of the order, it

22  would be approved by a higher authority.

23  Q.   Could administrative assistants or coordinators order

24  cheques on their own authority?

25  A.   No.  Well, they could get -- through the central

1    coordinator in Human Resources, they could get a

2    distribution of cheques that were already ordered.

3    Q.    But how about ordering cheques themselves?

4    A.    No, sir, I don't think so.

5    Q.    And what was the procedure for ordering the cheques?

6    A.    It was done through a procurement system so that an

7    order was placed to American Express, I believe.

8    Q.    What is the SAP system?

9    A.    SAP is a system of software that was used by BD and

10   many other companies for financial systems procurement,

11   inventory management, and a range of business functions.

12   Q.    Were cheques ordered through the use of the SAP system

13   for ordering cheques?

14   A.    Yes, sir.

15   Q.    And explain that.

16   A.    Well, SAP is a computer system, and one function is

17   procurement purchasing.  So with the proper authority, a

18   person could order gift cheques or any other item that was

19   required through that system.

20   Q.    And what do you mean with the proper authority?

21   A.    You have to -- you can only approve a certain amount of

22   money, and above that you have to get another level of

23   management to approve.

24   Q.    Do you recall what the limits of what could be ordered

25   were?

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 50 of 280

1   A.    I think that I was limited to about $5,000, but that's

2   from recollection of my own.  I'm not certain of that

3   amount.

4   Q.    Now, who ultimately pays for the gift cheques?

5   A.    The company, Becton Dickinson.

6   Q.    So the ultimate bill is paid by Becton Dickinson?

7   A.    Yes, sir.

8   Q.    Are employees during the time -- during the time you

9   were employed with Becton Dickinson, were employees

10  authorized to order gift cheques for their own use?

11  A.    No, sir.

12  Q.    For example, were you authorized to order gift cheques

13  to pay for some expensive personal expense of your own?

14  A.    No.

15  Q.    In fact, is it fair to say that BD employees were not

16  authorized to use Becton Dickinson' money for their own use?

17  A.    No, that is improper.

18  Q.    Was there some procedure for admin assistants or

19  coordinators to keep records of cheques that were ordered?

20  A.    Yes.

21  Q.    And what was that procedure?

22  A.    They were to keep a cheque -- a record of all the

23  cheques received and then a list of the recipients as they

24  were distributed and the amounts.

25  Q.    And who was supposed to actually hand the cheque out as

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   the award?

2   A.   Well, the manager -- well, the person who originated

3   the award, frequently the manager; but it could be in some

4   cases, as I said, peer-to-peer.

5   Q.   Now, how were -- when gift cheques were given as

6   awards, how were they filled out?

7   A.   With the recipient's name.

8   Q.   Were they ever written to "cash" and then cash given to

9   the recipient?

10  A.   No, sir.

11  Q.   How often in your department in the years '05 to '06

12  were gift cheques issued?

13  A.   I don't have an accurate remembrance of that figure.  I

14  would say 30 or so times, plus -- about 30, plus the one

15  exception that I mentioned, the core team of people that

16  received the thousand dollars.

17  Q.   Is that 30 a year?

18  A.   In a year, yes.

19  Q.   Now, during the time you supervised Ms. Perry, did she

20  ever receive an employee award?

21  A.   Yes, she did.  She was part of that core team that

22  received the thousand dollars.

23  Q.   And did you nominate her for any other awards?

24  A.   Not to my recollection.

25  Q.   Now, in the years '05 and into '06, who ordered gift

1    cheques for your department?

2    A.    Ms. Snipes Perry did.

3    Q.    And what was the procedure in your department for

4    ordering gift cheques and keeping records?

5    A.    She was to keep a list of all the cheques received and

6    the amounts and then, when distributed, the date and the

7    name of the person who received it.

8    Q.    Was Ms. Perry authorized to order gift cheques on her

9    own authority?

10   A.    No.

11   Q.    Was Ms. Perry authorized to order cheques for her own

12   personal use?

13   A.    No.

14   Q.    Was Ms. Perry authorized by you to cash gift cheques

15   that were ordered for the program?

16   A.    No.

17   Q.    Where were gift cheques stored in your department that

18   were ordered?

19   A.     In -- I believe they were kept in a lockable cabinet in

20   her office area.

21   Q.    You've testified to a -- one unique situation where you

22   gave a large amount of -- a large award to the whole team.

23   Can you recall any other large awards that you made in '05

24   or '06?

25   A.    I cannot.

1  Q.   And outside of that one instance, did you authorize

2  Ms. Perry to make any large order of American Express Gift

3  Cheques?

4  A.   No, sir.

5  Q.   Did you have any knowledge that she might be making a

6  large order of gift cheques?

7  A.   Not -- no, sir, not until toward the end of her time

8  there.

9  Q.   Did you -- in the year 2005 into 2006, did you

10 authorize her to order thousands of dollars of gift cheques?

11 A.   No, sir.

12 Q.   In April of '05, did you authorize her to order

13 $6,000 -- over $6,000 in gift cheques?

14 A.   I don't recall that, no.

15 Q.   And how about in May of '05, did you authorize her to

16 order over $7,000 of gift cheques?

17 A.   No, sir.

18 Q.   In August of '05, did you authorize her to order over

19 $9,000 in gift cheques?

20 A.   In gift cheques, no, sir.

21 Q.   In September, did you authorize her to order $9,000 of

22 gift cheques?

23 A.   That's possible because that would've been in the time

24 frame of that large award, but those were in the form of

25 cards, not cheques.

1    Q.   So you authorized her to order cards once.

2    A.   Yes.

3    Q.   How about cheques?

4    A.   No, sir.

5    Q.   Did you authorize her in December of '05 to order over

6    $9,000 in gift cheques?

7    A.   No.

8    Q.   And how about in September of -- excuse me -- January

9    of '06, did you authorize her to order over $9,000 in

10   cheques?

11   A.   No.

12   Q.   And in January of '06, did you believe there was any

13   trouble with the American Express Gift Cheque Program as the

14   manager in your department?

15   A.   I was not aware of it at that time.

16   Q.   And at some point were you notified that there was a

17   difficulty with the program in your department?

18   A.   Yes, sir.

19   Q.   And how did that come about?

20   A.   I received notice from a financial analyst --

21           MS. RUBAIN:  Objection.

22           THE COURT:  Hold on just a second, Mr. Rumbaugh.

23   Let me see counsel at the side.

24           (Bench conference as follows:)

25           THE COURT:  Is the basis hearsay?

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1          MS. RUBAIN:  Yes.

2          MR. CHUT:  Your Honor, just as a preliminary

3    matter to allow him to explain his testimony and move

4    forward in the area.  It's not offered for the truth of the

5    matter asserted except that he received notice, and it

6    caused him to further investigate on his own.

7          THE COURT:  All right.  Notice that there was a

8    problem with the gift cheques?  Is that the extent?

9          MR. CHUT:  And it was linked to Ms. Perry's

10   expenses and then went and spoke to Ms. Perry.

11         THE COURT:  That he went and spoke to Ms. Perry

12   about it?

13         MR. CHUT:  Correct.

14         THE COURT:  All right.  I'll overrule, but I'm

15   going to limit it --

16         MR. CHUT:  Yes, Your Honor.

17         (Bench conference concluded.)

18         THE COURT:  Ladies and gentlemen, what someone

19   else told Mr. Rumbaugh is hearsay in this case, and you may

20   not consider that testimony, that is, what someone else said

21   to Mr. Rumbaugh, as he is describing here, for the truth of

22   the matter asserted; that is, you may not use this testimony

23   to find that there was, in fact, a problem with the gift

24   cheques.  However, you may consider that testimony in

25   determining what notice or information Mr. Rumbaugh had at

1  the time any subsequent events unfolded -- or any subsequent

2  events occurred.

3          Mr. Chut, you may continue.

4          MR. CHUT:  Thank you, Your Honor.

5  BY MR. CHUT:

6  Q.   Did you -- so were you notified there was a problem in

7  your department with American Express Gift Cheque Program?

8  A.   Yes.

9  Q.   And, in general, what was the nature of that notice?

10 A.   That American Express Gift Cheques had been ordered --

11         THE COURT:  Hold on just a second.  Let me see

12 counsel at the side.

13         (Bench conference as follows:)

14         THE COURT:  What was he getting ready to say now?

15         MR. CHUT:  I believe he's getting ready to say

16 that he was told that large amounts were ordered in his

17 department, I assume.

18         THE COURT:  How far down this road are we going?

19         MR. CHUT:  Like two seconds.  Then I'll say, What

20 did you do next?  I assume he'll say, I went and spoke to

21 Ms. Perry.  I don't intend it belabor this or -- we have --

22 actually, Your Honor, the person who notified him is going

23 to testify next, so it's not -- I'm not --

24         THE COURT:  So the person who called --

25         MR. CHUT:  Yes, the financial officer is going to

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    come testify.

2            THE COURT:  All right.  I'll let it stand at this

3    point.

4            (Bench conference concluded.)

5            THE COURT:  All right.  You may answer the

6    question, Mr. Rumbaugh.

7    BY MR. CHUT:

8    Q.   What notice did you receive, sir?

9    A.   I received notice from one of the financial analysts in

10   the corporate headquarters that there were large charges

11   made out to American Express in my department without

12   apparent cause or authorization.

13   Q.   And was that David Chice who notified you?

14   A.   Yes, sir.

15   Q.   And who is Mr. Chice?

16   A.   He was -- is or was then a financial analyst who

17   handled the IT Department and probably some other

18   departments as well.

19   Q.   Was he stationed in RTP or elsewhere?

20   A.   No, he was at the corporate headquarters in New Jersey.

21   Q.   And what did you do when you were made aware of that

22   issue?

23   A.   We began looking for the records and asked for -- I

24   asked for a record of the cheques received and distributed.

25   Q.   And who did you ask?

1    A.    Ms. Snipes Perry.

2    Q.    And where did you ask her?

3    A.    Where did I ask her?

4    Q.    Were you at work?

5    A.    At work, yes.

6    Q.    And so you asked her for records?

7    A.    Yes, sir.

8    Q.    And what was her response?

9    A.    That she would need a little time to prepare them and

10   could she have a day or two.

11   Q.    And did you ask her to account for the number of gift

12   cheques she had ordered?

13   A.    The number of gift cheques ordered and the number of

14   gift cheques distributed and the names of the recipients.

15   Q.    And did she respond to your request for this

16   information?

17   A.    A few days later, yes, sir.

18   Q.    And what was her response?

19   A.    We have a list of gift cheques that seemed accurate,

20   but partial compared to the amount of money that had been

21   charged to the department.

22   Q.    And was she able to explain why she ordered a large

23   number of gift cheques?

24   A.    No, sir.

25   Q.    Did she ever provide you information on how she

 1    disposed of the cheques?

 2    A.    No, sir.

 3    Q.    Did she have records of the cheques that she had

 4    ordered?

 5    A.    No, sir, only the few that I mentioned.

 6    Q.    Did she have any gift cheques in her possession when

 7    you spoke to her?

 8    A.    Some remained in the cabinet, I believe, yes.

 9    Q.    What amount remained?

10    A.    I do not know.

11    Q.    Was it an amount in line with the amount that appeared

12    to have been ordered?

13    A.    No, it seemed to be smaller than that.

14    Q.    And did you question Ms. Perry about that?

15    A.    Yes.

16    Q.    And who was her response?

17    A.    There was not a good -- there was no answer.

18    Q.    At some point did she offer an explanation where those

19    cheques might be?

20    A.    I think not a good explanation.  My recollection is

21    that she felt that people were coming and getting them and

22    giving them out to fellow employees without adequate

23    recordkeeping.

24    Q.    And were the -- what was the nature of the cabinet that

25    the gift cheques were kept in?

1   A.   It was a cabinet in her cubicle that was locked with a

2   key.

3   Q.   So they had been accessible to other employees?

4   A.   I don't believe so.

5   Q.   And who had the key to the cabinet?

6   A.   Ms. Perry would have a key.  The facility manager would

7   have a key.

8   Q.   In general, was Ms. Perry able to account for the

9   number of cheques ordered?

10  A.   No, sir.

11  Q.   Did you report that up your chain of command?

12  A.   Yes, I worked with Mr. Chice.

13  Q.   Did Mr. Chice want some investigation of the matter?

14  A.   He did.

15  Q.   And was Susan Luthy involved?

16  A.   Yes, she was.

17  Q.   And who is Susan Luthy?

18  A.   She was the HR -- Human Resource representative who

19  handled the IT group.

20  Q.   And was Tom Valenti involved?

21  A.   He was.

22  Q.   And who is Mr. Valenti?

23  A.   I'm not sure of his exact role.  He's in corporate

24  finance, and he did the financial investigation in the

25  matter.

1   Q.   And during the investigation, was Ms. Perry's job

2   status altered?

3   A.   At one point, she was suspended.

4   Q.   Did that limit her authority to conduct further

5   financial transactions/orders on behalf of BD?

6   A.   Yes, it did.

7   Q.   Did that prevent her from ordering more gift cheques?

8   A.   It did.

9   Q.   And, Mr. Rumbaugh, was there a consequence for you at

10  Becton Dickinson based on the ordering of gift cheques?

11  A.   Um --

12          MS. RUBAIN:  Objection, Your Honor.

13          THE COURT:  Yeah, let me see counsel at the side.

14          (Bench conference as follows:)

15          THE COURT:  Yes, sir?

16          MR. CHUT:  He's going to testify that he was

17  term -- forced to resign or asked to resign based on his

18  negligence.  That's the consequence to him.  It's certainly

19  relevant, especially since the opening statement of the

20  defense has said that they're going to argue he was

21  authorize to do -- he had authorized them.  It's just this

22  one point.

23          THE COURT:  He was terminated for negligence.

24  That doesn't necessarily rebut the fact that he authorized

25  it, does it?

1          MR. CHUT:  Not necessarily, no.

2          THE COURT:  I mean, this is one of those tricky

3   things.  This is bias.  If I sustain the objection, I'm not

4   going to let you inquire into it on cross-examination

5   either.

6          MS. RUBAIN:  Well, I believe he was -- he

7   resigned, and maybe not the characterization of forced to

8   resign for his negligence.  I mean, we have his personnel

9   file which doesn't say anything about why he resigned.  They

10  allowed him to tender his resignation.  I don't have a

11  problem if he says he resigned as a result of this

12  investigation into the gift cheques.

13         MR. QUANDER:  And I also think the question -- and

14  I don't know if Mr. Chut was able to get the whole question

15  out, but it sounded to me like the question was what

16  happened to him employment-wise as a result of these cheques

17  being ordered.

18         THE COURT:  Yeah.  Here's the way I think -- I

19  think even if it's bias, I think the Government can bring it

20  out in anticipation of cross.  I think the problem is with

21  the form of the question.  What were the consequences to

22  you?  To describe that, he's got to say what other people

23  said to him --

24         MR. CHUT:  Yes, Your Honor.

25         THE COURT:  -- and how that decision was made.  So

1    I think it's a form of the question problem --

2              MR. CHUT:  Yes, Your Honor.

3              THE COURT:  -- more than it is an evidentiary

4    issue.  So I'll sustain as to the form.

5              (Bench conference concluded.)

6              THE COURT:  All right.  I'll sustain the objection

7    as to the form of the question.  You may continue, Mr. Chut.

8              MR. CHUT:  Thank you, Your Honor.

9    BY MR. CHUT:

10   Q.   Following the investigation by BD personnel of the

11   American Express Gift Cheque use, what happened with your

12   employment at Becton Dickinson?

13   A.   In May of '06, I was asked to leave employment.

14   Q.   Was that a direct consequence of the incident with

15   American Express Gift Cheques?

16             MS. RUBAIN:  Objection.

17             THE COURT:  Yeah, I'll sustain as to that

18   question.

19   BY MR. CHUT:

20   Q.   Why did you resign?

21   A.   I was asked to resign because of lack of controls in my

22   department over financial matters.

23   Q.   Did you benefit in any way from any orders of gift

24   cheques by Ms. Perry in your department?

25   A.   No, sir.

1  Q.   And did you authorize those orders of gift cheques?

2  A.   No, sir.

3            MR. CHUT:  Thank you, Your Honor.

4            THE COURT:  Cross-examination?

5            MS. RUBAIN:  Thank you, Your Honor.

6                 C R O S S - E X A M I N A T I O N

7  BY MS. RUBAIN:

8  Q.   Mr. Rumbaugh, from 2005 up until your resignation from

9  Becton Dickinson in May of 2006, who was your supervisor?

10  A.   Steven Cohrs.

11  Q.   And was Mr. Cohrs located at the RTP location, or was

12  he at corporate in New Jersey?

13  A.   Corporate headquarters in New Jersey.

14  Q.   Now, I believe you testified that Ms. Perry came to

15  work for you as your administrative coordinator in January

16  of 2005?

17  A.   I don't recall that it was January.  It was early in

18  2005 is my recollection.

19  Q.   And Ms. Perry had been working in another area of BD

20  prior to that, correct?

21  A.   Yes.

22  Q.   And did she come to you with good recommendations?

23  A.   Yes.

24  Q.   And to your knowledge, prior to her becoming your

25  administrative coordinator, had she performed well in her

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    various capacities at Becton Dickinson?

2    A.    She was considered to be a meets expectations employee

3    to slightly better, I believe, yes.

4    Q.    Did you review her performance appraisals before

5    extending an offer to her to come work as your

6    administrative --

7    A.    Yes, I talked to her former supervisors.

8    Q.    I'm sorry, could you say that again.

9    A.    Yes, I did review it, and I talked to her former

10   supervisors.

11   Q.    And is it fair to say that she had always meets

12   expectations or outstanding appraisals?

13   A.    I believe so, yes.

14   Q.    Now, in your position as Director of Global Operations,

15   was there a lot of travel involved?

16   A.    Yes.

17   Q.    Did you often travel to the corporate headquarters in

18   New Jersey?

19   A.    Yes, ma'am, frequently.

20   Q.    How many days approximately per month would you say you

21   that were traveling?

22   A.    I would say in a month, 8 to 10 perhaps.

23   Q.    And those are 8 to 10 business days?

24   A.    Yes.

25   Q.    So approximately almost two weeks of the month you were

1   out of the office?

2   A.    It varied, but something like that, yes.

3   Q.    So is it fair to say that because of the amount of

4   travel involved in your work as director of Global

5   Operations, Ms. Perry had a lot of power delegated to her to

6   the everyday running of your department?

7   A.    Yes.

8   Q.    Now, is it fair to say that you also trusted Ms. Perry?

9   A.    Yes.

10  Q.    At any point prior to her leaving the company in early

11  2006, did you give her any unfavorable performance

12  evaluations?

13  A.    I did not.

14  Q.    And I believe you testified that Ms. Perry supported

15  you and your team in the Global Operations Department?

16  A.    Yes, and a larger group of IT associates not reporting

17  to me.

18  Q.    And how many people in all would you say that she

19  supported?

20  A.    It would be 30 or 40, but that's a guess on my part.

21  Q.    And by "supported," could you tell the jury what you

22  mean by that?

23  A.    I think for that group that large, it depends on the

24  requests.  It's typical administrative assistant type

25  functions: the scheduling of meetings, the review or

1   production of documents, ordering the food services for

2   meetings, scheduling of resources, booking of travel.  That

3   type of thing.

4   Q.   Now, you testified on direct that there was a project

5   in -- opening a data center migration, is that correct?

6   A.   Yes, that's right.

7   Q.   And that was in October of 2005?

8   A.   Yes.

9   Q.   And as part of Ms. Perry's work on that project, I

10  believe you said that she was rewarded with a thousand

11  dollar American Express Gift Cheque?

12  A.   Yes, she was considered part of the core team, you

13  would call it, and that central group was rewarded with

14  $1,000 each.

15  Q.   And part of her job duties as a administrative

16  coordinator would be organizing events like that data center

17  migration event, correct?

18  A.   Yes.

19  Q.   Where she organized catering and set up decorations and

20  all of those things associated with putting on the ribbon

21  cutting for that?

22  A.   Correct.

23  Q.   Now, I believe you also said that you and Ms. Perry

24  enjoyed a very friendly professional relationship, is that

25  correct?

1  A.    Yes.

2  Q.    And would you agree with me that because of the trust

3  you invested in Ms. Perry, you actually had her assist you

4  with some personal events at your home, correct?

5  A.    Yes.

6  Q.    She helped you put on about two or three parties at

7  your residence, correct?

8  A.    Correct.

9  Q.    And she organized the catering and decorations and

10  solidified everything that you needed to put on these events

11  at your home?

12  A.    That's correct.

13  Q.    So for all intents and purposes, you trusted this

14  woman?

15  A.    Yes.

16  Q.    Mr. Rumbaugh, when were those events that you had

17  Ms. Perry cater or organize at your home?

18  A.    One was a Halloween party is the only one I can recall.

19  There may have been a picnic in the spring.  I'm not sure

20  about that.

21  Q.    And those would've been in 2005?

22  A.    Yes.

23  Q.    Now, as part of her duties as an administrative

24  coordinator, did she have to order supplies and products for

25  your Global Operations Department?

1    A.   Yes.

2    Q.   And would those supplies include just everyday office

3    supplies, correct?

4    A.   Yes.

5    Q.   Or different equipment needed by one of the people in

6    your department?

7    A.   Equipment?   It would depend.

8    Q.   But she has ordered equipment before?

9    A.   It depends on what you mean by "equipment."

10   Q.   Now, you dealt in computers, correct?

11   A.   Correct.

12   Q.   When one of your IT people needed a computer or some

13   kind of electronic gadget, could they have gone to Ms. Perry

14   to order that?

15   A.   A computer, I think, would have been ordered through

16   the IT Department.   An electronic gadget such as a cell

17   phone or smart phone, it's possible, yes.

18   Q.   Now, to order items like that, Ms. Perry would have

19   used the SAP system, correct?

20   A.   Yes.

21   Q.   So she had authorization to use the SAP purchasing

22   system?

23   A.   She did.

24   Q.   And did you give her that authorization to use the SAP

25   purchasing system?

A.   Yes.

Q.   And as part of that authorization, Mr. Rumbaugh, did
you have to approve certain levels of authority for
Ms. Perry to make orders?

A.   Yes.

Q.   Now, do you remember between her -- beginning of her
employment in early 2005 up until 2006 what level of
authority you had given to Ms. Perry?

A.   I'm sorry, I don't recall that number.  I really don't
recall.  I could not grant authority greater than my own,
which I think was $5,000; but I am working from
recollection, and I'm not sure.

Q.   So it's your testimony that as Director of Global
Operations, you only had authority up to $5,000?

A.   Something like that.  I'm sorry.  I don't recall the
exact amount.

Q.   Now, I believe you testified that in addition to
providing general admin support, part of Ms. Perry's job
responsibilities were to order for your department the
American Express Gift Cheques, correct?

A.   Yes.

Q.   Okay.  Now, she had authority to go into the SAP system
and order American Express Gift Cheques?

A.   Well, I believe so, although I think the procedure was
to order them through the HR coordinator.

1    Q.   Are you not familiar with what the procedure was?

2    A.   I thought that was the procedure.

3    Q.   My question is are you familiar with what the procedure

4    was?

5            MR. CHUT:  Objection, Your Honor, asked and

6    answered.

7            THE COURT:  I'll overrule it.

8    BY MS. RUBAIN:

9    Q.   Mr. Rumbaugh, my question is:  Are you familiar with

10   what the procedure to order the American Express Gift

11   Cheques was?

12   A.   Yes, ma'am.

13   Q.   And was the procedure that Ms. Perry had authorization

14   to order them from American Express?

15   A.   No, I believe the procedure was that the cheques would

16   be delivered through the HR Department through a central

17   coordinator.

18   Q.   Okay.  So it's your testimony that you never requested

19   Ms. Perry to order American Express Gift Cheques for use in

20   your department?

21   A.   We would ask -- I would ask her to get the cheques for

22   use in my department assuming that she would use the

23   procedure of the -- going through the HR Department.

24   Q.   Okay.  I need to understand.  So it's your testimony

25   you recall between early 2005 and 2006 making requests of

1   Ms. Perry to obtain gift cheques, correct?

2   A.   Yes, yes.

3   Q.   Now, what she did after that, your speculation is that

4   she went through HR to order the gift cheques?

5   A.   Yes, ma'am.

6   Q.   But you don't have any firsthand knowledge of how she

7   obtained gift cheques?

8   A.   I do not.

9   Q.   Now, do you know whether or not there was a written

10  policy at Becton Dickinson this time that we're talking

11  about setting out the guidelines for ordering these gift

12  cheques?

13  A.   I believe there was, but I don't recall it.

14  Q.   So you don't know whether there was a written policy?

15  A.   No.

16  Q.   Now, to your knowledge, Ms. Perry could maintain gift

17  cheques in her locked cabinet, correct?

18  A.   Yes.

19  Q.   Gift cheques that she obtained somehow, correct?

20  A.   Yes.

21  Q.   And you're aware that members of your team would

22  routinely go to Ms. Perry to make those requests for spot

23  awards, correct?

24  A.   I think "routinely" is a little strong; yes, it could

25  happen that way.

1    Q.    But you would agree with me that members of your team

2    could go to Ms. Perry to request a cheque in whatever

3    denomination to issue a peer-to-peer spot award, correct?

4    A.    No, a peer-to-peer spot award was limited to $25.

5    Q.    Now, you would agree with me that one of your team

6    could go to Ms. Perry and ask for a $25 gift cheque to make

7    a peer-to-peer spot award, correct?

8    A.    Yes.

9    Q.    And Ms. Perry did not have to seek your approval to

10   give the gift cheque out to a member of your team?

11   A.    No.

12   Q.    And you would agree with me that a member of your team,

13   if they went through the nomination process and had the

14   managerial approval, could go to Ms. Perry to request a gift

15   cheque in a higher amount, correct?

16   A.    Yeah, the approval would have to come from the manager.

17   Q.    So you were aware that Ms. Perry maintained gift

18   cheques in her locked cabinet in her cubicle area?

19   A.    Yes.

20   Q.    Now, what denomination she maintained at any given

21   time, would you agree with me you did not know what that

22   was?

23   A.    I did not know.

24   Q.    Now, back to the SAP system.  Is that a system that you

25   as Director of Global Operations, Mr. Rumbaugh, had control

1    over?

2    A.    I think "control" is not the right word.  My team ran

3    the computer systems on which the software ran.

4    Q.    Now, with your team running the computer system, you

5    would -- you understand the approval process of how a

6    purchase order was generated, correct?

7    A.    Not entire -- well, in theory, yes, through the system.

8    We do not control that process, however.

9    Q.    Do you know whether or not, based upon your knowledge

10   of the system, whether someone could obtain authorization to

11   make -- to request a purchase order in an amount that they

12   did not have approval authority for?

13   A.    I do not know how that could be done.

14   Q.    So based on your knowledge of the system, if a purchase

15   order number was generated, the appropriate approval in the

16   SAP system had to have been met, correct?

17   A.    Yes.

18   Q.    Now, Mr. Rumbaugh, as part of your duties as Director

19   of Global Operations, did you review any financial reports

20   associated with expenditures in your department?

21   A.    Yes.

22   Q.    How often did you review or receive financial reports?

23   A.    I think received monthly, but I probably didn't review

24   them as frequently as I should have.

25   Q.    Now, on those monthly reports that you were given --

1   first of all, did let me ask you.  Did you receive them via

2   email, or were they hard copied to you?

3   A.    Email.

4   Q.    And who would those emails have come from?

5   A.    I believe they came from probably an anonymous

6   financial -- just from the Finance Department.

7   Q.    You did not have your own particular finance person for

8   Global Operations?

9   A.    No.

10  Q.    No?

11  A.    Well, we used Mr. Chice and others in the corporate

12  center in New Jersey.

13  Q.    But you did not have an identified person designated

14  specifically for you to be your go-to person for finance

15  issues?

16  A.    No.

17  Q.    Okay.  So you would receive these monthly reports.

18  Would the American Express purchases be on those monthly

19  reports?

20  A.    They would.

21  Q.    Now, were you required to approve any payment by the

22  company at large for expenditures in your department?

23  A.    No.

24  Q.    Okay.  What was the purpose of you receiving those

25  monthly reports?

1   A.    To check against my records and, you know, to make sure

2   that proper purchases were being made.

3   Q.    Now, beginning in January of '05, you would have

4   received a monthly report, correct?

5   A.    Yes.

6   Q.    And do you recall reviewing the January '05 monthly

7   report?

8   A.    I do not.

9   Q.    Do you recall whether or not you observed any strange

10  activity on the January '05 monthly report?

11  A.    I do not recall that.

12  Q.    With respect to February of 2005, did you receive a

13  monthly report?

14  A.    I believe so.

15  Q.    And you received a monthly report from March of '05

16  through December of '05, correct?

17  A.    Correct.

18  Q.    And you received one for January, 2006, correct?

19  A.    Correct.

20  Q.    Now, from January of '05 to December of 2005, did you

21  ever meet with Mr. Chice or anyone else from finance to

22  discuss any irregularities that you saw within those monthly

23  reports?

24  A.    After Mr. Chice notified me of the irregularities, yes.

25  Q.    My question was between January of '05 to December of

1    '05?

2    A.    No, I don't believe so.

3    Q.    And, again, you did not have to approve payment by

4    Becton Dickinson for those expenditures from your

5    department, correct?

6    A.    It is a retroactive review of payments made.

7    Q.    But based on that retroactive review, you could have

8    notified someone had you seen something out of order --

9    A.    Correct.

10   Q.    -- correct?  Now, do you recall meeting with Inspector

11   Angela Ellison from the Postal Inspection Service on

12   November the 16th of 2007?

13   A.    I recall meeting with Ms. Ellison on several occasions.

14   I don't remember the specific dates.

15   Q.    How many occasions did you meet with Ms. Ellison?

16   A.    By phone?  Three or four, I suppose.  Then more

17   recently as we were leading up to this trial, it was more

18   frequent.

19   Q.    Do you recall telling Ms. Ellison that, in fact,

20   Ms. Perry was authorized to order gift cheques for awards?

21   A.    Yes.

22   Q.    So it's your testimony that she did have the

23   authorization to order gift cheques?

24   A.    Yes, to -- well, let's say to obtain gift cheques in

25   the approved manner, yes.

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  Q.   Now, my question is:  Do you recall telling Ms. Ellison

2  that Ms. Perry was authorized to order the gift cheques?

3            MR. CHUT:  Objection, Your Honor.

4            THE COURT:  I'll overrule it.

5            THE WITNESS:  Yes.

6  BY MS. RUBAIN:

7  Q.   Okay.  So, in fact, Mr. Rumbaugh, was she authorized to

8  actually order the gift cheques?

9  A.   She was authorized to order gift cheques using an

10  approved procedure.

11  Q.   Now, you mentioned on direct that you questioned

12  Ms. Perry about this unusual activity that had been brought

13  to your attention, correct?

14  A.   Correct.

15  Q.   And at some point you testified that she produced to

16  you a document listing out some cheques that she had

17  received and who they were disbursed to, correct?

18  A.   Yes.

19  Q.   Did you provide that document to Ms. Ellison?

20  A.   No, I did not.

21  Q.   What did you do with that document?

22  A.   I provided it to Mr. Chice, I believe.

23  Q.   And do you know what happened with that document once

24  you turned it over to Mr. Chice?

25  A.   No.

1    Q.    Today, do you have a specific recollection of how many

2    individuals or entities were listed on that document that

3    Ms. Perry provided to you?

4    A.    I do not have a specific recollection.  It was --

5    Q.    Was it a one-page document or multiple pages?

6    A.    I think it was a one-page document.  That document is

7    not in my possession, so I don't have a specific

8    recollection.

9    Q.    Did you ever go, Mr. Rumbaugh, to anyone in Human

10   Resources to request that gift cheques be ordered for your

11   department?

12   A.    Not to my recollection, no.

13   Q.    Now, I believe you testified on direct that you recall

14   approximately 30 or so awards that were given out by your

15   department in 2005, correct?

16   A.    That's just a guess.  It seems about right, though.

17   Q.    Could it have been higher?

18   A.    It could've been higher.

19   Q.    Now, that data center migration project, that was a

20   pretty big project, correct?

21   A.    Yes, ma'am, it was.

22   Q.    And you all had some events after that to celebrate the

23   hard work that your team had done, correct?

24   A.    Yes.

25   Q.    You had a core team dinner?

1    A.    Yes.

2    Q.    And you had a bowling event as well?

3    A.    We did.

4    Q.    To your knowledge, were gift cheques given out during

5    that period to various people on the team?

6    A.    I believe so, yes.

7    Q.    Do you have any other recollections of any other events

8    in 2005 where gift cheques were given out?

9    A.    No, I don't recall any.

10            MS. RUBAIN:  Your Honor, if I may just have the

11   Court's brief indulgence, please.

12            Your Honor, that's all I have.

13            THE COURT:  Redirect, Mr. Chut?

14            MR. CHUT:  Yes, Your Honor.

15                R E D I R E C T   E X A M I N A T I O N

16   BY MR. CHUT:

17   Q.    You testified about a unique time where you gave out

18   thousand dollar awards.  Were those gift cards or gift

19   cheques?

20   A.    They were cards.

21   Q.    They were cards; they were not cheques.

22   A.    They were cards that had the appearance of like a

23   credit card.

24   Q.    And the cheques look like travelers cheques?

25   A.    Like travelers cheques.

1   Q.   What type of computers -- strike that.  Does -- during

2   the time you were at Becton Dickinson, did Becton Dickinson

3   use Apple computers?

4            MS. RUBAIN:  Objection.

5            THE COURT:  Well, let me see counsel at the side.

6            (Bench conference as follows:)

7            THE COURT:  Basis?

8            MS. RUBAIN:  It's outside the scope of my cross

9   what kind of computers did they use.

10           THE COURT:  Is there -- what's the relevance?

11           MR. CHUT:  Your Honor, it's -- the defense has

12  asked about whether she was authorized to order computers.

13  I suspect in anticipation of evidence the United States will

14  offer later, I think on redirect I'm well within the scope

15  to ask what type of computer --

16           THE COURT:  He said no, didn't he?

17           MS. RUBAIN:  Yes.

18           MR. CHUT:  He did.  But also, Your Honor, the --

19  clearly, they're going to try to attack his credibility.  A

20  particular type of computer was ordered.  I think that would

21  be very relevant, and this issue of computers was raised by

22  the defense, not by the --

23           THE COURT:  Wait a minute.  He said she wasn't

24  entitled -- authorized to order computers.  Now, you want to

25  present evidence that they were using and, therefore,

1   ordering Apple computers?

2          MR. CHUT:  No, Your Honor, the exact opposite;

3   that, in fact, they do not use Apple computers, which does

4   relate directly to her question.  Clearly, this line of

5   questioning is intended to suggest that some of her

6   purchases are authorized by Mr. Rumbaugh.  Now, he's already

7   denied it, but the Government should have the latitude to go

8   a little further and say -- he's the IT person, clearly has

9   knowledge -- and say, no, we didn't use Apples.  I didn't

10  authorize her to order Apples.  That's directly in line with

11  their question --

12         THE COURT:  I mean, did she order Apples?  What --

13         MR. CHUT:  Yes, Your Honor.

14         THE COURT:  I'm really lost on this.

15         MR. CHUT:  The evidence will show, Your Honor, she

16  wrote numerous American Express Gift Cheques to Apple

17  Computers, and I assume that these questions are in

18  anticipation of trying to argue that Mr. Rumbaugh told her

19  to do so.

20         MS. RUBAIN:  Your Honor, that's not true.

21         THE COURT:  Is there going to be evidence that

22  she's going to say that the Apples were used by the company?

23         MS. RUBAIN:  No, that's not true.  The question

24  merely was what did she have authority to order?  I said

25  office supplies, would that include things like computers in

Rumbaugh - Redirect

1   the IT Department?

2           THE COURT:  Yeah, I don't think going into what

3   they used at this point, Mr. Chut, is appropriate.  If it

4   becomes relevant, I'll let you call him in rebuttal.

5           MR. CHUT:  Okay.

6           THE COURT:  But at this point I think whether they

7   used Apples or Dells or something, I don't think that's

8   right.

9           MR. CHUT:  Yes, Your Honor.

10          (Bench conference concluded.)

11          THE COURT:  I'll he sustain the objection.  You

12  may continue.

13  BY MR. CHUT:

14  Q.   Did Becton Dickinson employees receive training in the

15  SAP program?

16  A.   Yes.

17  Q.   Did Ms. Perry receive training in the SAP?

18  A.   Yes, she did.

19  Q.   Did she have any special status with regard to the SAP

20  program?

21          MS. RUBAIN:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry, say your question again.

24  BY MR. CHUT:

25  Q.   Did she have any special status in regard to the SAP

1    program?

2    A.    Can I answer that?

3             THE COURT:  You may answer.

4             THE WITNESS:  Yes, she became a trainer herself to

5    train others in the use of the program.

6    BY MR. CHUT:

7    Q.    Based on your working with Ms. Perry and her training,

8    did she have any expertise in the use of the program?

9    A.    Yes, she was a proficient user and a trainer.

10   Q.    And you've testified that you asked Ms. Perry to obtain

11   American Express Gift Cheques for the award program?

12   A.    Yes, sir.

13   Q.    Did you ask her to obtain dozened of cheques?

14   A.    Over time it could be dozens of cheques.

15   Q.    At one time did you ever ask her to obtain dozens?

16   A.    I don't think so.

17   Q.    And did you ever authorize her to use cheques for her

18   own purpose?

19   A.    No, sir.

20   Q.    And did you ever authorize her to use cheques for

21   office expenses?

22   A.    No.

23   Q.    To your knowledge, were gift cheques ever used for

24   office expenses?

25   A.    I think that I've learned since then that it may have

 1    occurred, but that would not be a proper use of the gift
 2    cheques.
 3    Q.    Did you ever authorize any use for office expenses?
 4    A.    No.
 5    Q.    Did you ever authorize Ms. Perry to order tens of
 6    thousands of dollars of gift cheques?
 7              MS. RUBAIN:  Objection.
 8              THE COURT:  Well, I'll overrule it.
 9              THE WITNESS:  With the exception of the one
10    occasion, the thousand dollar awards, the answer is no.
11    BY MR. CHUT:
12    Q.    And those were gift cards?
13    A.    Those were gift cards.
14              MR. CHUT:  Thank you, Your Honor.
15              MS. RUBAIN:  Your Honor, just briefly.
16              R E C R O S S - E X A M I N A T I O N
17    BY MS. RUBAIN:
18    Q.    Mr. Rumbaugh, you don't recall how many occasions you
19    requested Ms. Perry to order gift cheques, correct?
20    A.    I do not recall that.
21    Q.    And you don't recall whether or not you asked her to
22    order specific amounts, correct?
23    A.    I do not.
24    Q.    Now, with respect to Ms. Perry being a trainer in the
25    SAP system, who is would she train on that system?

1  A.    Users who are learning the system, other users.

2  Q.    So at all times during her employment as administrative

3  coordinator for you, she was a trainer, and she was

4  authorized to train people to use the system?

5  A.    I don't know when she became a trainer, but certainly

6  during that period of time, yes.

7  Q.    Is there a difference between an SAP user versus an SAP

8  trainer?

9  A.    An SAP trainer, you know, implies a level of expertise

10  greater than an average user.

11  Q.    Have you ever heard the term "super user" before?

12  A.    Yes.

13  Q.    And what is a "super user"?

14  A.    A "super user" would be someone that has an extra level

15  of privileges in the system.

16  Q.    And was Ms. Perry a super user?

17  A.    Not to my knowledge.

18  Q.    Now, with respect being a trainer in the SAP system,

19  you previously testified that no one could go in and change

20  approvals or authority, correct?

21  A.    Say that one more time, please.

22  Q.    With respect to Ms. Perry being an SAP trainer, she

23  still could not go in and change approval levels or

24  authorities required to issue purchase orders, correct?

25  A.    I don't believe so.

1              MS. RUBAIN:  Your Honor, that's all I have.

2              MR. CHUT:  Very briefly, Your Honor.

3              R E D I R E C T   E X A M I N A T I O N

4    BY MR. CHUT:

5    Q.   Mr. Rumbaugh, you just testified that Ms. Perry didn't

6    have authority to change purchase orders.  Would it be

7    possible based on her expertise in SAP that she could

8    actually do that with or without authority?

9              MS. RUBAIN:  Objection.

10             THE COURT:  Well, let me see counsel at the side.

11             (Bench conference as follows:)

12             THE COURT:  It's not clear to me at this point

13   what he knows about the SAP system outside of what he

14   understands various levels of authority to be.  So at this

15   point I'm not sure there's a foundation for him to answer

16   that.

17             MR. CHUT:  Yes, Your Honor.

18             THE COURT:  So I'll sustain on that point.

19             MR. CHUT:  Yes, sir.

20             (Bench conference concluded.)

21             THE COURT:  I'll sustain.  You may continue,

22   Mr. Chut.

23             MR. CHUT:  Nothing further, Your Honor.  Thank

24   you.

25             THE COURT:  All right.  You may step down,

1    Mr. Rumbaugh.

2              (At 11:09 a.m., witness excused.)

3              THE COURT:  Let's see.  Ladies and gentlemen, I

4    know we got to a late start, but this is a good point to

5    take a mid-morning recess.  So I'm going to excuse the jury

6    for 15 minute recess.

7              (At 11:10 a.m., jurors excused.)

8              (At 11:30 a.m., break concluded.)

9              MR. CHUT:  Your Honor, two brief matters.  If we

10   could have Mr. Rumbaugh released, Your Honor.

11             THE COURT:  Are you asking?

12             MR. CHUT:  Yes, Your Honor.

13             THE COURT:  Any objection?

14             MS. RUBAIN:  Your Honor, I believe I subpoenaed

15   him, and I don't know if I'm prepared to release him at this

16   point as well.

17             THE COURT:  Where does Mr. Rumbaugh live?  Does he

18   live -- does he still work and live in Durham?

19             MR. CHUT:  Yes, Your Honor.

20             THE COURT:  All right.  He can be released from

21   staying any further today, but make sure he's told he's not

22   released from his subpoena and subject to being re-called at

23   a later time.

24             MS. RUBAIN:  Thank you, Your Honor.

25             THE COURT:  Is that okay?

1              MR. CHUT:  Yes, Your Honor.  And, Your Honor, the

2    second matter is I neglected to give the Court its copy of

3    the exhibits, Your Honor.

4              THE COURT:  Oh, that will be fine.

5              MR. CHUT:  And, Your Honor, the only other brief

6    note just for clarity, the next witness is David Chice.  I

7    intend to call Mr. Chice; have him step down; then call the

8    next witness, who is an American Express investigator; and

9    then recall Mr. Chice at the end of Mr. Daniel's testimony.

10             THE COURT:  All right.  Any objection to that?

11             MS. RUBAIN:  No, Your Honor.

12             THE COURT:  If for whatever reason you want to

13   reserve your cross until he's re-called, you can do that.

14   Just let me know.  All right.  Mr. Caple?

15             (At 11:33 a.m., jurors arrive.)

16             THE COURT:  Ladies and gentlemen, I think all of

17   you recognize it, but we're standing for you so when you

18   come in, you are free to come in, pick up your notes, and

19   have a seat.  Once you all take your seats, then we'll take

20   our seats.

21             Mr. Chut, is the Government ready to call its next

22   witness?

23             MR. CHUT:  It is, Your Honor.  The United States

24   would call David Chice.

25             THE CLERK:  Do you solemnly swear that all the

1  testimony you're about to give in the case now before the

2  Court will be the truth, the whole truth, and nothing but

3  the truth so help you God?

4          MR. CHICE:  I do.

5          THE CLERK:  Please take the stand.

6                    DAVID LEE CHICE,

7      Being first duly sworn at 11:34 a.m., testified under

8      oath as follows:

9              D I R E C T   E X A M I N A T I O N

10 BY MR. CHUT:

11 Q.   Mr. Chice, can you please state your full name for the

12 court.

13 A.   David Lee Chice.

14 Q.   And where do you reside, sir?

15 A.   410 Hartford Drive, Nutley, New Jersey, 07410.

16 Q.   And how are you employed currently, sir?

17 A.   I currently work Becton Dickinson, otherwise known as

18 BD.

19 Q.   And what is your educational background, sir?

20 A.   I have a bachelor's degree of science in accounting at

21 Fairleigh Dickinson University.

22 Q.   And what BD location do you work at?

23 A.   I work in Franklin Lakes, New Jersey.

24 Q.   And is that the corporate headquarters?

25 A.   Yes.  It's the worldwide headquarters.

1    Q.    And what is your current position?

2    A.    My current position is Finance Manager for Project

3    Diverse.

4    Q.    And just briefly, what is that?

5    A.    It's a project that the company is working on that is

6    implementing a software worldwide.  It's called SAP.  It's a

7    manufacturing system.  It's a finance system that

8    consolidates all of these tools worldwide.  So it takes the

9    manufacturing procurement, finance, HR, into one system.

10   Q.    How long have you been employed by BD?

11   A.    Since 1996; 14 years.

12   Q.    And what was your position with BD in 2006?

13   A.    My position was the Finance Manager for the Global IT,

14   Information Technology.

15   Q.    And what were your duties in that position?

16   A.    My duties were to observe the operating expenses for

17   the call centers within IT as well as observe the capital

18   spent.

19   Q.    And in that position, were you aware of the existence

20   of an American Express Rewards Program?

21   A.    Yes, yes, I was.

22   Q.    And your position in 2006, did you review costs for

23   that program?

24   A.    Yes, I did.

25   Q.    And what was the nature of that program?

A.    The nature of the program was to provide associates

within the company like on-the-spot awards.  So if they did

something that was above and beyond their roles and

responsibilities, someone that received the benefit of that

above-and-beyond work for -- above-and-beyond work, they

could nominate that person for a monetary award.  So those

monetary awards were gift cheques from American Express for

about $50 or actually $25 to $50 to $100 denomination.

Q.    And did you review the cost of that program for the IT

group?

A.    Yes, I did.

Q.    And were you familiar based on that with workings of

the AmEx Cheque Program?

A.    Yes, I was.

Q.    And who would pay for these gift cheques?

A.    The company, Becton Dickinson.

Q.    Now, who is authorized to make one of these awards?

A.    Who -- well, it would come from the -- it would be

nominated for an associate.  Then a manager would approve

the nomination of the award -- of the gift cheque.

Q.    And where would the gift cheques be ordered from?

A.    They would be ordered through the SAP system, and a

purchase order would be -- purchase requisition would be cut

through SAP.  It would be approved by the manager and a

purchase order would go to the vendor, which is American

1    Express.

2    Q.    Were employees authorized to nominate themselves for

3    awards?

4    A.    No, they were not.

5    Q.    So someone else had to nominate them?

6    A.    Correct.

7    Q.    Were there limits on -- strike that.  Who was

8    authorized to order American Express Gift Cheques?

9    A.    Managers, supervisors.

10   Q.    Did managers and supervisors have limits to the amount

11   of expenditures they could make --

12   A.    Correct.  Certain managers would have authority to, you

13   know, release funds on behalf of the company, 10,000,

14   50,000, 100,000 and under depending on job title.

15   Q.    And were you familiar with Rick Rumbaugh?

16   A.    Yes.  Yes, I was.

17   Q.    And who was Mr. Rumbaugh?

18   A.    He is a -- or at least he was the IT leader in Research

19   Triangle Park in North Carolina.

20   Q.    And did Mr. Rumbaugh have a limit on his authority to

21   order -- make purchases on behalf of BD?

22   A.    Yes, he had a limit of $50,000.

23   Q.    Was that annually?

24   A.    Yes.

25   Q.    Now, did administrative assistants have limits on how

1    much they could --

2    A.    They did, but that was up to a thousand dollars.

3    Q.    What were AmEx Gift Cheques -- reward cheques used for

4    by BD?

5    A.    Again, it was on-the-spot awards, impact awards.  So if

6    someone did something above and beyond their normal

7    responsibilities, they would nominated for a gift cheque.

8    Q.    Were they ever used to make purchases on behalf of BD?

9    A.    That was not the role or the classification of the

10   program.  So if they were to make purchases on behalf of the

11   company, they should have gone through a purchase

12   requisition or PO process.

13   Q.    Were gift cheques supposed to be written to cash?

14   A.    No.

15   Q.    Who were they supposed to be written to?

16   A.    To the associate, because within the nature of the

17   program, each associate were to pay taxes on that nomination

18   of gift cheque.

19   Q.    And were employees ever authorized to -- BD employees

20   ever authorized to order gift cheques for their own personal

21   use?

22   A.    No, they were not authorized.

23   Q.    Were employees authorized to use BD funds or property

24   for their own use?

25   A.    No, they were not.

1    Q.    What was the purpose for which BD employees were

2    authorized to order or use American Express Gift Cheques?

3    A.    They were authorized to nominate the associate with

4    on-the-spot awards.  So it was just a nomination.  Then it

5    would go to the supervisor for approval if they get that

6    nomination approved.

7    Q.    Were American Express Gift Cheques ever used to

8    supplement -- outside the award function, were they ever

9    used to supplement income?

10   A.    No.

11   Q.    Were American Express Gift Cheques ever used in some

12   way to give a tax-free gift to employees?

13   A.    No.

14   Q.    Does BD have a facility in Research Triangle Park?

15   A.    Yes.

16   Q.    And what's the nature of that facility, sir?

17   A.    There's BD Technologies, which is a piece of the

18   facility.  It's research and development as well as IT.

19   It's where they house their data center.  So this is where

20   they have servers, storage for all of their applications

21   worldwide.

22   Q.    And was that facility in place in -- how long has that

23   facility been there?

24   A.    Just -- at least the data center was just built

25   probably in -- I guess it was just opened in 2006, at least

1   the expansion piece of it was.

2   Q.    And in 2006 approximately how many BD employees worked

3   there?

4   A.    Just about 200.

5   Q.    And did you review the expenses in 2006 of that

6   facility?

7   A.    I reviewed the expenses for what was my responsibility,

8   which was IT function.  So that was my duties there.

9   Q.    And based on such review, were you aware of what the

10  normal annual cost for American Express Gift Cheques were?

11  A.    I think the cost itself was -- should've been at least

12  $10,000.  But through my responsibilities within the IT

13  function, my responsibilities was operating expenses of

14  120 million dollars and 15 to 20 million dollars in capital

15  expense.  So that probably sounded right, about $10,000 in

16  gift cheques for on-the-spot awards.  So these were stuff

17  for people doing above and beyond their normal activity.

18  Q.    Was that for the entire facility?

19  A.    Yes.

20  Q.    So you would expect the cost about $10,000 for the 200

21  employees at the RTP facility?

22  A.    Right.

23  Q.    And that's annually?

24  A.    Annually.

25  Q.    What records were employees required to keep for order

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   and use of American Express Gift Cheques?

2   A.   Well, they -- there was a purchase requisition process

3   that would be entered into SAP.  Then the requisition would

4   be approved by the managers.  Then a purchase order would be

5   cut through the system.  Then the purchase order would be

6   sent via fax or telephone conversation with the vendor

7   explaining like these are the amount of cheque requests --

8   or gift cheques that are required, and the vendor would send

9   the gift cheques along with the invoice.

10  Q.   And was -- were the employees required to keep a log or

11  anything like that?

12  A.   Yes, they were -- the person who purchased the gift

13  cheques, they were responsible to keep a log to identify who

14  received those gift cheques so that the log could be

15  submitted to HR so that they would be taxed on those gift

16  cheques.

17  Q.   Now, in 2006 -- strike that.  What was the purpose of

18  keeping those records?

19  A.   For tax purposes.

20  Q.   Now, in 2006 did Becton Dickinson have some type of

21  internal report line or procedure for making reports about

22  conduct in the company?

23  A.   Yes.

24  Q.   And in 2006, did you receive an anonymous tip about --

25          MS. RUBAIN:  Objection.

1          THE COURT:  Well, let me hear the rest of the

2    question.

3    BY MR. CHUT:

4    Q.   Did you receive an anonymous tip in regard to --

5          THE COURT:  Well, on second thought, let me see

6    counsel up here at the bench.

7          (Bench conference as follows:)

8          THE COURT:  Anonymous tip in regard to what?

9          MR. CHUT:  His answer would be, Your Honor,

10   anonymous tip in regard to use of AmEx gift cheques by

11   Ms. Perry, and then he began an investigation.  This would

12   be testimony analogous, for example, to a 9-1-1 call.

13   Not -- this is a preliminary matter not offered to prove the

14   truth of the matter asserted.

15         THE COURT:  Analogous to a 9-1-1 call?

16         MR. CHUT:  Just as a preliminary matter that

17   starts an investigation.  For example, when somebody -- when

18   the police get a call that says there's a robbery in

19   progress, and they go and -- it's not offered for the truth

20   of the matter asserted, Your Honor.  It's just a matter to

21   explain why he began the investigation of Ms. Snipes.

22         THE COURT:  You know, here it seems to me to let

23   the caller go into an unauthorized use we're going more or

24   less well beyond what's permitted under the confrontation

25   cases that -- Crawford and the others.  He can say he

1    received an anonymous call, and, as a result of that call, I

2    began an investigation, but that's the extent of it I will

3    permit.

4              MR. CHUT:  Yes, Your Honor.

5              (Bench conference concluded.)

6              THE COURT:  I'll sustain as to the form of the

7    question.  You may continue, Mr. Chut.

8    BY MR. CHUT:

9    Q.   Mr. Chice, did you begin in 2006 an investigation of

10   AmEx Gift Cheque use at the RTP facility?

11   A.   Yes.

12   Q.   And was that in response to a --

13             MS. RUBAIN:  Objection.

14             THE COURT:  Overruled.

15   BY MR. CHUT:

16   Q.   Was that in response to an anonymous tip?

17   A.   Yes.

18   Q.   And what investigation did you conduct?

19   A.   We started to --

20             THE COURT:  Hold on just a second.  Ladies and

21   gentlemen, you should not concern yourselves with the

22   content of the anonymous tip.  That testimony is offered

23   solely by way of explanation as to why Ms. Perry -- excuse

24   me -- why Mr. Chice began his investigation.  You may

25   continue.

1          THE WITNESS:  Back in 2007, I started to look into

2    the records of Ms. Perry and her global ID, which is an

3    ID -- her ID in SAP.  And that's where we looked at all of

4    the purchase requisitions that she had entered into SAP from

5    2004, 2005, and 2006 to identify how much gift cheques she

6    had purchased through American Express during that time

7    span.

8    BY MR. CHUT:

9    Q.    Did you also look at the year 2003?

10   A.    Yes, sorry.

11   Q.    And was Ms. Perry employed during that time period by

12   BD?

13   A.    She was employed by BD Technologies, which is the

14   other -- which is the research and development piece of BDT.

15   Q.    And where was she working from 2003 to '06?

16   A.    She was working in Research Triangle Park.

17   Q.    And you mentioned an SAP ID.  Explain that a little

18   further.

19   A.    It's a global ID that each individual has -- it's

20   actually a 9-digit number.  Instead of using my name, my

21   first name and last name, to get into the system, it's a

22   9-digit number that you enter in as a user ID.  So that's

23   how we would access the system along with a password.

24   Q.    And what did you find when you used the ID -- SAP ID in

25   the program?  What did you find?

1    A.   Well, what I had found was that there was purchase

2    requisitions made out to American Express for close to

3    200,000 -- $200,000 worth of gift cheques.

4    Q.   And over what time period?

5    A.   From 2003 to 2006.

6    Q.   And what was your response to that finding?

7    A.   Based on the amount of gift cheques purchased for that

8    one location for the number of employees at that location,

9    that was just way too much for 200 associates at that

10   location.

11   Q.   Was that amount linked to Ms. Perry's ID in SAP?

12   A.   Yes, it was.

13   Q.   And how did that amount of -- that amount compare to

14   what you would normally expect to see for gift --

15            MS. RUBAIN:   Objection.

16            THE COURT:   Ladies and gentlemen of the jury, I'm

17   going to ask you to step back to the jury room for just a

18   moment if you don't mind.

19            (At 11:50 a.m., jurors excused.)

20            THE COURT:   Mr. Chut, at this point in time, I may

21   not have fully understood what Mr. Chice testified to, but

22   you asked him about his understanding of what he expected as

23   far as the facility, that is, about $10,000 a year in gift

24   cheque awards for the spot awards.   His explanation for

25   that:   My responsibilities within the IT function were

1    operating expenses of 120 million and 15 to 20 million in

2    capital expense.  So about $10,000 in gift cheques for

3    on-the-spot awards sounds about right.

4              I don't, quite candidly, see any relationship

5    between what his authority is and how he would know what

6    would be about right for this particular facility.  So I

7    don't see that there's been a sufficient foundation laid at

8    this point for us to go back and forth as to what Mr. Chice

9    anticipated either based on the number of employees in

10   comparison to other facilities.  So if you want to try to

11   lay a foundation, I'm happy to do that.  But I don't see

12   that -- I don't quite understand his expertise in making

13   some estimate as to how much he would have anticipated.

14             MR. CHUT:  Well, Your Honor, I think he's already

15   testified that he was -- reviewed their budget; and based on

16   his financial review of the program, he expected $10,000 in

17   gift cheque use annually.

18             THE COURT:  Why?

19             MR. CHUT:  Well, Your Honor, I can go back, Your

20   Honor, and develop that further.

21             THE COURT:  I mean, you know, the budget for my

22   office is X.  I don't do gift cheques, so what's anticipated

23   is zero.  But the fact that somebody has some familiarity

24   with an office that operates on a budget of X dollars

25   wouldn't know what to expect as far as gift cheques is

1   concerned.

2           MR. CHUT:  Well, I think, Your Honor, he testified

3   that in the annual budget about $10,000 was what they would

4   expect.

5           THE COURT:  What he said was, "So that probably

6   sounded right, about $10,000 in gift cheques."  I mean, I'll

7   give you a chance now, and I'll hear it outside the

8   presence, and we'll see where we are.

9           MR. CHUT:  Yes, Your Honor.

10  BY MR. CHUT:

11  Q.   Mr. Chice, what was your role in reviewing expenditures

12  at the RTP facility?

13  A.   My role was to review the operating expenses and the

14  capital budget.  But let me further explain the operating

15  expense budget.  This is a global IT organization which has

16  $120 million in operating expenses.  But for that specific

17  site, it was in the neighborhood of $30 million.  So that's

18  their spent.  Probably about another $5 million in capital

19  spent.  But for that specific location was $30 million.

20  Q.   Did you review the budget there annually?

21  A.   Yes.  Actually, it's reviewed annually as well as

22  quarterly for the quarterly forecast.

23  Q.   And did you carry out those reviews?

24  A.   Yes.

25  Q.   Did you -- as part of those reviews, did you review the

1    cost for the AmEx Gift Cheque Program?

2    A.    Yes.

3    Q.    And do you do that quarterly?

4    A.    We do that monthly because we do a detailed

5    departmental review.  And so it's not annually, it's not

6    quarterly, it's monthly.  We sit down with the department

7    managers to review their budgets and costs.

8    Q.    Based on that review, were you aware of what the normal

9    expenditures for gift cheques were?

10   A.    The annual expenditures for gift cheques?

11   Q.    Yes.

12   A.    For that location?

13   Q.    Yes.

14   A.    For that location, it was it was probably -- I'm not

15   sure specifically.  But for the size of that location,

16   $10,000 --

17          THE COURT:  Hold on just a second.  You're not

18   sure specifically.  You've been reviewing the budgets, and

19   you're not sure specifically.  So why is it that you

20   consider $10,000 to be normal?

21          THE WITNESS:  The reason why I think it's the norm

22   is because these are on-the-spot awards, and they're not

23   given to the associates on a regular basis.  So these are

24   above --

25          THE COURT:  So let's take it piece by piece.

1   They're not given to associates on a regular basis.  How

2   often are they given?

3           THE WITNESS:  It's -- well, there's a process that

4   individuals go through, and someone would nominate an

5   associate for this on-the-spot award.  So once the

6   nomination comes forth, the supervisor would either approve

7   or deny that on-the-spot award.  So for this location for

8   that magnitude of $200,000 of gift cheques, it was just

9   above and beyond for that location.

10          THE COURT:  In comparison to what, though?

11          THE WITNESS:  In comparison to the whole IT

12  budget.  I mean, it's above and beyond on-the-spot awards.

13  So someone would not regularly get an on-the-spot award

14  because they're dealing with -- that is part of their

15  responsibility of doing -- you know, whether it's admin work

16  or whether it's doing accounting work.  So there's

17  different --

18          THE COURT:  Let me ask it this way.  I understand

19  that you as an accountant might look at a budget and say,

20  okay, payroll -- expenses for this facility are $30 million.

21  So in my mind, based upon reasonable accounting principles,

22  an incidental expense like a gift cheque award should be

23  $10,000.  I can understand that analysis.

24          THE WITNESS:  Right.

25          THE COURT:  But as to what is normal, it would

1    seem that that's a function of what the managers -- how the

2    managers approach the program, how often they encourage

3    their employees to give either on-the-spot awards or other

4    awards.  Is that all correct?

5              THE WITNESS:  That's correct.

6              THE COURT:  So I'm struggling a little bit to

7    understand how it is you arrive at a $10,000 normal figure.

8    I don't hear you saying by comparison to other sections or

9    companies that I've worked for, this is what I've seen in

10   the past.  And I don't hear you saying that you were

11   familiar specifically with the way the managers and

12   supervisors were running the program within the company.  It

13   sounds to me like you're taking a number that you would have

14   anticipated based on this being an incidental expense.  But

15   whether this is normal or customary, I can't figure out what

16   the standard you're gauging that by is.

17             So having heard that lengthy prelude to the

18   question, what's the standard you're using to determine

19   what's normal?

20             THE WITNESS:  Just personal preference or personal

21   belief.

22             THE COURT:  Okay.  That's what it sounded like to

23   me.  Mr. Chut, in the absence of some standard, I think

24   re-visiting what is normal I think is -- I don't think

25   there's a foundation for that.  His belief and my belief

1   might be two different things there.  So I think saying

2   what's normal --

3           MR. CHUT:  Your Honor, if I might rephrase that is

4   what is an unusual expense based on his experience reviewing

5   the budget.  The purpose of the testimony is to make a

6   bridge to the account ordering the cheques from AmEx.  So

7   that's what -- that's the purpose of the testimony.

8           And I think he's showing based on his personal

9   knowledge of reviewing the budget, this was an unusually

10  large expense to him, and I think he'll have to explain

11  that.  It wasn't normal to find this huge requisition for a

12  particular associate.

13          I mean, it's larger than the entire anticipated

14  budget for that cost annually for the entire facility.  I

15  don't think that's -- he's testified he reviews the

16  facility's books so he's not -- he's certainly familiar with

17  the numbers.  He's certainly familiar with the process.  And

18  really the purpose is simply to say this is a very large

19  amount compared to the facility and, therefore, investigate

20  it further.

21          THE COURT:  Yes, ma'am?

22          MS. RUBAIN:  Your Honor, he reviewed the budget

23  each month, and we're talking now about what conclusions he

24  reached back in 2007 some one year after Ms. Perry separated

25  and going back four years.  And so I don't think he can make

1  that leap to what's unusual.  He had these numbers every

2  month from 2003 until 2006, and nothing unusual was --

3  nothing unusual -- there was nothing unusual about them at

4  that time.  He can testify as to what he reviewed and what

5  he did, but he can't make a conclusion about what was

6  unusual.

7          THE COURT:  I think what's normal, usual, and

8  unusual is -- I think that's a matter of Mr. Chice's

9  opinion.  And I understand the way he has arrived at that

10 opinion, but it is just his personal opinion and not based

11 on any facts relevant to this case.

12         I think -- I don't know why it's necessary to even

13 establish a foundation.  He got the records.  He saw

14 $200,000 in expenses, and he ordered further -- conducted

15 further investigation.  So I'm not going to -- I'm not going

16 to permit this further comparison --

17         MR. CHUT:  Yes, Your Honor.

18         THE COURT:  -- of normal, usual, and unusual.

19 Mr. Chice is not qualified as an expert -- not been

20 qualified as an expert.  I understand there's some room for

21 lay opinion testimony, but at this point I think Mr. Chice

22 is a fact witness, and he can testify to what he did as to

23 each step, and we'll deal with his conclusions or opinions

24 as they come along.

25         Mr. Caple, you may bring the jury back in.

1              (At 12:01 p.m., jurors arrive.)

2              THE COURT:  The objection is sustained.  Mr. Chut,

3    you may continue.

4    BY MR. CHUT:

5    Q.    After reviewing the SAP system, what was your next step

6    in the investigation?

7    A.    We contacted American Express for copies of the gift

8    cheques.

9    Q.    And did you receive copies of the gift cheques?

10   A.    We received several copies of gift cheques.

11   Q.    When you say "several," what do you mean by that?

12   A.    Hundreds of thousands.

13   Q.    Hundreds of thousands in amounts?

14   A.    Hundreds of thousands of copies of gift cheques.

15   Q.    And did you also receive copies of invoices?

16   A.    Yes.

17   Q.    And did you also receive copies of orders?

18   A.    Yes.

19   Q.    And as the cheques -- who were these cheques -- strike

20   that.  Were there authorized or counter-signatures on these

21   cheques?

22   A.    There were -- yes, there were signatures on the

23   cheques.

24   Q.    And whose signature were they?

25   A.    Robin Snipes Perry.

1   Q.   As to the invoices, whose name are the invoices in?

2   A.   The invoices were made out to BD, but Robin Snipes

3   Perry was the requisitioner.

4   Q.   And whose name appeared on the order forms that you

5   received?

6   A.   Robin Snipes Perry.

7   Q.   I'm going to approach with what's been marked as

8   Exhibit No. 8.  Ask that you'll take a look at this.

9              MR. CHUT:  If I may approach the witness, Your

10  Honor?

11             THE COURT:  You may.

12  BY MR. CHUT:

13  Q.   I'll ask you to take a quick look at that exhibit.  Are

14  you familiar with that exhibit?

15  A.   Yes, I am.

16  Q.   And what is that exhibit?

17  A.   These are copies of gift cheques from American Express

18  in various nominations.  The majority of them were made out

19  to cash signed by Robin Snipes Perry.

20  Q.   And what time period does that exhibit cover?

21  A.   Between 2003 through 2006.

22  Q.   And approximately how many cheques are there?

23  A.   How many cheques?

24  Q.   Approximately.

25  A.   Hundreds of thousands.

Q.    Hundreds of thousands.

        MR. CHUT:  If I may approach with Exhibit No. 7,

Your Honor.

        THE COURT:  You may.

BY MR. CHUT:

Q.    I believe this is marked Exhibit No. 7.  Do you

recognize Exhibit No. 7?

A.    Yes, these are invoices from American Express.  Robin

Snipes is listed as the requisitioner with the company's

purchase order number on it.  So this -- these invoices

indicate --

        MS. RUBAIN:  Objection.

        THE COURT:  Well, let me see counsel at the side.

        (Bench conference as follows:)

        THE COURT:  Basis?

        MS. RUBAIN:  He's testifying as to what's

contained on the document, and they haven't been admitted

yet.  I've been giving Mr. Chut a little bit of latitude in

leading him.  They're going to come in through Mr. Daniel.

He can testify that he recognizes what they are, and they're

a fair and accurate representation of what he received from

American Express in response to his request.

        MR. CHUT:  That's fine, Your Honor.  That's the

intention.

        MS. RUBAIN:  It's coming in in a different way,

 1   and it's not admitted into evidence yet.

 2          THE COURT:  I think -- the way I like to go at it

 3   is get them identified first so I can make sure there's no

 4   authentication issues, and then they can start substantively

 5   talking about it.

 6          MR. CHUT:  And, Your Honor, my intention is he's

 7   going to identify them and then go sit, and Mr. Daniel will

 8   come up and identify them as business records and go through

 9   that.

10          THE COURT:  I'll sustain it at this time.

11          (Bench conference concluded.)

12          THE COURT:  I'll sustain the objection as to -- at

13   this time as to what the invoices indicate.  You may

14   continue, Mr. Chut.

15   BY MR. CHUT:

16   Q.   What was the source of -- do you recognize -- strike

17   that.  What was the source of those invoices?

18   A.   The source, meaning?

19   Q.   Who did you get them from?

20   A.   I got these invoices from American Express.

21   Q.   And do you recognize Exhibit 7 as the invoices from

22   American Express?

23   A.   Yes.

24          MR. CHUT:  If I may approach with Exhibits 2

25   through 6?

1          THE COURT:  You may.

2    BY MR. CHUT:

3    Q.   And I'll ask you to look at Exhibits 2 through 6.  Are

4    you familiar with Exhibits 2 through 6?

5    A.   Yes, these are --

6          MS. RUBAIN:  Objection as to what they are.

7          THE COURT:  Well, overruled.  If he can identify

8    them, he may.

9          THE WITNESS:  These are gift cheques.  It's an

10   order form to American Express signed by Robin Snipes.

11   BY MR. CHUT:

12   Q.   And did you -- where did you receive those order forms

13   from?

14   A.   From American Express.

15   Q.   And as to Exhibits 2 through 6, 7, and 8, where were

16   all those exhibits received from?

17   A.   From American Express.

18   Q.   And was that in response to your request?

19   A.   Correct.

20         MR. CHUT:  At this point, Your Honor, we would

21   have Mr. Chice step down subject to re-call.

22         THE COURT:  All right.  Ms. Rubain, any

23   cross-examination at this time?

24         MS. RUBAIN:  No, Your Honor, I'll reserve.

25         THE COURT:  I will permit the defendant to reserve

1    any cross-examination until Mr. Chice has completed his

2    testimony.

3              Mr. Chice, if you'll step down at this time, the

4    Government's going to call another witness, and then you'll

5    be re-called.

6              (At 12:08 p.m., witness excused.)

7              THE COURT:  Mr. Chut, you may call your next

8    witness.

9              MR. CHUT:  The United States would call Barron

10   Daniel.

11             THE CLERK:  Please come forward and be sworn.  Do

12   you solemnly swear that all the testimony you're about to

13   give in the case now before the Court will be the truth, the

14   whole truth, and nothing but the truth so help you God?

15             MR. DANIEL:  I do.

16                      BARRON DANIEL,

17        Being first duly sworn at 12:09 p.m., testified under

18        oath as follows:

19               D I R E C T   E X A M I N A T I O N

20   BY MR. CHUT:

21   Q.   Mr. Daniel, if you'll please state your full name for

22   the Court.

23   A.   Barron Daniel.

24   Q.   And how are you employed, sir?

25   A.   I'm employed in the security division for American

1  Express.

2  Q.   And what is the nature of your duties?

3  A.   We investigate financial crimes against American

4  Express.  We represent the company in criminal and civil

5  presentations.  We represent and identify business records

6  and testify to what our investigative findings are.

7  Q.   And how long have you been so employed?

8  A.   Thirty-two years.

9  Q.   And in that -- in your position, are you familiar with

10 the operation of the American Express Gift Cheque Program?

11 A.   Yes, sir, I am.

12 Q.   And what is the nature and purpose of that program?

13 A.   The gift cheque program was initially assigned as a

14 retail product to sell during seasonal programs, to provide

15 people with a method to give gifts.  Rather than cash or

16 cards, they designed the gift cheque to give to individuals.

17 Then they recognized the marketing potential for it in an

18 incentive program to solicit businesses to use the same

19 product to award employees.  And it was -- you know, the

20 corporate gift cheque program was established.

21 Q.   What's the nature of a gift cheque itself?

22 A.   It's similar, but it was designed as a different color

23 than the American Express travelers cheque.  It's designed

24 to be accepted as cash.  When it's presented to a recipient,

25 the individual is responsible for endorsing the cheque in

1    the upper left hand corner.  And then when they negotiate

2    the cheque, when they present it to a merchant or where

3    ever, they're supposed to make the cheque payable to that

4    individual, merchant, or business.  And then they're

5    supposed to countersign the cheque on the lower left-hand

6    side of the of the gift cheque, and the acceptor is only

7    required to watch and compare those two signatures and see

8    that they, in fact, correspond in order to be guaranteed

9    payment on the gift cheque.

10   Q.   And once it's signed and countersigned, is it the

11   equivalent of cash?

12   A.   Yes, sir, it is.

13   Q.   Can the cheque be made out to cash?

14   A.   It can, yes, sir.

15   Q.   And in general, you mentioned it's a corporate program.

16   Are corporations a normal customer for the program?

17   A.   Would you ask me that again?

18   Q.   You described it that corporations use it as a reward

19   program.

20   A.   Yes, sir.

21   Q.   Is it basically a corporate program?

22   A.   No, it's -- it is a corporate program, but small

23   businesses do it as well.  They have different levels of --

24   for the gift cheque program, and the corporate gift cheque

25   program is one of them.  It's for larger industries that, in

1    fact, use higher volumes of the gift cheque to distribute to

2    their employees.

3    Q.    And was -- in the years 2003 through 2006, was Becton

4    Dickinson a corporate client of American Express?

5    A.    Yes, they were.

6    Q.    And were they a corporate client of the American

7    Express Gift Cheque Program?

8    A.    Yes, they were.

9    Q.    And is there a procedure in the American Express Gift

10   Cheque Program for ordering cheques -- for a client to order

11   cheques?

12   A.    Yes, sir.  We have an actual order form that's supposed

13   to be completed by the client.  It's supposed to be

14   completed by an authorized person with that client who is

15   authorized to place the order.  And when they place it with

16   American Express if it's an authorized request, we fill the

17   order.

18   Q.    And how is the order fulfilled?

19   A.    It has a form that has to be completed designating what

20   types of gift cheques they wish to purchase, the different

21   denominations that they wish to purchase.  They're available

22   in 10s, 20s, 50s, and 100s.  You can order any amount of

23   each of the denominations.  They complete the order form.

24   They designate how the order is to be delivered.  Then an

25   authorized signer has to sign the order, and it has to be an

1    authorized signer that's recognized by American Express to

2    do so.

3    Q.   And how did the ordered gift cheques get to the

4    customer?

5    A.   They're special delivery, overnight delivery, next day

6    delivery.  They're couriered by different courier services.

7    During this time, it was everyone.

8    Q.   And where in the United States does AmEx run the gift

9    cheque program?

10   A.   The actual program is administered in Salt Lake City,

11   Utah.  The distribution of the gift cheques come out of a

12   service center in Piscataway, New Jersey.  So the order is

13   filled in Salt Lake City, and then the distribution comes

14   out of Piscataway to the recipient.

15   Q.   Now, how are the gift cheques paid for?  Is there a

16   procedure for the company paying for the gift cheques?

17   A.   Yes, sir.  Once the gift cheque order is received and

18   acknowledged by the vendor, in this instance, BD

19   Technologies, an invoice accompanies that delivery, and

20   they're supposed to pay on demand from American Express.

21   Q.   Is an invoice generated for each order?

22   A.   Yes, sir.

23   Q.   Would an invoice be generated without an order being

24   sent?

25   A.   No, sir, it would not.

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 119 of 280

1    Q.    And the invoice accompanies a delivery of the cheques?

2    A.    Yes, it does.

3    Q.    Now, once the cheques are used, is there a process by

4    which AmEx keeps a copy or receives a copy of the cheques?

5    A.    Yes, sir, there is.

6    Q.    And what is that?

7    A.    They're imaged electronically, and they're maintained

8    for 36 months.  The purpose for that is inventory and

9    control.  A recipient receives a gift cheque with a specific

10   serial number on it.  Once it's paid, if another gift cheque

11   came in with the same serial number, we would know we have

12   an issue with a forgery or counterfeit problem.  Those

13   cheques are uniquely numbered and preserved for 36 months.

14   Q.    Is every cheque that's used preserved by AmEx?

15   A.    Would you ask me that again.

16   Q.    Is every cheque that's used preserved by AmEx?

17   A.    Yes, sir.

18   Q.    So for each cheque, that's signed or used or -- an

19   image is created?

20   A.    Yes, sir.

21   Q.    And that's in the ordinary course of AmEx's business?

22   A.    It is.

23   Q.    And does AmEx keep copies of the orders?

24   A.    Yes, they do.

25   Q.    And tell us about that.

A.   Again, the order form is imaged when it's received, and

it's maintained for 36 months as are the travelers cheques,

and it's, you know, a permanent record of American Express

for 36 revolving months from the date it's received.

Q.   Now, you say it's imaged.  Is a certain portion of the

order form imaged?

A.   Yes, just the front of the order form is imaged; the

back is general contract information that's repetitive

information.

Q.   And when is the image of the order form made?

A.   Well, when it's received, it would be -- it would be

received by the corporate gift cheque program recipient.  It

would be maintained there, and then it would be sent to an

imaging process system that might be days, I wouldn't think

anymore than 7 to 10 days, before it would be imaged.

Q.   So it's close to the date of the order?

A.   Yes, sir.

Q.   How about invoices, are copies kept by AmEx of

invoices?

A.   Yes, sir.

Q.   And tell us about that.

A.   It's the exact same similar process.  Invoices are --

they're generated, the invoice itself, when the shipment is

manufactured at the delivery unit distribution center in

Piscataway, New Jersey.  It's put into our computer system,

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   and it's maintained from there.  And the actual individual

2   image is done when the shipment is acknowledged as being

3   received, in this instance, by BD Technologies.  When they

4   acknowledge that they've received it, it would be imaged

5   under their account number so that we could keep a track of

6   the actual invoice.

7   Q.    And you've testified that -- let me back up a second.

8   Did AmEx cooperate providing documentation to BD as part of

9   its investigation of gift cheque use as part of the BD

10  facility?

11  A.    Yes it, did.

12  Q.    And were order forms provided to BD?

13  A.    Yes, they were.

14  Q.    How about invoices?

15  A.    Yes, they were.

16  Q.    How about copies of cheques?

17  A.    Yes, they were.

18  Q.    Now, you've testified that there is a standard form

19  order form, is that correct?

20  A.    That's correct.

21          MR. CHUT:  And if I may approach with Exhibit

22  No.-- marked Exhibit No. 1.  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. CHUT:

25  Q.   Mr. Daniel, I'm going to show you what's marked Exhibit

1    No. 1.  Let me see if you recognize that exhibit.

2    A.    Yes, sir.

3    Q.    And what is that exhibit, sir?

4    A.    This is an American Express Gift Cheque corporate order

5    form.

6    Q.    And is that the same form as was used in 2003 to 2006?

7    A.    Yes, it is.

8    Q.    And is that the form that's used basically for all

9    these orders?

10   A.    Yes, it is.

11          MR. CHUT:  And I'll move to introduce Exhibit

12   No. 1, Your Honor?

13          THE COURT:  Any objection to Government's

14   Exhibit No. 1?

15          MS. RUBAIN:  No, Your Honor.

16          THE COURT:  Government's Exhibit No. 1 is

17   admitted.

18          MR. CHUT:  If I may approach the witness and

19   retrieve the exhibit, Your Honor.

20          THE COURT:  You may.

21   BY MR. CHUT:

22   Q.   Mr. Daniel, if you'll take that out of the evidence

23   sleeve.  There's multiple pages to that exhibit.  Which is

24   the part that's actually imaged by American Express?

25   A.    Page No. 1, the face of the document.

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   Q.   And what do the remaining pages consist of?

2   A.   The back identifies the generic information.  It

3   describes the importance of recordkeeping, the signing of

4   the cheques.  As I explained, when they're given to an

5   employee, they're supposed to be endorsed by the recipient.

6   It tells you how to use it.  It gives you communication

7   deadlines.  It talks about the liability of -- and

8   responsibility for storing the cheques.  It talks about the

9   gift cheque -- the American Express corporate gift cheque

10  agreement.  And it ends with "The agreement shall be

11  governed in accordance with the laws of the state of New

12  York," which is where we're incorporated.

13  Q.   And is that basically boiler plate provisions?

14  A.   Yes, sir, it is.

15              MR. CHUT:  If I may approach the witness, Your

16  Honor?

17              THE COURT:  You may.

18  BY MR. CHUT:

19  Q.   Mr. Daniel, this is going to appear on the screen next

20  to you, if I can have this work properly.  Drawing your

21  attention to the top of the form, there's a place that I

22  have a little sticky going to that says "company name."

23  What information is filled out there?

24  A.   That would be BD Technologies, which is the name of the

25  corporate gift cheque program client.

1   Q.    And what information would be placed into the portions

2   marked Exhibit 2-A where the next arrow points to?

3   A.    It's the destination where the cheques would be

4   delivered.  It includes a street address, the name of the

5   recipient, the company name.

6   Q.    And moving down to 3-A, what would be in that portion?

7   A.    That's the denomination area for where you're ordering

8   the gift cheques.  It shows the face value of each order.

9   If you were to order 25s, 10s, it would be $250 -- like 25s,

10  50s, and 100s.  It gives you the subtotal of the total

11  order.  And then there's -- under 3-B, is an individual

12  cheque item charge of $3.  For instance, if they was to

13  order 100 cheques, it would be a $300 additional cost for

14  the products, and it goes on down, gives the processing

15  fees.

16  Q.    And is there a place here -- in the processing fees, is

17  that also the delivery instructions?

18  A.    Yes, sir.

19  Q.    Is that where the customer indicates how the cheques

20  will be delivered?

21  A.    Yes, sir, it does.

22  Q.    And what are the options that the orderer has?

23  A.    You can do certified mail -- I can't see it, but you

24  can do certified mail overnight through mail delivery, or

25  you can use special delivery through a courier service.

Case 1:10-cr-00032-WO  Document 52  Filed 09/01/11  Page 125 of 280

1    Q.    And does that tell AmEx how to send the cheques?

2    A.    Yes, sir, it does.

3    Q.    And does AmEx follow up those instructions --

4    A.    Yes, we do.

5    Q.    And does filling in of that section cause AmEx to send

6    the cheques?

7    A.    That's correct.

8    Q.    Now, drawing your attention to the top arrow that's

9    marked 1-C that there's a signature blank there.  What is

10   that signature blank for?

11   A.    That's to be the signature of the authorized party

12   that's ordering the cheques.

13   Q.    And what is the import of that signature?

14   A.    If the order is received and it's not a recognized

15   authorized signature for that particular corporate gift

16   cheque program, they would contact the client to see if, in

17   fact, there was an error, if there this was -- whatever the

18   situation might have been to rectify those.  They would not

19   deliver the order if it was not signed by an authorized

20   party.

21   Q.    Why is it important that an authorized signature appear

22   there?

23   A.    For American Express to be paid, we would be negligent

24   in our duties if we just sent corporate gift cheques or gift

25   cheques, period, to anyone who wasn't authorized to receive

1   them.

2   Q.   What does that signature represent when it's filled out

3   to AmEx?

4   A.   It represents to us that the party ordering the cheques

5   is authorized by the client, BD Technologies in this

6   instance, to order the cheques.

7   Q.   And order them in the amount that's being ordered?

8   A.   And order in the amount that's been placed, yes.

9   Q.   And is there a notation there about whether the order

10  would be processed or not without a signature?  I'd draw

11  your attention back to the exhibit.

12  A.   Yes, sir, there is.

13  Q.   And what does it say?

14  A.   It says, "If signed, I understand I am binding my

15  company to the agreement on page 2," which is the page on

16  the back.

17  Q.   And what does the next line say?

18  A.   "Order will not be processed without authorized

19  signature."

20  Q.   Now, Mr. Daniel, drawing your attention to Exhibits 2

21  through 6, which are in front of you.

22          MR. CHUT:  If I may approach, Your Honor, just to

23  facilitate him in locating those, Your Honor?

24          THE COURT:  You may.

25  BY MR. CHUT:

1  Q.   And you testified these are documents that were

2  provided to BD.  What type of documents are Exhibits 2

3  through 6?

4  A.   These are all corporate gift cheque order forms.

5  Q.   And are they the same -- the first page of the same

6  form that you've just testified about?

7  A.   Yes, sir, that's correct.

8  Q.   And are these for a particular company?

9  A.   They're for BD Technologies, yes, sir.

10  Q.   And do these bear an authorized signature?

11  A.   Yes, they do.

12  Q.   And what signature is that?

13  A.   That is Angela Snipes -- Snipes, and it -- Robin

14  Snipes, Robin Snipes, Robin Snipes.

15  Q.   And were those documents retrieved from AmEx records?

16  A.   Yes, they were.

17  Q.   And were these documents imaged and maintained by AmEx

18  in the manner you've already described?

19  A.   Yes, sir, they were.

20  Q.   And were they maintained in the ordinary course of

21  AmEx's business?

22  A.   Yes, they are.

23  Q.   And were they imaged and retained at a time close to

24  the actual order?

25  A.   Yes, they were.

1   Q.   And is it fair to say they were kept just like any

2   other AmEx order -- gift cheque order form would've been

3   kept?

4   A.   That's correct, yes, sir.

5             MR. CHUT:  I move to introduce 2 through 6, Your

6   Honor.

7             THE COURT:  Any objection?

8             MS. RUBAIN:  No objection.

9             THE COURT:  Government's Exhibit No. 2, 3, 4, 5,

10  and 6 are admitted.

11            MR. CHUT:  If I may approach one more time, Your

12  Honor?

13            THE COURT:  You may.

14  BY MR. CHUT:

15  Q.   Let me draw your attention to Exhibit No. 7, which I

16  believe is up here, too.  If you'll take a look at these.

17  And do you recognize Exhibit No. 7, Mr. Daniel?

18  A.   Yes, sir, I do.

19  Q.   And what's Exhibit No. 7?

20  A.   These are American Express invoices to BD Technology

21  for individual cheque orders.

22  Q.   And is there a particular name that these invoices are

23  directed to?

24  A.   Robin Snipes.

25  Q.   And were these documents retrieved from AmEx records?

1   A.   Yes, sir, they were.

2   Q.   Were these documents recorded and maintained in the

3   manner you've already testified to?

4   A.   Yes, sir, they were.

5   Q.   And were they -- were they retained in the ordinary

6   course of AmEx's business?

7   A.   Yes, they are.

8   Q.   And were they imaged at a time close to the actual

9   ordering invoice?

10  A.   Yes, they were.

11  Q.   And were they provided to Becton Dickinson?

12  A.   Were they?

13  Q.   Provided to BD.

14  A.   Yes, sir.

15           MR. CHUT:  Move to introduce No. 7, Your Honor.

16           THE COURT:  Any objection?

17           MS. RUBAIN:  No objection.

18           THE COURT:  Government's Exhibit No. 7 is

19  admitted.

20  BY MR. CHUT:

21  Q.   And if I could just ask, Mr. Daniel, if you'll take a

22  look at those three expandable folders in front of you.

23  A.   Okay.

24  Q.   And do you recognize what's in those folders?

25  A.   Yes, I do.

1    Q.    And what are they?

2    A.    They're copies of American Express Gift Cheques.

3    Q.    Now, you've testified that American Express creates an

4    image of the gift cheques; is that correct, sir?

5    A.    That's correct.

6    Q.    On the image that's created by American Express, does

7    American Express add any further information to the record?

8    A.    Yes, sir, they do.

9    Q.    And what is that?

10   A.    It's the tracking information to show when it was

11   received by American Express through the Federal Reserve for

12   payment.

13   Q.    And is that added to the image of every cheque that's

14   imaged by AmEx?

15   A.    It should be, yes.

16   Q.    And the presence of that information, does that

17   indicate that this is an official AmEx record?

18   A.    That's correct, it does.

19   Q.    And does that information appear on the cheques in

20   Exhibit No. 8?

21   A.    Yes, sir, it does.

22   Q.    And were these cheques imaged pursuant to the procedure

23   you've already testified to?

24   A.    Yes, sir, they were.

25   Q.    And were they imaged in the ordinary course of AmEx's

1   business?

2   A.    Yes, they are.

3   Q.    And were they imaged at a time contemporaneous to AmEx

4   receiving them back?

5   A.    That's correct, yes, sir.

6   Q.    And approximately what time period do those cheques

7   cover?

8   A.    These were September of '05.  I'm sorry, I can't read

9   the dates.  '04, excuse me, November of '04.  I think these

10  are also August '04.  It looks like '04 and '05.

11  Q.    Are there also cheques for late 2003?

12  A.    Yes, sir.

13  Q.    And how about early 2006?

14  A.    Yes, sir.

15  Q.    And were these cheques provided to BD at their request?

16  A.    Yes, sir, they were.

17          MR. CHUT:  And move to introduce No. 8, Your

18  Honor.

19          THE COURT:  Any objection to Government's

20  Exhibit No. 8?

21          MS. RUBAIN:  No, Your Honor.

22          THE COURT:  Government's Exhibit 8, which consists

23  of three accordion files, are admitted.

24  BY MR. CHUT:

25  Q.    Now, if I can draw your attention -- if I may approach

1    the witness?

2              THE COURT:  You may.

3    BY MR. CHUT:

4    Q.   Actually, I don't need to.  If I can draw your

5    attention to your screen next to you, Mr. Daniel.  This is

6    marked Exhibit 8-A as part of 8.  What does that portray?

7    A.   It's a $100 denomination American Express Gift Cheque

8    dated 1/30/06.  It's endorsed with the name Robin Snipes.

9    Q.   And is this the form of the American Express Gift

10   Cheque that you testified to?

11   A.   Yes, sir, it is.

12   Q.   And does this cheque bear a unique tracking number?

13   A.   Yes, sir, it does.  It was received by American Express

14   on February the 1st, 2006, and it was paid at that time for

15   $100.

16   Q.   And are these like regular checks in that they bear a

17   check number?

18   A.   Yes, sir, they are.

19   Q.   And where does the check number appear on this exhibit?

20   A.   RG936 -- you need to reduce it again, that's too

21   blurry -- it looks like 080.  It's obliterated on the screen

22   here.

23   Q.   And does that --

24   A.   But I can read it -- RG360605574.  It's in the tracking

25   line at the bottom of the cheque.

1   Q.   And where would be the signature of the person that's

2   using the cheque.

3   A.   It's in the upper left-hand corner and then again in

4   the lower left-hand countersignature line.

5   Q.   And which is the countersignature line?

6   A.   The one at the bottom, the bottom left-hand side of the

7   gift cheque.

8   Q.   Now, where is the portion of the cheque where it's paid

9   out to a maker or paid --

10  A.   The pay to the order line is in the center of the

11  cheque.  In this instance, it's cash.

12  Q.   Now, this particular image has a front and back, is

13  that correct?

14  A.   That's correct.

15  Q.   Do all the cheque images have front and back?

16  A.   Yes, sir.

17  Q.   Do some not have front and back?

18  A.   There might be an instance where one might be missed in

19  the imaging process, but they're both supposed to, both

20  sides, be imaged.

21  Q.   And this particular one has a back?

22  A.   Yes, sir.

23  Q.   And what information is reported on the back of the

24  cheque?

25  A.   It shows that it was for deposit only to the State

1   Employees Credit Union, it gives the teller number and the

2   teller location, and the date is 1/30/06.

3   Q.   I'm going to draw your attention again to your screen

4   and draw your attention to what's been marked as

5   Exhibit 7-B.  And what is Exhibit 7B?

6   A.   It's an invoice for payment to American Express for a

7   corporate gift cheque order shipped May 12, 2005.

8   Q.   And what is -- whose name -- is there a portion where

9   the name of who this was sent to appeared?

10  A.   Yes, it's directed to Robin Snipes, BD Technologies, 21

11  Davis Drive.

12  Q.   And does this invoice indicate the amount of the order?

13  A.   Yes, sir.  It's in the lower right-hand side of the

14  cheque.  The actual order is $7,810.

15  Q.   Does it indicate the denominations that were ordered?

16  A.   Yes, sir, it does.  It breaks out that there was 50s

17  and 100 denomination gift cheques ordered.

18  Q.   And when is this document sent to the client during the

19  course of AmEx business?

20  A.   It's sent in the normal course of business with the

21  invoice with the order of the cheques --

22  Q.   Would this invoice be sent without an order?

23  A.   No, sir, it would not.

24  Q.   And does a courier fee -- a delivery fee appear on this

25  particular document?

1  A.    Yes, sir.   It shows in this instance it was UPS, and it
2  was a $10 courier fee.
3  Q.    And does that record how the package of cheques was
4  sent?
5  A.    Yes, sir, it does.
6  Q.    And what is the date -- does the date appear on that
7  invoice?
8  A.    The date is May 12, 2005.
9  Q.    And what would be the relation of that date to the
10 actual shipment of cheques?
11 A.    It would be on or about the same date of the shipment.
12 Q.    Going to Exhibit 7-A.   What is this document?
13 A.    It's also an American Express invoice dated 4/22/'05.
14 The lines are obliterated a little bit.
15 Q.    And who is this invoice directed to?
16 A.    It's directed to Robin Snipes, BD Technologies, 21
17 Davis Drive, Research Triangle Park.
18 Q.    And what is the amount of this particular order?
19 A.    It's $6,510.
20 Q.    And is there a courier fee on this particular order?
21 A.    Yes, there's a delivery fee of $35 added to the order.
22 Q.    And is that the cost of shipping the cheques to the --
23 A.    Yes, sir, it is.
24 Q.    Going to Exhibit 7-C.   What is the -- what is this
25 document?

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 136 of 280

1    A.    This is an invoice that's been reported as "past due."

2    It's dated 8/20 of '05, and it's for a previous order for

3    $9,085 of the gift cheques, which included a $35 delivery

4    fee.

5    Q.    And who was this order directed to?

6    A.    Robin Snipes, BD Technologies, 21 Davis Drive.

7    Q.    And going to Exhibit 7-D.  What is this document?

8    A.    This is also an invoice for American Express Gift

9    Cheques in the amount of $9,085.

10   Q.    And who was this directed to?

11   A.    It's also directed to Robin Snipes of BD Technologies,

12   21 Davis Drive, Research Triangle Park.

13   Q.    And what is the date on that invoice?

14   A.    It could be 801 or 831.  The way the date is printed,

15   it's hard to distinguish.

16   Q.    And what -- is there a courier fee on this document?

17   A.    It is 831.  Yes, sir, there's a $35 delivery fee.

18   Q.    And going to 7-E.  What -- what kind of document is 7E?

19   A.    It's an invoice dated 12/2/05 for the delivery of gift

20   cheques.

21   Q.    And who is it directed to?

22   A.    It's directed to Robin Snipes, BD Technologies.

23   Q.    And what's the amount of this invoice?

24   A.    $9,865.

25   Q.    And does that include a delivery fee?

1   A.   Yes, sir it, does of $35.

2   Q.   And going to Exhibit 7-F.  What is 7F?

3   A.   It's an invoice dated 1/19 of '06 with a delivery of

4   gift cheques totaling $9,575.

5   Q.   And who is this -- what is the date on this document?

6   A.   January 19, 2006.

7   Q.   And who was this made out to?

8   A.   Robin Snipes, BD Technologies, 21 Davis Drive, Research

9   Triangle Park.

10  Q.   And is there a courier fee on this particular invoice?

11  A.   Yes, sir.  There's a courier fee of $10.

12  Q.   Now, drawing your attention to Exhibits 2 through 6

13  starting with Exhibit 2.  What is Exhibit No. 2?

14  A.   It's an American Express Corporate Gift Cheque order

15  form dated 4/20 of '05.

16  Q.   And who is it -- what is the information for the

17  company.

18  A.   It's BD Technologies, 21 Davis Drive, Research Triangle

19  Park.

20  Q.   And who is the -- is there a person indicated as --

21  under the company name?  Is there an individual named?

22  A.   Yes, sir, it's Robin Snipes.

23  Q.   And does that give an address also?

24  A.   Yes, sir, it does, and it provides an email address.

25  Q.   And what is the email address?

1   A.    It's rsnipes@bd.com.

2   Q.    And does this order form request a certain amount of

3   cheques?

4   A.    Yes, sir.  It's ordering $6,250 worth of American

5   Express Gift Cheques in denominations of 50s and 100s.

6   Q.    And is there also a cheque fee?

7   A.    Yes, sir.  There's an individual cheque fee for the 75

8   individual cheques of $3 each, which amounts to $225.

9   Q.    And are there instructions on how this order would have

10  been sent?

11  A.    It's supposed to be same-day processing.  If received

12  by 2:00 eastern time, it would be shipped the next day.

13  There's a $35 fee for that.

14  Q.    And is this order form signed?

15  A.    Yes, sir, it is.  It's signed in the upper signature

16  authorized signature area by Robin Snipes 4/20 of '05.

17  Q.    And is that the signature block you've previously

18  testified to and was the authorized signature?

19  A.    Yes, sir.  It says, "By signing, I understand that I'm

20  binding my company to the agreement" on page 2.  Under that,

21  "The order will not be processed without authorized

22  signature."

23  Q.    And what did that signature represent to American

24  Express?

25  A.    It represents that Robin Snipes is authorized by BD

1    Technologies to order these gift cheques.

2    Q.   And going to Exhibit No. 3 --

3              THE COURT:  Let's stop here, Mr. Chut, and we'll

4    take our lunch recess.  Ladies and gentlemen of the jury,

5    I'm going to excuse you until 2:00 for a lunch recess.  The

6    jury is excused until 2:00.

7              (At 12:42 p.m, break taken.)

8              (At 2:00 p.m., break concluded.)

9              MR. CHUT:  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.  Let's see.  Is

11   Mr. Daniel here?  He can come back up.

12             MR. CHUT:  May I approach the witness just

13   briefly, Your Honor?

14             THE COURT:  You may.  All right.  Mr. Caple, you

15   may bring the jury in.

16             (At 2:02 p.m., jurors arrive.)

17             THE COURT:  All right.  Mr. Chut, you may

18   continue.

19   BY MR. CHUT:

20   Q.   Drawing your attention, Mr. Daniel, to Exhibit No. 4 in

21   front of you.  It will also come up on your screen.  What is

22   Exhibit No. 4?

23   A.   It's also an American Express Corporate Gift Cheque

24   order form.

25   Q.   And whose name is that in?

1   A.    BD Technologies, Robin Snipes, 21 Davis Drive, Research

2   Triangle Park.

3   Q.    And what is the -- what is the amount of this order?

4   A.    It is $8,085.

5   Q.    And is there a direction as to how this should be

6   shipped?

7   A.    Yes, sir, there -- next day delivery.

8   Q.    And who -- does an authorized signature appear on this?

9   A.    Robin Snipes.

10  Q.    And going to Exhibit 5.  What is it Exhibit No. 5?

11  A.    This also is a corporate gift cheque order form.

12  Q.    And what's the date on --

13  A.    Dated 12/2 of '05.

14  Q.    And whose information appears in this?

15  A.    BD Technologies, Robin Snipes, 21 Davis Drive, Research

16  Triangle.

17  Q.    And what's the amount of this order?

18  A.    It is $9,865.

19  Q.    And is there a direction for how this should be

20  shipped?

21  A.    Yes, there is.  It's same-day processing, next-day

22  delivery, and there's a $35 delivery fee.

23  Q.    And is there an authorized signature --

24  A.    Yes, Robin Snipes.

25  Q.    And direct your attention to Exhibit No. 6.  What is

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  this?

2  A.   It's also a corporate gift cheque order form from BD

3  Technologies, Robin Snipes, Davis Drive, Research Triangle

4  Park.

5  Q.   And what is the amount of this order?

6  A.   It's $9,250.

7  Q.   And how many hundred dollars -- does this document

8  indicate the denominations of the cheques that were ordered?

9  A.   Yes, it's for 50's and $100 denomination cheques.  They

10  ordered twenty-five 50s and fifty $100 -- no eighty $100

11  gift cheques.

12  Q.   And is there a designation of how this was to be

13  shipped?

14  A.   Yes, same-day processing, next-day delivery.  There's a

15  $35 delivery fee.

16  Q.   And who signed the authorized signature on this one?

17  A.   Robin Snipes.  It's dated 11/19 of '06.

18  Q.   Now, if I may draw your attention to Exhibit 8-E which

19  is going to appear on the screen next to you, and I draw

20  your attention to the first two cheques on this page of

21  three.  Now, do you see the sequence information on those

22  you've testified to that AmEx provides on the cheques?

23  A.   Yes, sir, I do.

24  Q.   And is that below the actual image of the cheque?

25  A.   Yes, sir, it is.

1  Q.   And the two cheques that are blown up, who are they

2  made out to?

3  A.   They're endorsed by Robin Snipes, and they're made

4  payable to Research Triangle Park Federal Credit Union.

5  They're dated 12/9 of '03.

6  Q.   Is that the party that that cheque would then be paid

7  to?

8  A.   Yes, sir.

9  Q.   And what are the amounts of those cheques?

10 A.   They're each $100 denomination gift cheque.

11 Q.   Drawing your attention to Exhibit 8-F, which will

12 appear on your screen.  Is that another American Express

13 Gift Cheque?

14 A.   Yes, sir, it is.

15 Q.   And who is that made payable to?

16 A.   It's made payable to Nordstrom's Department Store.

17 Q.   And who -- where could that cheque then be used?

18 A.   It was payable to Nordstrom's.  I would assume it was

19 used there.

20 Q.   And who has signed and countersigned this cheque?

21 A.   It's endorsed and countersigned by Robin Snipes.

22 Q.   And if you'll go back to the whole page.  What are all

23 three of those cheques made out to?

24 A.   They're each made out to Nordstrom's.

25 Q.   Now, Mr. Daniel, if an American Express Gift Cheque was

1    used for a purchase that was less than the face amount of

2    the purchase -- say you spent out of a $100 cheque $50,

3    would the person writing the cheque receive change?

4    A.    Yes, they would.

5    Q.    Is that because the cheque is cash-equivalent,

6    basically?

7    A.    It is.  It's tendered just as cash.

8    Q.    Let me ask you one more -- let me draw your attention,

9    Mr. Daniel, to another cheque.  I'll draw your attention to

10   Exhibit 8-C.  It will come up on your screen.  You can blow

11   up the bottom cheque.  Looking at that cheque, can you tell

12   who that cheque is endorsed to?

13   A.    Yes, sir.  It's endorsed to Diva Nail Salon,

14   November 20, 2004.

15   Q.    And who has signed and countersigned that cheque?

16   A.    Robin Snipes.

17        MR. CHUT:  Thank you, Mr. Daniel.

18        THE COURT:  Cross-examination?

19        MS. RUBAIN:  Thank you, Your Honor.

20             C R O S S - E X A M I N A T I O N

21   BY MS. RUBAIN:

22   Q.   Mr. Daniel, in your capacity with the security division

23   for American Express, did you have occasion to review all

24   American Express Gift Cheques ordered by Becton Dickinson

25   from 2003 to 2006?

Case 1:10-cr-00032-WO  Document 52  Filed 09/01/11  Page 144 of 280

1   A.    No, ma'am.  I just reviewed these.

2   Q.    And by "these," you mean the cheques that have been

3   introduced as Government's Exhibit No. 8, correct?

4   A.    These here.  I don't know what number.

5   Q.    Yes, sir.

6   A.    Yes, it's the same.  Yes, ma'am.

7   Q.    So you don't know how many gift cheques total were

8   ordered by anyone at the RTP facility of Becton Dickinson

9   between 2003 and 2006?

10  A.    That's correct.

11  Q.    Now, with respect to the order forms for the cheques, I

12  believe you testified that your company maintains them for a

13  period of 36 months?

14  A.    That's correct.

15  Q.    Are they destroyed electronically after that period

16  expires?

17  A.    That's correct.

18  Q.    Now, with respect to Government's Exhibits 2 through 6,

19  those would be the order forms.  I believe you have those up

20  there with Ms. Perry's name on it?

21  A.    Right.

22  Q.    Are those the only order forms that American Express

23  retained with respect to orders made by Ms. Perry?

24  A.    I only know -- I do not know the answer to that

25  question.

1   Q.   Were you asked to gather documents for the Government

2   in preparation for this case?

3   A.   Yes, I was.

4   Q.   Were you asked to gather any and all documents that

5   relate back to order -- American Express cheques ordered by

6   Robin Perry?

7   A.   Yes, I was.

8   Q.   And the documents that are there up front with you,

9   which would be Government's Exhibit No. 8, Government's

10  Exhibit No. 7, and Government's Exhibits 2 through 6, are

11  the only documents that you produced?

12  A.   I didn't produce these documents.

13  Q.   And by "these," what are you referring to?

14  A.   These documents were produced by American Express.

15  Q.   And were those the invoices --

16  A.   Before -- I'm sorry.

17  Q.   And the invoices?

18  A.   Yes, also.

19  Q.   So you just produced the cheques, correct?  Did you

20  produce the cheques?

21  A.   No, they were produced and delivered to BD

22  Technologies.

23  Q.   Okay.  So you did not produce any documents to the

24  Government, correct?

25  A.   No, I did not.

1    Q.   And you did not produce any documents to Becton

2    Dickinson?

3    A.   That's correct.

4    Q.   But you've reviewed those documents up at the witness

5    stand, correct?

6    A.   And before this, yes.

7    Q.   So you're not aware of whether American Express

8    maintains any other American Express Gift Cheque order forms

9    going back to 2003 with Ms. Perry's name on it?

10   A.   I'm not -- I know that they're not available.  Whatever

11   records were retained by American Express are no longer

12   available.  They've been purged.

13   Q.   Okay.  So with respect to the cheques that you're

14   testifying to, and those would be the cheques contained in

15   Government's Exhibit No. 8, any cheques that relate to

16   periods of time where you don't have an order form up at the

17   witness stand with you, you don't know how those -- or who

18   ordered those cheques, correct?

19   A.   That's correct.

20   Q.   Okay.  And you don't know whether it was Ms. Perry or

21   any other employee of Becton Dickinson who ordered those

22   cheques?

23   A.   That's correct.

24   Q.   You just know that those cheques were delivered to

25   Becton Dickinson?

1    A.    That's correct.

2    Q.    And that you can read from the cheques that the

3    Government has introduced that were returned back to

4    American Express once they were negotiated?

5    A.    That's correct.

6    Q.    Now, if I may ask you --

7              MS. RUBAIN:  Your Honor, may I approach, please?

8              THE COURT:  You may.

9    BY MS. RUBAIN:

10   Q.    Mr. Daniel, I'm going to place what the Government has

11   previously introduced as Exhibit No. 2 on the screen.  I

12   hope you can see it up at your stand.

13   A.    Not yet.

14   Q.    Okay.  Mr. Daniel, hopefully you can see that document

15   now.

16   A.    I can, yes.

17   Q.    Now, I believe you gave some testimony about the

18   various -- about the information contained on this document,

19   correct?

20   A.    Correct.

21   Q.    And with respect to the information contained in

22   Section 1-A, again, that would be the individual who was

23   placing the order for the cheques, correct?

24   A.    Correct.

25   Q.    And that would also contain the address for the

1   individual who wished to receive the cheques from American

2   Express?

3   A.    That's correct.

4   Q.    Now, with respect to the information contained in Part

5   1-B, that would be the information related to the same

6   individual listed in 1-A as to what position they held at

7   the company, correct?

8   A.    Correct.

9   Q.    Now, I believe when you testified regarding the

10  signature contained in 1-C, it's your testimony that that

11  signature had to be an authorized person to order the

12  cheques, correct?

13  A.    Correct.

14  Q.    And that was an authorized person as far as American

15  Express was concerned, correct?

16  A.    It would be an authorized party that the company

17  designated, BD Technologies, to order these gift cheques

18  under the gift cheque program with American Express.

19  Q.    Now, when American Express received Government's

20  Exhibits 2 through 6 and placed the orders for the

21  denominations of gift cheques ordered, American Express

22  believed that Robin Snipes was an authorized person by BD to

23  order those gift cheques, correct?

24  A.    That's correct.

25  Q.    And had American Express not believed that Robin Snipes

1    was an authorized person, you would not have shipped those

2    gift cheques, correct?

3    A.   That's correct.

4    Q.   Now, did American Express keep a list of authorized

5    users for Becton Dickinson to your knowledge?

6    A.   Yes, ma'am.

7    Q.   Do you know today whether Robin Snipes or Robin Perry

8    was listed as an authorized person to order the gift cheques

9    for Becton Dickinson?

10   A.   Yes, she was.

11   Q.   And at any point between 2003 and 2006, was Ms. Snipes

12   removed as an individual to be an authorized person to

13   receive gift cheques?

14   A.   No, she was not.

15          MS. RUBAIN:  Your Honor, if I may approach the

16   witness, please.  First, if I may approach madam clerk to

17   have an exhibit marked.

18          THE COURT:  You may.

19          MS. RUBAIN:  If I may approach, Your Honor.

20   BY MS. RUBAIN:

21   Q.   Mr. Daniel, I'm approaching with what I marked for

22   identification as Defendant's Exhibit No. 1.  If you could

23   look at that, and tell the members of the jury whether you

24   recognize what that document is.

25   A.   It is American Express Corporate Gift Cheque order

1    form.

2    Q.    All right.  And how -- I am sorry, keep going, sir.

3    A.    It's from BD Technologies.

4    Q.    And how do you recognize that to be an American Express

5    Gift Cheque order form?

6    A.    Well, this is this -- appears to be a photocopy of our

7    order form, and it's dated 12/3.  It has the account number

8    on it.  It contains all the history and records that are on

9    file for BD Technologies.

10   Q.    Okay.  Does that appear to be a fair and accurate

11   representation of a gift cheque order form that would have

12   been submitted to Becton Dickinson -- I'm sorry -- that

13   would have been submitted to American Express to be honored

14   on behalf of Becton Dickinson?

15   A.    It does, yes.

16   Q.    Now, with respect to those gift cheque order forms, do

17   they also routinely contain a purchase order number?

18   A.    Yes.

19   Q.    And is there a purchase order number listed on what

20   I've marked for identification as Defense Exhibit No. 1?

21   A.    It's filled in, yes.

22   Q.    And would that have been a piece of information

23   supplied by the individual from Becton Dickinson to place on

24   the order form?

25   A.    Becton Dickinson would have supplied that, correct.

1  Q.   And, again, does this appear to be a fair and accurate

2  representation of --

3  A.   Yes, ma'am.

4  Q.   Thank you, sir.  Mr. Daniel, I'm going to approach you

5  again with an exhibit that I've marked as Defense Exhibit

6  No. 2 and ask you if you recognize what that document is.

7  A.   Yes, ma'am.  It's a BD Technology corporate gift cheque

8  order form.

9  Q.   And how do you recognize that document to be a BD

10 Technology American Express Corporate Gift Cheque order

11 form?

12 A.   It has their individual account information, their

13 address, and coordinator of the program, an authorized party

14 signer.

15 Q.   Does it also contain a purchase order number on there

16 as well?

17 A.   It has a number attached to it filled in, but it

18 doesn't identify it as a purchase order number.  But a

19 purchase order number wouldn't be required by American

20 Express to fulfill the order.  That would be something that

21 would be kept internally by BD Technologies.  We wouldn't

22 require a purchase order number.  We only require payment

23 upon delivery of gift cheques.

24 Q.   Why wouldn't American Express require a purchase order

25 number from Becton Dickinson?

1  A.    That's something that would be an internal process at

2  BD Technologies.  It's not something that would be in

3  association to an authorized party at BD Technologies

4  placing a gift cheque order with American Express.

5  Q.    Did American Express have -- I'm sorry.  Did Becton

6  Dickinson have a standing account with American Express?

7  A.    Yes, ma'am, it did.

8  Q.    Does Defense Exhibit No. 2 appear to be a fair and

9  accurate representation of an American Express Gift Cheque

10 order form?

11 A.    Yes, ma'am, it does.

12        MS. RUBAIN:  Your Honor, just for the expediency

13 sake, if I may just take the rest of my marked exhibits and

14 move them to Mr. Daniel, that might save the Court some

15 time.

16        THE COURT:  Is there any objection to this,

17 Mr. Chut?

18        MR. CHUT:  No, Your Honor, there's not.

19        THE COURT:  You may.

20 BY MS. RUBAIN:

21 Q.    Mr. Daniel, I'm going to approach and show you what

22 I've marked for identification as Defendant's Exhibits No. 3

23 through 7.  I'll just ask if you'll look at those and tell

24 me if you recognize what those documents are.

25 A.    Yes, ma'am.  They're corporate gift cheque order forms

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   for 2005 and '06.

2   Q.    Okay.  And how do you recognize those to be corporate

3   gift cheque order forms?

4   A.    For one, it has their account number affixed to each

5   item of authorized parties -- or recognized authorized

6   parties from BD Technologies, and it has BD Technologies'

7   address for delivery.

8   Q.    And do you recognize Defendant's Exhibits 3 and 7?

9   Would those be fair and accurate representations of

10  Corporate American Express Gift Cheque order forms?

11  A.    Yes, they are.

12  Q.    Thank you, sir.  Now, Mr. Daniel, could there be an

13  occasion where the person requesting the issuance of the

14  gift cheques may be different from the authorized user who

15  signs the order form?

16  A.    Well, in order for American Express to fulfill the

17  delivery of the items, it has to be an authorized party to

18  sign off on the order form.

19  Q.    So as long as American Express saw that an authorized

20  signer had signed the American Express Gift Cheque, it was

21  fine for American Express to actually ship the cheques to

22  another individual within Becton Dickinson?

23  A.    That's correct.  They identify that in the delivery

24  address area.

25  Q.    So there's nothing unusual if the gift cheque had a

1    different recipient versus the authorized signer?

2    A.    That's correct.

3    Q.    Now, on those forms that were submitted by Ms. Perry,

4    and I'm referring back to Government's Exhibits 2 through 6,

5    Ms. Perry always listed her name on the form and always

6    signed the form, correct?

7    A.    On each of those forms, she did, yes.

8    Q.    And she always included her address at Becton

9    Dickinson, correct?

10   A.    Correct.

11   Q.    And I believe on at least one of those forms, she

12   listed an email address as well, is that correct?

13   A.    That's correct.

14   Q.    And that was something that was required by American

15   Express to have accurate shipping information for where the

16   cheques were to be shipped, correct?

17   A.    That's correct.

18   Q.    Now, I believe you testified that when the American

19   Express Gift Cheques were shipped, they were also shipped

20   with an invoice, correct?

21   A.    Yes, it has an invoice and a trust receipt that

22   accompanies it that the recipient has to acknowledge that

23   they've received the gift cheques.

24   Q.    Could the invoice come at a later point?

25   A.    It could.

1    Q.    So it wouldn't be an uncommon thing for those to come

2    two to three days later?

3    A.    No, that's correct.

4    Q.    But the cheques always came with an accounting of the

5    cheque numbers that were contained in that particular order,

6    correct?

7    A.    That's correct.

8    Q.    Now, how were the invoices paid by Becton Dickinson?

9    A.    I would assume they were paid by cheque, but I do not

10   know how they were paid.

11   Q.    To your knowledge, were any of the invoices in

12   Government's Exhibit No. 7 not paid by Becton Dickinson?

13   A.    Yes, there was one or two that were posted past due.

14   Q.    Were they eventually paid?

15   A.    Yes.  I know the account was paid in good standing.

16   That's all I know.  I don't know how the delinquency of the

17   account or any balance of the account was paid and

18   maintained.

19   Q.    But to your knowledge, no invoice was ever rejected and

20   went unpaid?

21   A.    That's correct.

22   Q.    Do you know how many individuals from Becton Dickinson,

23   at least I'm talking about the RTP location, were authorized

24   orderers of the American Express Gift Cheques between 2003

25   and 2006?

1    A.    I've written it down.   I don't recall off the top of my

2    head, but I have those notes.

3              MS. RUBAIN:   Okay.   Your Honor, may I approach?

4              THE COURT:   You may.

5    BY MS. RUBAIN:

6    Q.    Mr. Daniel, if I approach again with my exhibits I've

7    marked Nos. 1 through 7 for identification, if I by looking

8    at these, would it help to refresh your recollection as to

9    who some authorized requesters were?

10   A.    Linda Tingen, T-I-N-G-E-N --

11             THE COURT:   At this point, Mr. Daniel, she just

12   asking you to look at the documents and see if that

13   refreshes your recollection as to how many authorized

14   persons there were.

15             THE WITNESS:   Yes, these people are authorized

16   parties.

17   BY MS. RUBAIN:

18   Q.    Okay.   So these documents I just handed up refresh your

19   recollection as to who some of the authorized requesters

20   were, correct?

21   A.    That's correct.

22   Q.    And who were some of those authorized individuals to

23   order gift cheques?

24   A.    Betty Stewart is on that list and Linda Tingen I think

25   is how she pronounces it.

1    Q.   Do you recognize any -- or do you remember any other

2    individuals who were authorized requesters?

3    A.   No, ma'am, I do not.

4    Q.   Now, surely American Express had in place some internal

5    controls to prevent any type of fraud in the ordering of

6    these gift cheques, correct?

7    A.   That's correct.

8    Q.   And that's why American Express required an authorized

9    signature prior to issuing the gift cheques, correct?

10   A.   That's correct, yes, ma'am.

11   Q.   And at no point between 2003 and January of 2006 did

12   American Express notify Becton Dickinson regarding any fraud

13   on their particular account with the gift cheque program?

14   A.   That's correct.

15            MS. RUBAIN:  Your Honor, if I may have one moment,

16   please.

17   BY MS. RUBAIN:

18   Q.   Mr. Daniel, to your knowledge, did American Express

19   have any internal limitations to the number of gift cheques

20   ordered or the total amount of gift cheques ordered by

21   Becton Dickinson?

22   A.   No, there's not.

23   Q.   And as long as the invoices were satisfied, American

24   Express was satisfied, correct?

25   A.   That's correct.

1  Q.   And as long as there was no fraud in committing -- in

2  ordering the cheques, correct?

3  A.   That's correct.

4  Q.   And with respect to the invoices that the Government

5  has introduced as their Exhibit No. 7, Mr. Daniel, there was

6  nothing that caused American Express to have concern about

7  those order -- cheque order forms and the invoices sent out,

8  correct?

9  A.   That's correct.

10  Q.   And those would be the invoices and order forms with

11  Ms. Perry's name on it?

12  A.   Yes, ma'am.

13  Q.   There's nothing that caused American Express to have

14  any concern, is that correct?

15  A.   That's correct.

16  Q.   And now let me shift gears, Mr. Daniel, and we're

17  almost done.  Now, once -- you testified that these American

18  Express Gift Cheques were basically negotiable, correct?

19  A.   That's correct.

20  Q.   And, in essence, they were also like cash because you

21  could receive cash back if you did not use the full value of

22  the gift cheque, correct?

23  A.   Yes, that's correct.

24  Q.   Now, I believe you testified there had to be two

25  signatures on each cheque, correct?

1  A.   That's a requirement for acceptance of the gift cheque

2  and the travelers cheque.

3  Q.   But the cheques could be made out to any individual or

4  any other entity for negotiation, correct?

5  A.   That's correct.

6  Q.   And there was nothing unusual about a cheque being made

7  out to cash?

8  A.   No.

9  Q.   Or any other individual corporation or business,

10 correct?

11 A.   That's correct.

12          MS. RUBAIN:  Your Honor, that's all.  Thank you.

13          THE COURT:  Redirect, Mr. Chut?

14          MR. CHUT:  Yes, Your Honor.

15            R E D I R E C T   E X A M I N A T I O N

16 BY MR. CHUT:

17 Q.   Direct your attention to Exhibits 2 through 6.  You

18 just testified that AmEx had no problem processing those

19 orders, is that correct?

20 A.   That's correct.

21 Q.   And who are those orders -- strike that.  Whose

22 authorized signature appears on those orders?

23 A.   Robin Snipes.

24 Q.   Did AmEx have no problem processing those orders when

25 Robin Snipes's authorized signature appeared on them?

1    A.    That's correct.

2    Q.    Does AmEx do any investigation beyond the authorizing

3    signature?

4    A.    No.

5    Q.    Does AmEx call the client and say is this person acting

6    in their authority?

7    A.    No, that's done in initial call when the person is set

8    up to be an authorized signer on the account.

9    Q.    Would -- if the authorized signer was exceeding their

10   authority, would AmEx know that?

11   A.    No.

12   Q.    And would AmEx rely on the authorized signature?

13   A.    That's correct.

14   Q.    And the authorized signature is a representation that

15   the order is approved?

16   A.    That's correct.  Not necessarily that it's approved,

17   but they are acting within their authority as an employee of

18   BD Technologies in this substance.

19   Q.    And it's a representation that the cheques have been

20   ordered for a proper purpose?

21   A.    That's correct.

22         MS. RUBAIN:  Objection, Your Honor.

23         THE COURT:  Yeah, I'll sustain -- let me see

24   counsel at the side.

25         (Bench conference as follows:)

 1          THE COURT:  Order for proper purpose.  Explain to

 2    me how he can tell what the purpose is for which they were

 3    ordered.

 4          MR. CHUT:  He can't.  The authorized signature is

 5    the representation.

 6          THE COURT:  That?

 7          MR. CHUT:  That these are ordered with proper

 8    authority.

 9          THE COURT:  But not -- authority doesn't

10    necessarily encompass purpose, as I understand the

11    testimony, at this point.

12          MR. CHUT:  Yes, Your Honor.

13          THE COURT:  All right.

14          (Bench conference concluded.)

15          THE COURT:  I'll sustain as to that last question.

16    You may continue, Mr. Chut.

17          MR. CHUT:  Thank you, Your Honor.

18    BY MR. CHUT:

19    Q.  Let me draw your attention to Exhibit 8-A.  It will

20    appear on your screen.  And drawing your attention to the

21    face of the cheque on the top part of the exhibit.  Who --

22    how was that cheque made out to?

23          MS. RUBAIN:  Objection, Your Honor.

24          THE COURT:  Objection to how was the cheque made

25    out to?

 1                MS. RUBAIN:  I think this exceeds the scope.

 2                THE COURT:  Let me see counsel at the side.

 3                (Bench conference as follows:)

 4                THE COURT:  How does this exceed the scope?

 5                MS. RUBAIN:  He went through this on direct, and I

 6     didn't examine him on cross on this.

 7                THE COURT:  Oh, exceeds the cross --

 8                MS. RUBAIN:  Of cross.

 9                THE COURT:  Well, I'm going to give him some

10     latitude --

11                MR. CHUT:  Your Honor, she asked about could

12     cheques be written to cash.  I think I'm allowed to ask a

13     follow-up question who would get the cash from this

14     particular cheque.

15                THE COURT:  Yeah, I'm going to overrule this

16     objection.

17                (Bench conference concluded.)

18                THE COURT:  I'll overrule the objection.  You

19     may -- is it Daniel or Daniels?

20                THE WITNESS:  Just Daniel.

21                THE COURT:  Daniel.  All right, Mr. Daniel, you

22     may answer the question.  Do you remember the question?

23                THE WITNESS:  Who was the cheque made out to?

24                THE COURT:  All right.

25                THE WITNESS:  It's made out to cash.

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 163 of 280

1   BY MR. CHUT:

2   Q.   And whose signature and countersignature appears on

3   this cheque?

4   A.   Robin Snipes.

5   Q.   And who would be entitled to receive the cash for this

6   gift cheque?

7   A.   Robin Snipes.

8            MR. CHUT:  Thank you, sir.

9            MS. RUBAIN:  Just a few follow-up, Your Honor.

10               R E C R O S S - E X A M I N A T I O N

11  BY MS. RUBAIN:

12  Q.   Mr. Daniel, I believe you testified that Ms. Perry was

13  set up as an authorized person on Becton Dickinson's account

14  as far as American Express was concerned, correct?

15  A.   That's correct.

16  Q.   Do you know who would have set her up as that

17  authorized person on the account?

18  A.   The original party that set up the account was Betty

19  Stewart, and it would have to be, you know, a representative

20  of the company who set her up.

21  Q.   And, again, to your knowledge between September of 2003

22  and January of 2006, Ms. Perry continued to remain an

23  authorized user on that account?

24  A.   That's correct.

25            MS. RUBAIN:  Your Honor, that's all.

1              MR. CHUT:  Briefly, Your Honor.

2                  R E D I R E C T   E X A M I N A T I O N

3    BY MR. CHUT:

4    Q.   In 2006 was AmEx notified by Becton Dickinson there

5    might be fraud on this account?

6              MS. RUBAIN:  Objection, Your Honor.

7              THE COURT:  I'm going to sustain as to hearsay.

8              MR. CHUT:  Thank you, Your Honor.

9    BY MR. CHUT:

10   Q.   In 2006, was Ms. Perry removed as an authorized user?

11   A.   That's correct.

12             MR. CHUT:  No further questions, Your Honor.

13             MS. RUBAIN:  Nothing further.

14             THE COURT:  All right.  You may step down,

15   Mr. Daniel.

16             (At 2:35 p.m., witness excused.)

17             MR. CHUT:  Your Honor, we would ask Mr. Daniel be

18   released, Your Honor.

19             MS. RUBAIN:  No objection.

20             THE COURT:  Mr. Daniel may be released from his

21   subpoena.

22             MR. CHUT:  We would re-call David Chice, Your

23   Honor.

24             THE COURT:  Mr. Chice, as I always do if there's a

25   break in testimony, I will remind you that you're still

1   under oath in this proceeding.

2            THE WITNESS:  Okay.

3            THE COURT:  All right.  Mr. Chut, you may

4   continue.

5                    DAVID LEE CHICE,

6        Being previously sworn, is recalled to further testify

7        under oath as follows:

8                D I R E C T   E X A M I N A T I O N

9   BY MR. CHUT:

10  Q.   Mr. Chice, when we left off, you identified the

11  exhibits on the witness stand.  And just to pick up again,

12  you had requested AmEx provide you copies of gift cheques,

13  correct?

14  A.   Correct.

15  Q.   And you identified that as Exhibit No. 8?

16  A.   Yes.

17  Q.   And that's the three expandables in front of you?

18  A.   Right here, yes.

19  Q.   And you also asked for invoices, is that correct?

20  A.   Correct.

21  Q.   And what exhibit are they?

22  A.   Exhibit 7.

23  Q.   And did you also ask for orders?

24  A.   Correct.

25  Q.   And what exhibit are those?

1   A.    Exhibit 5.

2   Q.    Did I actually ask you to look at Exhibits 2 through 4.

3   A.    Two, three, four, five, and six.

4   Q.    Did you, as part of your investigation, review the

5   cheques that are part of Exhibit No. 8?

6   A.    Yes.

7   Q.    And what did you discover when you reviewed these

8   cheques?

9   A.    A lot of cheques that were made out to cash signed off

10  by Robin Snipes or Robin Snipes Perry.

11  Q.    Did you also find cheques made out to department

12  stores?

13  A.    Yes.

14  Q.    And did you find cheques made out to car Care?

15  A.    I do not recall about the car care.

16  Q.    Did you find cheques made out for various personal

17  uses?

18  A.    Yes.

19          MS. RUBAIN:  Objection, Your Honor.

20          THE COURT:  Let me see counsel at the side.

21          (Bench conference as follows:)

22          MS. RUBAIN:  As to the leading.  He asked an

23  open-ended question, and you can't lead him to where you

24  want him to go.

25          MR. CHUT:  I don't think that's a leading

1    question.  It's a yes or no question.  Did you find cheques

2    involving certain things?  Yes or no?

3            THE COURT:  Except you're telling him what to

4    answer when you do it that way.  I think you can ask him --

5    I mean, he's your witness.  He's your financial -- some

6    leading I'll permit since it's a prelude, but -- I mean,

7    since it's a prelude to other materials, introductory, I

8    guess you might say.  But I think if he's going to testify

9    that he went through the cheques and found certain things,

10   he needs to identify what those things are, not the

11   Government.

12           MR. CHUT:  Yes, Your Honor.

13           (Bench conference concluded.)

14           THE COURT:  I'll sustain as to the leading.  You

15   may continue, Mr. Chut.

16   BY MR. CHUT:

17   Q.   What type of -- strike that.  Did you examine who the

18   cheques were made out to?

19   A.   Yes, I did.

20   Q.   And besides the cash, what did you find?

21   A.   There were several cheques that were made out to food

22   establishments, Bojangles, were some of -- was one in

23   particular food establishment that I recall.  There were --

24   actually, the majority of the cheques were made out to cash.

25   So that's what I do recall.

1    Q.    I'm going to draw your attention to Exhibit 8-F, which

2    will appear on your screen.   It will appear the screen,

3    Mr. Chice.   Looking at 8-F, is this some of the cheques you

4    reviewed?

5    A.    Yes.

6    Q.    And who are these cheques made out to?

7    A.    Nordstrom's.

8    Q.    And who has signed these cheques?

9    A.    Robin Snipes.

10   Q.    And what is Nordstrom's?

11   A.    It's a retail store.   It's a department store.

12   Q.    Would it be -- would these cheques have -- strike that.

13   Moving on to cheque -- Exhibit 8-G.   What is Exhibit 8-G?

14   A.    Is that on the screen?

15   Q.    Hold on a second.   It will be coming up in a second.

16   What is Exhibit 8-G?

17   A.    It's a gift cheque for $100 made out to TJ Maxx.

18   Q.    And what is TJ Maxx?

19   A.    It's another retail store.

20          MR. CHUT:   If I may approach, Your Honor, with the

21   actual physical Exhibit 8-G.

22          THE COURT:   You may.

23   BY MR. CHUT:

24   Q.    And if you can take those exhibits out of the evidence

25   slot.   How many cheques are actually part of 8-G?

1   A.    There's three cheques for $100 in denominations, so

2   $300.

3   Q.    And how are they made out to?

4   A.    They're paid to the order of TJ Maxx signed by Robin

5   Snipes Perry.

6   Q.    And what denominations or those?

7   A.    $100.

8   Q.    And drawing your attention to Exhibit 8-I.  Strike

9   that.  What are the dates that appear on those cheques?

10  A.    April 24, 2004.

11  Q.    And is that uniform to all three of those cheques?

12  A.    Yes.

13  Q.    And drawing your attention to Exhibit 8-I.

14  A.    It's an American Express Gift Cheque made out to State

15  Farm's.

16  Q.    And what is the date of this cheque?

17  A.    July 2, 2004.

18  Q.    And who is -- who are the signatures on this cheque?

19  A.    Robin Snipes Perry, signed off by Robin Snipes.

20  Q.    And does -- in its ordinary course of business, does BD

21  use gift cheques to pay for insurance costs?

22  A.    No.

23  Q.    To your knowledge, does BD have an account with State

24  Farm?

25  A.    Not to my knowledge.

1  Q.   And if I could approach with 8-I, Your Honor.  I'll

2  hand you physical 8-I and ask you to take that exhibit out

3  of the sleeve, please.  And how many cheques are in 8-I?

4            THE COURT:  We're still on 8-I?

5            MR. CHUT:  Yes, Your Honor.

6            THE COURT:  Okay.

7            THE WITNESS:  Eight cheques.

8  BY MR. CHUT:

9  Q.   And how are those cheques made out to?

10  A.   They're made out to State Farm's.  Signature on the

11  gift cheques is Robin Snipes Perry, I guess countersigned by

12  Robin Snipes -- or Robin Snipes Perry.

13  Q.   And are they of uniform dates or different dates?

14  A.   Uniform dates.

15  Q.   And what size -- what denomination of cheques are

16  these?

17  A.   $100.

18  Q.   If I may draw your attention -- take a moment to put

19  those back in.  I'll draw your attention to Exhibit 8-J.

20  And looking at 8-J, what is 8-J?

21  A.   It looks like it's made out to Clayton's.  It's a gift

22  cheque to Clayton's.

23  Q.   Looking at the back of the cheque, is there an

24  indication where this cheque was deposited?

25  A.   Paid to the order of Central Carolina Bank.

1    Q.    Is there an indication for who it's being deposited?

2    A.    For deposit only, Clayton Car Care.

3    Q.    To your knowledge, did BD have a contract with

4    Clayton's Car Care?

5    A.    Not to my knowledge, no.

6    Q.    What car care expenses did the RTP facility have?

7    A.    I don't believe they had any car expenses.

8    Q.    And what's the date on this cheque?

9    A.    July 21, 2004.

10   Q.    And who has signed this cheque?

11   A.    Robin Snipes.

12   Q.    And drawing your attention to 8-K.  What is 8-K?

13   A.    A gift cheque made out to Rack Room.

14   Q.    And what's the date on that cheque?

15   A.    July 22, 2004.

16   Q.    And who would have signed that cheque?

17   A.    Robin Snipes.

18   Q.    Are you familiar with Rack Room?

19   A.    Rack room?  No.

20   Q.    Do you recognize that as a business that BD does

21   business with?

22          MS. RUBAIN:  Objection.

23          THE COURT:  I'll overrule as to that question.

24          THE WITNESS:  No, I'm not familiar with that

25   vendor.

BY MR. CHUT:

Q.    And how does -- in reviewing the finances of the RTP

facility, do you review purchases made by that facility?

A.    Yes.

Q.    Are you familiar with the manner in which various --

manner in which equipment is purchased?

A.    Yes.

Q.    And do you review that in your normal course?

A.    Yes.

Q.    And how is the purchase of computers handled by the RTP

location?

A.    They are -- a purchase requisition is entered into SAP,

and it's approved and released in SAP through a manager.  So

once the requisition gets released by the manager, a

purchase order is generated.  Purchasing would send the PO

number, or purchase order number, to the vendor saying that

we're going to be purchasing these items for these dollars,

and here is the PO.  When the vendor invoices us, indicate

the PO number on the invoice so that it directly goes to

accounts payable for processing.

Q.    Who is in charge of ordering equipment, including

computers, for the RTP location?

A.    At the time it was Rick Rumbaugh and/or Dean Drum.

Q.    Were admin assistants in charge of ordering equipment?

A.    They were in charge of entering orders into SAP, but

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    not releasing purchase requisitions through SAP.

2    Q.    How were computer orders paid for?

3    A.    It was paid by wire transfer or check through BD.

4    Q.    Were they ever paid for with AmEx Gift Cheques?

5    A.    No.

6    Q.    Was Ms. Snipes authorized to pay for computer

7    purchases?

8    A.    No.

9    Q.    Are you familiar with the vendors that BD did business

10   with for computers?

11   A.    Yes.

12   Q.    How about for the RTP location?

13   A.    Yes.

14   Q.    Was Apple one of those vendors?

15   A.    No.

16   Q.    If I might show you what's marked as Exhibit 8-B.

17   Drawing your attention to Exhibit 8-B, what is that?

18   A.    A gift cheque made out to Apple.

19   Q.    And what amount is it?

20   A.    For $100.

21   Q.    And who has signed this gift cheque?

22   A.    Robin Snipes Perry.

23          MR. CHUT:  If I may approach the witness, Your

24   Honor?

25          THE COURT:  You may.

1    BY MR. CHUT:

2    Q.    I'm going to hand you the actual physical exhibit,

3    Mr. Chice.   If you'll take the individual cheques out of

4    8-B.   Mr. Chice, how many cheques are there in the exhibit?

5    A.    Twenty-six.

6    Q.    And who are they -- are they all made out to the same

7    party?

8    A.    Yes, to Apple.

9    Q.    And who has signed all those cheques?

10   A.    Robin Snipes Perry.

11   Q.    And are they all -- what amounts are those cheques in?

12   A.    $100.

13   Q.    What is the total amount of those cheques?

14   A.    $2,600.

15   Q.    And are they on the same date?

16   A.    There's some that are dated 12/23.   The majority of

17   them were dated 12/23, but the first few were made out to

18   12/24/2005.

19   Q.    And drawing your attention to Exhibit 8-L.   What is

20   8-L?

21   A.    It's a gift cheque for $50 made out to Maggiano's.

22   Q.    And who has signed that cheque?

23   A.    Robin Snipes.

24   Q.    And what is the date on that?

25   A.    June 19, 2005.

1    Q.    And are you familiar with what Maggiano's is?

2    A.    It's a food establishment.

3    Q.    And drawing your attention to Exhibit 8-H.

4    A.    It's a gift cheque for $100 for Cato.

5    Q.    Are you familiar with who that entity is?

6    A.    No.

7    Q.    Is that entity a vendor dealt with by BD?

8    A.    I'm not familiar with that vendor.

9    Q.    And who has signed this cheque?

10   A.    Robin Snipes.

11   Q.    And what is the date of that cheque?

12   A.    June 30, 2004.

13   Q.    What purpose does BD use American Express Gift Cheques

14   for?

15   A.    It's for on-the-spot awards or impact awards.

16   Q.    What amounts are normally awarded of American Express

17   gift cheques by BD?

18          MS. RUBAIN:  Objection.

19          THE COURT:  If you know.

20          THE WITNESS:  It's usually $50 or $100.

21   BY MR. CHUT:

22   Q.    Are multiple cheques normally awarded at one time?

23   A.    Sometimes, but --

24          MS. RUBAIN:  Objection.

25          THE COURT:  Hold on just a second.  Was multiple

1    cheques awarded, was that your question?

2              MR. CHUT:  Yes, Your Honor.

3              THE COURT:  Overruled.  You may answer.

4              THE WITNESS:  Multiple cheques can be provided to

5    someone receiving the award.  There's a form that is filled

6    out by the person that is requesting a nomination to that

7    person.  So they could provide a nomination of $50 to $100

8    to $500.

9    BY MR. CHUT:

10   Q.   What, if any, concerns did your review of the cheques,

11   the invoices, and the order forms raise?

12   A.   That there was one person that was signing off on the

13   purchases as well as, you know, releasing the invoices,

14   making payments to the invoices, distributing them, cashed

15   gift cheques.  So there was no oversight in the process as

16   well as there was no log in tracking the disbursements of

17   gift cheques so we can track the taxes associated to those

18   gift cheques.

19   Q.   Did you review what awards Ms. Perry had received?

20   A.   I did, yes.

21   Q.   And what was the result of that review?

22   A.   She was awarded in the neighborhood of $4,500 to $5,000

23   in awards.

24   Q.   And what was the -- did you determine -- strike that

25   question.  Did you determine the approximate amount of

1   cheques in Exhibit No. 8?

2   A.    Did I -- could you repeat that?

3   Q.    How much were the cheques in No. 8?

4   A.    Close to $175,000, or probably a little bit more than

5   that.  It was in that neighborhood.

6   Q.    Based on your review, had Ms. Perry been awarded that

7   many gift cheques?

8   A.    No.

9   Q.    Based on your review of the finances of the RTP

10  location, had any employee been awarded that many gift

11  cheques?

12  A.    No.

13  Q.    Did you review the activities of other personnel at the

14  RTP facility?

15  A.    Yes.

16  Q.    And what did you do in that regard?

17  A.    We looked at who was provided the gift cheques as far

18  as impact or on-the-spot awards, and the disbursement or

19  they did the not receive -- they received awards up to a few

20  hundred dollars, if that.

21  Q.    What other records did you review at the RTP center

22  with regard to the American Express program?

23  A.    We looked at the policies and guidelines and how the

24  program was working at that site because we weren't sure if

25  this was an isolated incident.  So we looked at other people

1   that were running the program as well at that site.  So we

2   determined that this was just a situation where --

3                  MR. QUANDER:  Objection.

4                  THE COURT:  Well, let me see counsel up here.

5                  (Bench conference as follows:)

6                  THE COURT:  No tag teaming on objections.

7                  MS. RUBAIN:  I know.

8                  THE COURT:  Whoever is doing the examination does

9   the objecting, too.

10                  The question is, have you looked at the other

11  records to determine, and did you find this to be an

12  isolated incident?  Since we're up here at the bench, I'll

13  hear from you.  What's the basis of that objection?

14                  MR. QUANDER:  Well, it sounds like he's relying on

15  hearsay in making -- coming up with what he's going to

16  espouse is his conclusion about how this related to anything

17  else.

18                  THE COURT:  Well, I thought I picked it up, but

19  one of Mr. Chut's questions was -- I thought he was asked

20  did he review the financial records and conduct an

21  investigation?  So right or wrong, I've been -- my

22  interpretation of what's being said is based on the

23  financial records of what -- you may need to clear that up,

24  but I'll overrule the objection as to that.

25                  (Bench conference concluded.)

1  BY MR. CHUT:

2  Q.    In reviewing the financial records of the RTP

3  facility --

4            THE COURT:  Hold on just a second.  I will

5  overrule that objection.  You may continue, Mr. Chut.

6  BY MR. CHUT:

7  Q.    In your investigation reviewing the financial records,

8  what did you -- at the RTP facility, what did you find about

9  the program?

10  A.    As far as the excessive.

11  Q.    The gift cheque program, yes.

12  A.    There was just an excessive amount of gift cheques that

13  were purchased through that location.

14  Q.    And were you able to determine based on your review of

15  the documents --

16            THE COURT:  You know, I'm going to sustain an

17  objection.  Let me see counsel up here at the bench.

18            (Bench conference as follows:)

19            THE COURT:  An excessive amount of gift cheques

20  purchased at that location just sounds to me like an end run

21  around what I sustained an objection to earlier.

22            MR. CHUT:  Yes, Your Honor.  That was not my

23  intention, Your Honor.

24            THE COURT:  All right.  I'm going to strike that

25  testimony.

1            MR. CHUT:  Yes, Your Honor.

2            (Bench conference concluded.)

3            THE COURT:  I'll strike that testimony about an

4   excessive amount of gift cheques.  The jury is instructed to

5   disregard that.  You may continue, Mr. Chut.

6            MR. CHUT:  Yes, Your Honor.

7   BY MR. CHUT:

8   Q.   Did you review records -- strike that.  What records

9   were kept required to be kept by admin assistants for the

10  gift cheque program?

11  A.   They were required to keep a log.

12  Q.   And were you able -- did you attempt to review

13  Ms. Perry's log?

14  A.   Yes.

15  Q.   And what was the result of that?

16  A.   It was incomplete.

17            MS. RUBAIN:  Objection.

18            THE COURT:  Well, I'll overrule it.  You may

19  continue.

20  BY MR. CHUT:

21  Q.   How was it incomplete?

22  A.   Either it was not provided to payroll for tax purposes,

23  or it was not filled out indicating who was provided the

24  gift cheques to.

25  Q.   Did you compare the log to the cheques?

1   A.   Yes.

2   Q.   And what was the result of that comparison?

3   A.   That -- compared the log to the cheques, these cheques?

4   Q.   Yes, sir.

5   A.   That it was -- the log did not match the disbursement

6   of the cheques.

7   Q.   At some point did you interview Ms. Perry in regard to

8   the American Express Gift Cheque Program?

9   A.   Yes.

10  Q.   And how did that come about?

11  A.   We had -- obviously, there was a -- I guess, a phone

12  call that went through the ethics hotline, and we were -- it

13  was indicated that there was some improprieties going on at

14  that location and --

15          THE COURT:  Hold on just a second.  Ladies and

16  gentlemen, let me ask you to step back to the jury room for

17  just a moment, please.

18          (At 3:01 p.m., jurors excused.)

19          THE COURT:  What are we talking about?  The --

20  what is the ethics hotline?  What's the ethics hotline,

21  Mr. Chice?

22          THE WITNESS:  Yes.  There is a hotline that BD has

23  that if there's any type of unusual circumstances of like

24  people doing something that doesn't smell right that someone

25  can call and remain anonymous.

1              THE COURT:  Okay.  So it's an anonymous tip to a

2    BD line?

3              THE WITNESS:  Correct.

4              MR. CHUT:  Your Honor, I can take it a different

5    direction.  I'm not trying to solicit that answer, Your

6    Honor.  I'm just trying to move on with their interview of

7    Ms. Perry.  I'm not trying to solicit information about the

8    tips, Your Honor.  So I'll just move on and avoid that.

9              THE COURT:  All right.  I think that's reasonable.

10   I didn't mean to suggest that you were trying at that point

11   to solicit anything.  I think his answer is a reasonable

12   answer, but it looked to me like we had all of a sudden

13   switched from reviewing records to an ethics hotline tip.

14             Mr. Chice, I'm not going to -- there are hearsay

15   rules and various other rules.  I don't expect you to know

16   all those rules.  It's my job to sustain or overrule those

17   objections as they come along.  But with respect to that

18   ethics hotline, that's an anonymous tip --

19             THE WITNESS:  Right.

20             THE COURT:  -- and that's hearsay, so I'm going to

21   sustain the objection to strike that.  Mr. Caple, you may

22   bring the jury back.

23             (At 3:04 p.m., jurors arrive.)

24             THE COURT:  Ladies and gentlemen, I'm going to

25   sustain the objection and strike the testimony with respect

1  to the ethics hotline.  You're to disregard any information

2  provided through the ethics hotline.  You may continue,

3  Mr. Chut.

4  BY MR. CHUT:

5  Q.   Mr. Chice, you participated -- following your review of

6  the documents, did you participate in an interview with

7  Ms. Perry?

8  A.   Yes, I did.

9  Q.   And approximately when did that interview take place?

10  A.   That was, I believe, in January or February of 2007.

11  Q.   And what was your -- who was present in that

12  conversation?

13  A.   John Dowd, who is the HR business partner in RTP.

14  Thomas Valenti, who is the assistant corporate controller.

15  He's located in Franklin Lakes, but he was in Research

16  Triangle Park.  Susan Luthy, who is the corporate HR

17  business planner.  And myself -- Susan and I were on the

18  telephone, while Tom and John were at the site.

19  Q.   And so where were you physically located?

20  A.   I was physically located in North Carolina, but on the

21  phone.

22  Q.   And what was the purpose of this interview?

23  A.   Just to get an understanding of what had transpired.

24  Just to get an understanding of these gift cheques and what

25  the process was for that site.  To interview several members

1   of the BDT location, the Research Triangle Park location, to

2   get an understanding of what the process is, how the gift

3   cheque program works, as well as how the disbursement and

4   purchase of the gift cheques.

5   Q.    Did Ms. Perry participate in this interview?

6   A.    Yes, she did.

7   Q.    And what questions were asked of her?

8   A.    Just general questions as to the process and how she --

9   how she purchased these gift cheques, you know, from start

10  to end and how they were tracked.

11  Q.    And how did -- did Ms. Perry respond to those

12  questions?

13  A.    She did.

14  Q.    And what was the nature of her response?

15  A.    It was -- she just didn't understand why we were

16  questioning the process because there was something that --

17           MS. RUBAIN:  Objection.

18           THE COURT:  Let me see counsel at the side.

19           (Bench conference as follows:)

20           THE COURT:  All right.  Basis?

21           MS. RUBAIN:  I believe Mr. Chut's question was how

22  did Ms. Perry respond to the question, and he begins

23  answering that she just didn't understand.  That's not

24  responsive.

25           THE COURT:  I think it is in part.  It's not a

1   great response, but I think that is his response.

2            MS. RUBAIN:  How does he know that she didn't

3   understand?

4            MR. CHUT:  Your Honor, he also got about a half of

5   a sentence out, Your Honor, before he was able to --

6            THE COURT:  She didn't understand why we were

7   questioning the cheques.  You know, it's not real clear, but

8   that at least gives --

9            MS. RUBAIN:  Did she say that, or is that what

10  he's speculating?

11           THE COURT:  Well, I think the question may be --

12  let's do this.  What was the nature of the response?  Sounds

13  like describe her response.  Let's go back and just say what

14  did she say and leave it at that.

15           MR. CHUT:  Okay.  And, Your Honor, it might be

16  clear if he could actually finish his sentence, though, too,

17  because he was in middle of the response.

18           MS. RUBAIN:  I don't want him to get out him

19  speculating as to what she did or did not understand for the

20  jury to hear.

21           THE COURT:  I understand that.

22           (Bench conference concluded.)

23           THE COURT:  I'll overrule the objection, but I'll

24  ask you to rephrase the question, Mr. Chut.

25  BY MR. CHUT:

Case 1:10-cr-00032-WO  Document 52  Filed 09/01/11  Page 186 of 280

1    Q.    What was the nature of -- well, let me rephrase that.

2    How did Ms. Perry answer?

3    A.    She didn't really answer the questions.

4    Q.    Did you ask her to account for the cheques?

5    A.    Yes, I did.

6    Q.    What was her -- how did she answer that?

7    A.    She had said that there were cheques in a locked

8    cabinet, and they were there for you to review.

9    Q.    What other explanation did she offer, if any?

10   A.    That there was a log, but the log did not match what

11   was left in the locked cabinet where the gift cheques were.

12   Q.    And what are you --

13            THE COURT:  Ladies and gentlemen, I'm going to

14   excuse you for the mid-afternoon recess.  The jury is

15   excused for 15 minutes for a mid-afternoon recess.

16            (At 3:10 p.m., break taken.)

17            THE COURT:  Mr. Chice, let me use this question as

18   an example of what I'm talking about here with respect to

19   something.

20            "What other explanation did she offer, if

21        any?

22            Answer:  That there was a log, but the log

23        did not match what was left in the locked cabinet

24        where the gift cheques were."

25            Now, the question to you is, what did she say?

1  And I can't tell from that response whether you're saying

2  what she said and your reaction to what she said, or whether

3  you're actually conveying what was said.  So when we come

4  back from the recess, I am going to instruct you to listen

5  to the question --

6           THE WITNESS:  Right.

7           THE COURT:  -- and answer the question.  You don't

8  need to argue anything up here.  If you're asked for your

9  perceptions or your understandings, you certainly may

10 answer.  But if you're asked a specific question like what

11 did she say, to the extent you remember, you describe or

12 tell what she said.

13          All right.  We'll stand in recess for 15 minutes.

14          (At 3:11 p.m., break taken.)

15          (At 3:28 p.m., break concluded.)

16          MS. RUBAIN:  Your Honor, in speaking with

17 cocounsel at the break, I think maybe the Court could

18 resolve this by voir dire.  I've got some concerns over

19 Mr. Chice's testimony with respect to this interview.

20          From what Mr. Chice has said, he was present via

21 telephone.  He was not present in the room with the

22 individuals who were actually conducting the interview.  And

23 I don't know from Mr. Chut's questions or Mr. Chice's

24 answers whether Mr. Chice was the one asking the questions,

25 who was asking them, and who responded.  I don't think

1   there's been a foundation as to whether or not he could

2   recognize Ms. Perry's voice, if he ever met her before, how

3   did he know that she was the one giving the responses to

4   whatever questions were being asked by whomever they were

5   being asked.  I feel like we're getting into muddy water

6   here, more muddy than what we've already been going through

7   with respect to this witness's testimony.

8              THE COURT:  Is this the same interview that's

9   detailed in Government's Exhibit No. 11 in the notebook?

10              MR. CHUT:  It is, Your Honor.  Plus, Your Honor,

11  the United States has witnesses who were actually physically

12  present.  So I think maybe the best way -- instead of

13  belaboring the point, we can move on with this witness, and

14  then Mr. Dowd and Mr. Valenti were both present and can

15  testify as to the interview in greater depth, Your Honor.

16              THE COURT:  I'm not sure -- it would have to be

17  somebody, but I think a better foundation is a valid point

18  given the answers I've heard so far.  But if you want to

19  move on, we'll skip that, and you can move on.  It sounds

20  like that resolves your concern, Ms. Rubain, at least at

21  this point.

22              MS. RUBAIN:  Other than at this point there's been

23  some testimony from this witness with respect to the

24  interview.  I don't know if the Court can give -- is willing

25  to strike that portion of his testimony related to this

1    interview and give a curative instruction to the jury.  I

2    believe he's testified at this point that he was present via

3    telephone; she was questioned about the cheque program at

4    the RTP location; she didn't answer the question or didn't

5    understand why she was being questioned about the cheques;

6    and that she indicated she kept some cheques in a locked

7    cabinet, but there was a log that didn't match up with what

8    she had remaining.  That's already out there in front of

9    this jury.

10          THE COURT:  Go ahead.

11          MR. CHUT:  If we're talking about striking, Your

12   Honor, then I'd like to go back and maybe lay a little more

13   foundation.  That was admitted without objection, Your

14   Honor.  I think he testified that -- who was present, that

15   he was on the phone, that she was being interviewed, and

16   that she was asked questions.  That was all without

17   objection.

18          If the Court would like me to lay who are

19   foundation, I would be happy to.  But I think that's already

20   in without objection, and I don't think that was -- and I

21   think he's testified that he was present by phone, and she

22   was being interviewed, etc., etc.

23          THE COURT:  We really only have a couple of

24   questions that relate to the interview specifically at this

25   point.  One of them is the question we already addressed at

1    the bench, and that is Ms. Perry wasn't responsive to the

2    questions.  It's one of those gray kind of an opinion kind

3    of his observation, and it seemed to me that it's not a real

4    helpful answer, but it's some explanation.  It does

5    constitute his observation of her answer, so I'm not

6    inclined to strike that question.

7            I am a little concerned about the last question

8    that was asked about the cheques were kept -- or the cheques

9    didn't match the log, because it's not clear to me that that

10   was his -- his follow-up response to what he heard her say

11   or whether she actually said that.

12           So here's what I'm going to do.  I'm going to

13   strike that last question about the cheques didn't match the

14   log.  I'm going to permit the Government to go back --

15   Mr. Chice, I will instruct you in that question -- well,

16   you're here now; I can ask you.  Let's see.  I don't even

17   remember what the question was now.  I think we had gotten

18   around to what did she say, and your response was something

19   along the lines of -- what other explanation did she offer,

20   if any?  And your response was that there was a log, but the

21   log did not match what was left in the locked cabinet where

22   the gift cheques were.

23           It's kind of a two-pronged response there.  Did

24   she actually say that the log did not match what was left in

25   the locked cabinet?

 1          THE WITNESS:  She did not say that.  It's through

 2   the review that the log did not match the gift cheques that

 3   were left there.

 4          THE COURT:  All right.  I'll go back and permit

 5   the Government to ask -- I'll strike that answer.  You can

 6   go back and ask the follow-up question, and just keep my

 7   instruction in mind.  If he asks you specifically what she

 8   said, you say what she said.  All right.  Then we'll move on

 9   to other evidence of the interview, it seems to me.

10          All right.  Mr. Caple.

11          (At 3:34 p.m., jurors arrive.)

12          THE COURT:  All right.  Ladies and gentlemen,

13   immediately before we took a break, Mr. Chice was

14   describing -- giving an answer that generally went along the

15   lines of the cheques were maintained in a locked cabinet,

16   but the log did not match cheques that were in the cabinet.

17   I'm going to strike that answer and ask you to disregard --

18   Mr. Chut, I'll ask you to repeat the question, and we'll

19   proceed.

20   BY MR. CHUT:

21   Q.   Okay.  Did you have the opportunity to review Ms.

22   Snipe's log?

23   A.   Yes, sir.

24   Q.   Or Ms. Perry's log, excuse me.  And did you have the

25   opportunity -- strike that.  What was the result of your

1    review of her log?

2    A.    The log did not match the cheques that were left in the

3    locked cabinet.

4    Q.    And explain that answer.

5    A.    So what that meant was that in the locked cabinet there

6    was, say, 15 gift cheques left, but there was nothing that

7    was -- that showed disbursements of those 15 cheques, or

8    there was no log itself to match that.  So it was

9    incomplete.

10   Q.    Did you -- did the log match -- strike that.  Did the

11   log record the cheques identified in Exhibit No. 8?

12   A.    Yes.

13   Q.    So she had a log for all of the cheques in Exhibit

14   No. 8?

15   A.    No, she did not.

16   Q.    Okay.  Explain that.

17   A.    Explain why did she not have --

18   Q.    Strike that.  Were those cheques in Exhibit No. 8

19   listed on her log?

20   A.    No.

21   Q.    Was that normal procedure?

22            MS. RUBAIN:  Objection.  I'm not sure --

23            THE COURT:  Overruled.  He's testified as to his

24   understanding of the procedure.

25            THE WITNESS:  The procedure was to maintain a log

1   as far as who was given a gift cheque, and so that the gift

2   cheques would go to HR for tax purposes.

3   BY MR. CHUT:

4   Q.    Could you match the log Ms. Perry kept to the cheques

5   in Exhibit No. 8?

6   A.    I could not.

7   Q.    Following this interview, what was Ms. Perry's

8   authority to order gift cheques?

9   A.    She did not have authority to order -- or she only had

10  authority to requisition gift cheques, not to approve gift

11  cheques.

12  Q.    Was there a change in her authority following the

13  interview?

14  A.    No.

15  Q.    Was she still able to order gift cheques on behalf of

16  BD?

17  A.    No.

18  Q.    What is the authority of a BD employee as to use of BD

19  property and money?

20  A.    Depending on the level of --

21          THE COURT:  I'm sorry?

22          MS. RUBAIN:  Objection.

23          THE COURT:  Let me see counsel at the side.

24          (Bench conference as follows:)

25          MS. RUBAIN:  How is this relevant?  How does he

1  know?  He's the finance guy.  I don't believe we have any

2  foundation for him to be talking about what BD's policies

3  with respect to employees using property, etc., or even what

4  her -- I mean, her authority.  How does he know any of this?

5           MR. CHUT:  Your Honor, how can a corporate finance

6  officer not know that employees are not allowed to use BD

7  property for their own purpose?  That's already been asked

8  and answered.  That's not a crazy question.

9           THE COURT:  Well, the question is what's the

10  authority?  Here's -- the question itself, what's the

11  authority with respect to BD's property?  Let me check.  As

12  to the use of BD money and property.  What's the authority

13  as to the use?

14           I think you're blending two concepts in there,

15  authority and use, and I'm not sure what that answer is

16  going to trigger there in terms of a response.  So it seems

17  to me that back to your original question of whether or not

18  an employee has the authority to use it for their own

19  personal use, there's some fair game in there.  But I think

20  the way that the question is phrased, I'm not sure you're

21  asking -- I'm not sure what we're going to get as far as an

22  answer with this witness.

23           I'm going to ask you to be as specific as you can

24  and not lead him because he's apt to chime in with a lot of

25  different information that's not necessarily responsive to

1    the question.  So I'll ask you to rephrase the question.

2              MR. CHUT:  Yes, Your Honor.

3              (Bench conference concluded.)

4              THE COURT:  I'll ask you to rephrase the question,

5    Mr. Chut.

6    BY MR. CHUT:

7    Q.    Can BD employees make awards to themselves?

8    A.    No.

9    Q.    Can they order gift cheques for themselves?

10   A.    No.

11   Q.    Can they convert BD money for their own purposes?

12   A.    No.

13             MR. CHUT:  No further questions, Your Honor.

14             THE COURT:  Cross-examination, Ms. Rubain?

15             MS. RUBAIN:  Thank you, Your Honor.

16                 C R O S S - E X A M I N A T I O N

17   BY MS. RUBAIN:

18   Q.    Now, Mr. Chice, when did you become Finance Director

19   for the IT department?

20   A.    Finance Manager?

21   Q.    Yes, sir.

22   A.    November 2006.

23   Q.    And what was your position prior to November of 2006?

24   A.    I was a senior business analyst for one of the

25   businesses.

1  Q.   And were you a senior business analyst for the IT

2  Department?

3  A.   No.

4  Q.   So prior to November 2006, you had no direct job

5  responsibilities related to the IT Department at the RTP

6  branch, correct?

7  A.   No.

8  Q.   Now, in your role as a Finance Manager for the IT

9  Department, did you administer the American Express Gift

10  Cheque Program?

11  A.   It was a corporate sponsored program, so -- but it was

12  my job to oversee disbursements and expense spending for my

13  IT departments.

14  Q.   Did you implement a written policy with respect to the

15  American Express Gift Cheque Program?

16  A.   This was a corporate program.

17  Q.   And my question was, did you implement a specific

18  policy with respect to the American Express Gift Cheque

19  Program?

20  A.   No, I did not.

21  Q.   And prior to November of 2006, did you implement any

22  program with respect to the American Express Gift Cheque

23  Program?

24  A.   No, I did not.

25  Q.   Now, prior to November 2006, did you have any dealings

1   with Rick Rumbaugh?

2   A.    Prior to 2006?  No, I didn't.

3   Q.    Did you have any dealing with Robin Perry?

4   A.    No.

5   Q.    Did you have any dealings with anyone at the RTP branch

6   of Becton Dickinson?

7   A.    Not prior to 2006, no.

8   Q.    And you were located at the international global office

9   up in New Jersey, correct?

10  A.    Correct.

11  Q.    Now, as of November of 2006, was the American Express

12  Gift Cheque Program still in operation or still being used

13  by BD?

14  A.    After 2006?

15  Q.    As of November 2006.

16  A.    It was still being used.

17  Q.    Okay.  Had there been any changes made to the program

18  prior to you joining or becoming the Director of Finance for

19  IT?

20  A.    No, not prior.  Aside -- well, aside from ensuring

21  people track the gift cheques for tax purposes.

22  Q.    Now, tell me about that change.  You said aside from

23  making sure the awards were reported for tax purposes,

24  correct?

25  A.    Correct.

1    Q.    When was that change made?

2    A.    I do not recall the date, but it was something that any

3    type of, you know, gifts that were provided to employees,

4    they needed to submit it for tax purposes.

5    Q.    And when was that change made to the program?

6    A.    I don't recall the date.

7    Q.    So you don't know whether it was in 2005?

8    A.    No.

9    Q.    Was it made after you became Finance Manager for the IT

10   or for Global IT?

11   A.    No, it was prior to.

12   Q.    So is it fair to say, Mr. Chice, you had no direct

13   knowledge of how the American Express Program was run prior

14   to November of 2006?

15   A.    Not direct knowledge, no.

16   Q.    And more specifically, you had no direct knowledge

17   prior to November of 2006 how Rick Rumbaugh managed the

18   American Express Gift Cheque Program and his IT Department

19   at RTP?

20   A.     I did not have any direct knowledge of Rick Rumbaugh

21   and how he managed IT.  But this is something that within

22   BD, through my learnings within BD, and I've had several

23   positions within BD, that this is something we would look

24   at, cost and reviews, to see if there's any unexplained

25   variances to budget versus forecast.  So these are things

1    that we would look at.

2    Q.    You don't know what Rick Rumbaugh looked at, correct?

3    A.    No.

4    Q.    And you don't know what Rick Rumbaugh authorized,

5    correct?

6    A.    But he's a cost center manager.

7    Q.    Okay.  My question is:  Do you know what Rick Rumbaugh

8    looked at?

9    A.    No, I do not.

10   Q.    Do you know what Rick Rumbaugh authorized?

11   A.    No.

12   Q.    Okay.  Now, in your position as Finance Manager for

13   Global IT, I believe you testified that you received monthly

14   reports of what expenditures the IT Department has made,

15   correct?

16   A.    Correct.

17   Q.    And I believe you testified that the overall budget for

18   the Global IT, that is, the international -- the whole

19   Becton Dickinson company, IT spends about 120 million,

20   correct?

21   A.    Well, that's for Franklin Lakes and RTP.

22   Q.    Okay.

23   A.    Globally, it's $180 million.

24   Q.    Okay.  And just with respect to RTP, that IT site

25   spends about $30 million, correct?

1    A.    Yes.

2    Q.    Now, as of November 2006 when you became the finance

3    manager for Global IT, you would receive monthly reports of

4    all the expenditures of the RTP IT location, correct?

5    A.    Well, I could generate a report through SAP.

6    Q.    Okay.  Did you do that each month?

7    A.    Yes.

8    Q.    And who had your position prior to November 2006?

9    A.    Lisa Gordon.

10   Q.    Okay.  And was Lisa Gordon still employed by BD as of

11   November 2006?

12   A.    Yes.

13   Q.    Okay.  And what position did she then take?

14   A.    She is the Six Sigma Coordinator or leader for

15   Corporate IT.

16   Q.    Now, would Lisa -- I'm sorry, say her last name again.

17   A.    Gordon.

18   Q.    Would Lisa Gordon have been the individual to prepare

19   these reports to the SAP system prior to November 2006 with

20   respect to IT's expenditures?

21   A.    Correct.

22   Q.    And she would have been the one to see all of the

23   American Express Gift Cheques that had been ordered by the

24   IT Department?

25   A.    If it was not a large difference versus budget and

1    forecast, she may have not picked up on it.  But then

2    when -- then there was a large purchase in January of 2007

3    for $50,000.

4    Q.   Again, Mr. Chice, my question was:  When Lisa Gordon

5    had your position as a global manager of -- a Finance

6    Manager for Global IT, she would have had the ability to

7    generate reports in the SAP system with respect to

8    expenditures of the IT Department at the RTP branch,

9    correct?

10   A.   Yes.

11   Q.   And the American Express Gift Cheque purchases for the

12   IT Department would have been part of those reports,

13   correct?

14   A.   Correct.

15   Q.   And it's part of your job duty as the Finance Manager

16   for the Global IT Department to generate these reports and

17   monitor expenditures, correct?

18   A.   Correct.

19   Q.   And prior to you joining or becoming Finance Manager

20   for Global IT when Ms. Gordon had that position, there was

21   no issue with respect to these American Express Gift

22   Cheques, correct?

23   A.   It was not discovered.

24   Q.   Okay.  Again, my question was:  There was no issue with

25   respect to American Express Gift Cheques?

1           MR. CHUT:  Objection, Your Honor, asked and

2    answered.

3           THE COURT:  I'll overrule the objection.  You may

4    answer the question.

5           THE WITNESS:  Was there any issue?  No.

6    BY MS. RUBAIN:

7    Q.   And if -- there wasn't an issue it because it was

8    within the budget of the RTP particular site to generate

9    these expenditures for the American Express Gift Cheque

10   Program, correct?

11   A.   I suppose, yes.

12   Q.   And to your knowledge or from what you learned once you

13   took this position in November 2006, every single

14   purchase -- every single order for American Express Gift

15   Cheques that was ordered through Rick Rumbaugh's IT

16   Department was paid by BD, correct?

17   A.   Correct.

18   Q.   Now, with respect to that process, who would have

19   received the invoice from American Express for the gift

20   cheques?

21   A.   Prior to?

22   Q.   Prior to you becoming the Finance Manager for Global

23   IT?

24   A.   Well, it would have gone through either Lisa Gordon or

25   accounts payable.

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 203 of 280

1   Q.   And would Lisa Gordon -- would she have had to approve

2   payment on those invoices?

3   A.   If there was a valid PO on the invoice, then it would

4   have been processed through accounts payable.  So she would

5   not have had to approve it.  Her manage -- well, the manager

6   who approves the requisition should have approved it.  So if

7   Rick Rumbaugh approved the requisition in SAP, then the

8   purchase order was created through SAP so that American

9   Express can put the purchase order on the envelopes.

10  Q.   So just so I understand you correctly, Mr. Chice, in

11  the SAP system, a manager would have had to approve a

12  requisition in order for a purchase order number to be

13  generated, correct?

14  A.   Correct.

15  Q.   And if that purchase order number was generated, once

16  Ms. Gordon, or now you in her position, gets a particular

17  invoice, so long as there's a purchase order number, it

18  would've been honored by BD and paid, correct?

19  A.   Correct.

20  Q.   Now, with respect to the awards that were given out,

21  you mentioned something on direct about "spot awards."

22  Could you tell the ladies and gentlemen of the jury what are

23  spot awards or your understanding of what they are?

24  A.   From my understanding is that these are rewards for

25  anything that was above and beyond that person's normal

1    duties.

2    Q.   And were those spot awards different from MVP awards?

3    A.   No.

4    Q.   Were they different from impact awards?

5    A.   No.

6    Q.   Were they different from director awards?

7    A.   Director awards?

8    Q.   Um-hum.

9    A.   I'm not sure what those are.

10   Q.   Have you ever seen a nomination form for receipt of an

11   American Express Gift Cheque?

12   A.   Yes.

13   Q.   Okay.  You don't recall seeing that there's an award

14   called a director's award?

15   A.   No.

16   Q.   Okay.  Have you ever awarded a gift cheque to any of

17   your employees at BD?

18   A.   No.

19   Q.   So when you talk about the term "spot award," you're

20   generalizing using any award given out for using American

21   Express Gift Cheque?

22   A.   Well, that's the program.

23   Q.   Now, did MVP awards need to be approved by a manager?

24   A.   Yes.

25   Q.   Did impact awards need to be approved by a manager?

1  A.    Yes.

2           MS. RUBAIN:  Your Honor, if I could just have one

3  moment, Your Honor, I would like to approach the witness,

4  please.

5           THE COURT:  You may.  Let me see counsel up at the

6  side when you come up here.

7           (Bench conference as follows:)

8           THE COURT:  I am going to caution you on the "just

9  so I understand" prelude.  I know that's a little habit

10 there, but that's a -- it's a little argumentive.  Whether

11 you understand the answer or not is not the issue.

12          MS. RUBAIN:  I forgot I'm in federal court, Your

13 Honor.  Thank you very much.

14          (Bench conference concluded.)

15 BY MS. RUBAIN:

16 Q.    Now, Mr. Chice, let me switch gears for one moment.  I

17 believe you said that once you became manager -- or Finance

18 Manager for Global IT, one of your jobs was to review all of

19 the American Express Cheques ordered by the IT department,

20 correct?

21 A.    Right.

22 Q.    Now, did you review every single American Express Gift

23 Cheque ordered by that department?

24 A.    In RTP?

25 Q.    Yes, sir.

1    A.    Yes.

2    Q.    And how many -- or approximately how many cheques were

3    ordered by the RTP branch of the IT Department from roughly

4    September 2003 through January 2006?

5    A.    I'm not sure.

6    Q.    Other than cheques ordered by Ms. Perry, who else in

7    the IT branch ordered gift cheques?

8    A.    Linda Tingen.  That's the only name that I recall.

9    Q.    Do you recall reviewing any gift cheques ordered by

10   Betty Stewart?

11   A.    I believe so, yes.

12   Q.    And did you review all gift cheques ordered by

13   Ms. Stewart?

14   A.    If she was not part of IT, then I did not.  But at the

15   time I reviewed some of them.

16   Q.    Did you review an order that Ms. Stewart forwarded to

17   American Express in November of 2005 for gift cheques

18   totaling $14,025?

19   A.    Can I take a look at the exhibit?

20          MS. RUBAIN:  Your Honor, if I may approach, I

21   believe this is what's previously been marked as Defendant's

22   Exhibit No. 5.

23          THE COURT:  You may.

24   BY MS. RUBAIN:

25   Q.    Mr. Chice, I'm going to approach you with what's

1    previously been marked as Defendant's Exhibit No. 5 and ask

2    if this document helps refresh your recollection as to

3    whether or not you recall reviewing Ms. Stewart's order of

4    that date.

5    A.    Yes.

6    Q.    Does that document help refresh your recollection?

7    A.    Yes.

8    Q.    Do you recall reviewing documents which noted that

9    Ms. Stewart made a request for American Express Gift Cheques

10   on November 7 of 2005 totaling $14,025?

11   A.    Yes.

12   Q.    Did you review Ms. Stewart's logs with respect to that

13   order?

14   A.    Yes.

15   Q.    And do you know where those gift cheques that she

16   ordered went?

17   A.    Not offhand, no.

18   Q.    Did you review each and every cheque that was issued to

19   Ms. Stewart as part of this order?

20   A.    I believe I did, but --

21         MR. CHUT:  Your Honor, objection.

22         THE COURT:  Had you finished your order [sic]?

23         THE WITNESS:  Had I finished my order?

24         THE COURT:  I mean, excuse me, finished your

25   order.  Finished your answer?  Sorry.  Had you finished your

1    answer?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  You may continue.

4              MS. RUBAIN:  Your Honor, did you overrule

5    Mr. Chut's objection?

6              THE COURT:  Was there something besides letting

7    him --

8              MR. CHUT:  No, Your Honor.  I was concerned that

9    Mr. Chice wasn't able to explain his answer, Your Honor.

10             THE COURT:  All right.  Mr. Chice, to the extent

11   you need to explain any answer, you may do that.

12             THE WITNESS:  Okay.

13             THE COURT:  All right.  You may continue,

14   Ms. Rubain.

15             MS. RUBAIN:  Thank you, Your Honor.

16   BY MS. RUBAIN:

17   Q.   Now, Mr. Chice, as part of your investigation into the

18   American Express Gift Cheque Program, were you able to

19   review what Mr. Rumbaugh's authority was as far as approval

20   authority in the SAP system during the period he was the

21   director of IT?

22   A.   He had authority of $50,000.

23   Q.   And where was that authority -- where did that

24   authority come from?

25   A.   Through his -- I believe approval through his boss,

1    Steve Cohrs.

2    Q.    And where did you get that information that he had

3    authority up to $50,000?

4    A.    There's a Lotus Notes database that indicates how much

5    he has approval authority for, and that's -- that approval

6    goes through the corporate controllers' group for approval

7    as well as his boss, Rick Rumbaugh's boss.

8    Q.    Did anyone in the Finance Department set Mr. Rumbaugh's

9    authority in the SAP system?

10   A.    It would've been -- the authority would have been given

11   through IT; but once the approval was given through this

12   Lotus Notes database, then IT establishes that approval

13   authority.

14   Q.    And what authority did Ms. Perry have?

15   A.    She -- I believe she had authority up to a thousand

16   dollars.

17   Q.    And by that, do you mean that she could make a

18   requisition in SAP and approve a purchase order for any

19   amount up to $1,000?

20   A.    Up to $1,000.

21   Q.    And is it your understanding that any approval for any

22   order over $1,000 had to be approved by Mr. Rumbaugh?

23   A.    Correct.

24   Q.    And you're familiar with the SAP system?

25   A.    Somewhat, yes.

1    Q.    Do you have training in the SAP system?

2    A.    Yes.

3    Q.    And do you have a particular -- are you a trainer of

4    the SAP system?

5    A.    No, I'm not a trainer.

6    Q.    You're not a super user of the SAP system?

7    A.    I'm a super user for the finance area.

8    Q.    Okay.  And what does being a super user for the Finance

9    Department mean?

10   A.    Means that you train users on to the program to do, you

11   know, journal entries, cost and reviews.  So it would get

12   someone into the system to do that type of activity.

13   Q.    But as a super user of the system, you could not change

14   people's authority within the SAP system, correct?

15   A.    Correct.

16   Q.    And you could not change your own authority?

17   A.    Correct.

18   Q.    Within the SAP system?

19   A.    Right.

20   Q.    Could you -- as a super user, could you go in and

21   approve a requisition just because of the simple fact that

22   you were a super user?

23   A.    No, because SAP is set up through profiles.  So if you

24   have a certain profile, like a finance profile, you can only

25   go into that module.

1    Q.    Who are the profiles created by?

2    A.    IT and Finance.

3    Q.    Now, I believe you testified with respect to those

4    profiles, you testified that each individual user of SAP was

5    assigned a unique 9-digit number, correct?

6    A.    A global ID.

7    Q.    Okay.  And that is an ID number so that you and anyone

8    else can track their usage within the SAP system, correct?

9    A.    Yes.

10   Q.    And as part of your investigation, did you review

11   Ms. Perry's use of the SAP system using her unique 9-digit

12   number?

13   A.    It was either -- I can't recall when the global ID was

14   established, whether it was just recently or if it was per

15   last name.  So it may have been her user name, meaning her

16   first initial/last name, or the global ID.

17   Q.    And were you able to generate a report in the SAP

18   system based upon either plugging in her name or that global

19   ID number?

20   A.    Yes.

21   Q.    And is that how you were able to track what gift

22   cheques she ordered?

23   A.    I was able to track the number of purchase requisitions

24   that she created through SAP.

25   Q.    And with respect to each purchase requisition that she

1   entered into SAP, for those that were over $1,000, were you

2   able to determine that Rick Rumbaugh had approved each of

3   those requisitions?

4   A.    It would indicate that.

5   Q.    Did it indicate that?

6   A.    Yes.

7   Q.    Now, you mentioned reviewing a log during the course of

8   your interview?

9   A.    Right.

10  Q.    Do you have a copy of that log with you?

11  A.    No.

12  Q.    Do you know who created that log?

13  A.    I would think Robin created it.

14  Q.    What did you do -- what, if anything, did you do with

15  that log?

16  A.    As far as reviewing it?

17  Q.    Well, what did you do after you reviewed it?

18  A.    Well, I looked at -- well, the log that Robin had

19  created had, I guess, the gift cheques, the code on it, and

20  so there was a log of that, but there was no denomination

21  associated or who it was given to.

22  Q.    Did you retain a copy of that document?

23  A.    I don't have it with me right now, no.

24  Q.    But did you retain a copy of that?

25  A.    Yes.

1   Q.   Do you still have it in your possession?

2   A.   It would probably be in Franklin Lakes, New Jersey.

3   Q.   Now, did you have a copy of that document prior to the

4   interview that you and John Dowd and Tom Valenti and Susan

5   Luthy conducted with Ms. Perry in 2007?

6   A.   Prior to?  I do not recall.

7   Q.   Had you had an opportunity to gather all of the gift

8   cheques and invoices assigned to Ms. Perry's global ID

9   number prior to your interview of her in 2007?

10  A.   It was probably during the time of when she was

11  suspended.

12  Q.   So is the answer yes or no?  Did you have -- had --

13  A.   At the time of interview, no.

14  Q.   So going into the interview, did you know how the

15  American Express Gift Cheque Program had been administered

16  by Rick Rumbaugh at the IT Department at RTP?

17  A.   No.

18  Q.   And the purpose of that interview was to get some

19  information, correct?

20  A.   Yes.

21  Q.   In addition to Ms. Perry, who, if anyone else, did you

22  interview?

23  A.   Well, I did not participate in all the interviews, so

24  I'll just leave it at that, I guess.

25  Q.   Did you -- you didn't participate in any other

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 214 of 280

1  interviews other than the interview with Ms. Perry?

2  A.    Right.

3  Q.    Okay.  Do you know who else was interviewed as a result

4  of this investigation that you and others were doing into

5  the American Express Gift Cheque Program?

6  A.    Yes.

7  Q.    Who was interviewed?

8          THE COURT:  Well, I'm going to sustain.  If he

9  didn't participate, it seems to me hearsay for him to say

10 who was.

11         MS. RUBAIN:  Thank you, Your Honor.

12 BY MS. RUBAIN:

13 Q.    With respect to the interview of Ms. Perry that you did

14 participate in, were you present for the whole interview?

15 A.    I was on the phone.

16 Q.    Okay.  You were on the phone immediately from the

17 inception of the interview?

18 A.    Correct.

19 Q.    And had you ever met Ms. Perry before?

20 A.    No.

21 Q.    Had you ever heard her voice before?

22 A.    No.

23 Q.    Did you ask any question at all during the interview

24 that was conducted of Ms. Perry?

25 A.    I do not recall, no; most likely not.

1  Q.   And where were you located during the interview?

2  A.   I thought I was in -- I believe I was in North

3  Carolina.

4  Q.   Were you at the RTP branch?

5  A.   I can't recall.

6  Q.   Do you recall the specific date of the interview?

7  A.   It was January or February of 2007.  It may have been

8  like the first week of February.

9  Q.   To backtrack a bit, Mr. Chice, with respect to using

10  the SAP system to order these cheques, is it your

11  understanding when the requisition was made that request was

12  sent to purchasing, correct?

13  A.   Well, once it's approved by the manager.

14  Q.   Okay.  So the step after the initial requisition is for

15  a manager then to approve the requisition, correct?

16  A.   Through SAP, yes.

17  Q.   Now, once that manager approves the requisition in SAP,

18  it's then sent to purchasing to generate a purchase order

19  number, correct?

20  A.   Correct.

21  Q.   Now, with respect to the American Express Gift Cheques,

22  once purchasing received an approved requisition to order

23  American Express Gift Cheques, did purchasing then generate

24  a purchase order and send it to American Express?

25  A.   It's either the purchaser purchasing would send the

1    req. or the PO to American Express, or the requisitioner

2    would send it.

3    Q.    And to your knowledge, did Becton Dickinson pay the

4    American Express -- the invoices for the American Express

5    Gift Cheques ordered by Ms. Perry either by wire transfer or

6    cheque?

7    A.    Correct.

8    Q.    Now, would the Finance Manager for the IT Department

9    receive copies of any cheques that were paid out by BD for

10   the IT Department?

11   A.    No.

12   Q.    Okay.  They would just be able to go into the SAP

13   system to see what expenditures have been made?

14   A.    But the SAP system will list the cheque number.

15   Q.    Mr. Chice, did you review each and every \check\cheque

16   that was in Robin Snipes' or Robin Snipes Perry's name

17   during the course of your investigation?

18   A.    These gift cheques?

19   Q.    Yes.  Yes, sir.

20   A.    Yes.

21   Q.    Now, with respect to any cheques that predate January

22   of 2005, you don't know which cheques, if any, Ms. Perry

23   received through a legitimate nomination from her manager,

24   correct?

25   A.    There would've been some type of form that the manager

1    would have filled out to nominate her for some type of

2    impact award or MVP award.

3    Q.    Who was her manager prior to Rick Rumbaugh?

4    A.    There was a manager Mohammed -- I can't recall his last

5    name, Andrea Vincent, Sherry Bromel or something like that.

6    Q.    Did you interview either of those managers during the

7    course of your investigation?

8    A.    I did not.

9    Q.    Now, throughout the course of your investigation, did

10   you learn that some gift cheque awards were issued without

11   using the nomination form?

12   A.    I do not recall.

13   Q.    You never learned that during your investigation?

14   A.    No.

15   Q.    Now, as far as the information that Ms. Perry had to

16   input into the SAP system to make the requisition, she

17   always used her name, correct?

18   A.    Um-hum.

19   Q.    And she used her own unique global ID number, correct?

20   A.    Yes.

21   Q.    And from your review -- from your investigation, were

22   you able to determine whether there was anything incorrect

23   or fraudulent input in the SAP system to make the

24   requisition?

25   A.    Fraudulent meaning?

Q.    Untrue, inaccurate.

          THE COURT:  I'm going to sustain as to the form.
I'm going to ask you to rephrase that question.

BY MS. RUBAIN:

Q.    Mr. Chice, you reviewed all requisitions associated
with Ms. Perry's number, correct?

A.    Correct.

Q.    And from the information that you reviewed, could you
determine whether there was any incorrect information input
in the SAP system?

A.    Not --

          MR. CHUT:  Objection, Your Honor.

          THE COURT:  Well, let me see counsel at the side.

          (Bench conference as follows:)

          MR. CHUT:  What does incorrect mean, I'd say?

          THE COURT:  It looked to me like he understood.
He was getting ready to answer.  Any incorrect information?
She's established that Ms. Perry had authorization up to a
thousand, rick Rumbaugh had to approve anything over a
thousand, and that everybody is supposed to be inputting at
each step of the process.  I mean, as I understand -- now,
I'm getting lost.  What does incorrect mean?

          MS. RUBAIN:  Well, my point is she inputted her
name, her specific number.  Did she put someone else's name
and make the request?  Did she use Rick Rumbaugh's name to

1    approve it, things like that.

2              THE COURT:  I think you may have to break that

3    question down into some component parts.

4              (Bench conference concluded.)

5              THE COURT:  I'll sustain as to the form.  You may

6    rephrase the question.

7              MS. RUBAIN:  Your Honor, I won't ask any further

8    questions.

9              THE COURT:  All right.  Redirect, Mr. Chut?

10             MR. CHUT:  Yes, Your Honor.

11              R E D I R E C T   E X A M I N A T I O N

12   BY MR. CHUT:

13   Q.   Mr. Chice, you reviewed Ms. Stewart's gift cheque

14   orders?

15   A.   Yes.

16   Q.   And you reviewed her cheques?

17   A.   Yes.

18   Q.   Did she write any cheques to cash?

19   A.   No.

20   Q.   Did she write any cheques to herself?

21   A.   No.

22   Q.   Did you review the other administrative assistants

23   cheque orders?

24   A.   Yes.

25   Q.   Did any of them write cheques to cash?

1   A.    No.

2   Q.    Did any of them write cheques to themselves?

3   A.    No.

4   Q.    Did any of them order cheques amounting to thousands of

5   dollars?

6   A.    No.

7   Q.    Let me rephrase that:  Tens of thousands of dollars?

8   A.    No.

9   Q.    Did you find any evidence that they had made an award

10  to themselves?

11  A.    No.

12  Q.    Were there any particular person that, based on your

13  review, you found evidence of improper use of the cheque

14  card program?

15  A.    No.

16  Q.    Was there any --

17  A.    Was there --

18  Q.    Any person at all?

19  A.    No, there was no persons.

20  Q.    Besides Ms. Snipes?

21  A.    Besides Ms. Snipes, right.

22  Q.    And you mentioned -- in one of your answers, you said

23  it was "discovered."  What did you mean by that?

24  A.    It was "discovered"?

25  Q.    Yes.  You mentioned that -- you were asked about

1   Ms. Snipes's -- Ms. Perry's conduct being discovered.  What

2   did you mean by that?

3   A.   Could you --

4   Q.   When was the -- when were Ms. Perry's use of gift

5   cheques discovered?

6   A.   Oh, sorry.  It was January of 2007, around that time

7   frame.

8   Q.   And what happened to the program after her conduct was

9   discovered?

10  A.   It was --

11          MS. RUBAIN:  Objection.

12          THE COURT:  Yeah, sustained.

13  BY MR. CHUT:

14  Q.   Was there a change in the program following the

15  discovery --

16          MS. RUBAIN:  Objection.

17          THE COURT:  Let me see counsel at the side.

18          (Bench conference as follows:)

19          THE COURT:  Basis?

20          MS. RUBAIN:  Basically, he's trying to get out

21  that they stopped the American Express Gift Cheque Program

22  because of what she did, and I would liken that to if

23  someone makes a change based upon someone slipping and

24  falling at their location, they now -- I mean, you can't get

25  in what curatively they did to correct a problem after the

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   fact.

2           MR. CHUT:  Your Honor, she's opened the door to

3   that.  She's elicited all type of testimony that this was

4   approved, this was hunky-dory, this was fine, and the

5   reality this defendant -- this witness will testify to is

6   when this conduct was discovered, BD came down like a ton of

7   bricks.  That is relevant.  That is directly in response to

8   her questions about authorization, and I think that's

9   perfectly appropriate.  He has personal knowledge.  I think

10  that's extremely relevant.  I did not ask --

11          THE COURT:  Personal knowledge of what?

12          MR. CHUT:  Of what the status of the program was

13  following the discovery of --

14          THE COURT:  What was that?

15          MR. CHUT:  They terminated the program.  They no

16  longer participate in the program because of the risks they

17  discovered through this.

18          THE COURT:  So what does that show?

19          MR. CHUT:  It shows -- it responds directly to her

20  questions on cross that this all must have been approved and

21  was, therefore, okay.  In fact, BD's response is directly

22  responsive to that, directly responsive to that line of

23  questioning.

24          THE COURT:  Well, I understand from the

25  cross-examination and, to a certain degree, from your

1    examination that there were certain levels of authority.

2    She had authority up to a thousand dollars.  She ordered

3    cheques.  According to your witness, Mr. Rumbaugh had to

4    approve -- would have authorized anything over a thousand.

5    So I think we're talking about what various authorities

6    people have, and I don't understand her to being saying

7    everything is hunky-dory at this point.  There's still the

8    unanswered question of how these cheques got into

9    Ms. Perry's hands.

10          But I think the fact that they terminated the

11   program, it could be because of the problems here.  You

12   know, I don't know.  Maybe they just were ready to terminate

13   it.  But that's a whole separate issue, just the simple fact

14   they terminated the program.

15          MR. CHUT:  But he can testify as to why they

16   terminated it, Your Honor, and I think that's directly

17   responsive to her question on cross.

18          THE COURT:  All right.  I'm going to send the jury

19   out.  We'll hear it outside the presence of the jury.

20          (Bench conference concluded.)

21          THE COURT:  Ladies and gentlemen, I'm going to ask

22   you to step back to the jury room for just a moment, please.

23          (At 4:13 p.m., jurors excused.)

24          THE COURT:  All right.  Mr. Chut, you may ask your

25   question.

BY MR. CHUT:

Q.   Following your investigation of Ms. Perry's use of the
American Express Gift Cheque Program, did BD make a decision
about the program?

A.   Yes, they did.

Q.   And what was the nature of that decision?

A.   To transfer it under the HR function or to eliminate
it.

Q.   And which choice did they make?

A.   It was to consolidate under HR.

Q.   Does BD continue the program to this day?

A.   They do, but it's very hard to get an MVP or spot
award.  So it's very strict.

        MR. CHUT:  No further questions, Your Honor.  I
will not follow this chain of questioning any further.

        THE COURT:  All right.  You may bring the jury
back in, Mr. Caple.  If they've stepped into the restroom,
when they're ready to come in, you can bring them.

        (At 4:16 p.m., jurors arrive.)

        THE COURT:  I'll sustain the objection.  You may
continue, Mr. Chut.

BY MR. CHUT:

Q.   You reviewed -- testified you reviewed the cheques that
were part of Exhibit 8?

A.   Yes.

1   Q.   Did you find any cheques signed by Mr. Rumbaugh?

2   A.   No.

3   Q.   Did you find any cheques made out to Mr. Rumbaugh?

4   A.   No.

5   Q.   Did you find any -- what did you find in reviewing

6   those cheques in regard to Mr. Rumbaugh?

7   A.   In regards to Mr. Rumbaugh?  That there were no cheques

8   made out to Mr. Rumbaugh.

9   Q.   Did Mr. Rumbaugh award cheques to himself?

10  A.   No.

11  Q.   Did Mr. Rumbaugh have cheques made out to him?

12  A.   No.

13  Q.   Now, you testified about the SAP program.

14  A.   Correct.

15  Q.   How would the authority -- the managerial authority

16  appear in the SAP program?

17  A.   There's a classification that goes from A through G,

18  and that's different levels of authority.  So depending

19  on -- I guess Mr. Rumbaugh had up to $50,000 of approval, so

20  he was classified as an E.

21  Q.   And how does that authority appear in the SAP records?

22  A.   It's through their profiles.

23  Q.   And how does a manager access the SAP program?

24  A.   Through user ID and a password.

25  Q.   And how is the user ID entered into the computer?

Case 1:10-cr-00032-WO   Document 52   Filed 09/01/11   Page 226 of 280

1    A.    Through IT.

2    Q.    And does someone have to type it in?

3    A.    Someone would have to type it in or enter it in, yes.

4    Q.    And how about a PIN?

5    A.    Excuse me?

6    Q.    How about the PIN?

7    A.    The pen?

8    Q.    The PIN?

9    A.    Oh, the PIN, yes.  No.

10   Q.    Would someone have to type that in?

11   A.    They would have to type it in, into SAP.

12   Q.    So all SAP showed was a PIN number and the profile?

13   A.    Right.

14   Q.    What would happen if someone besides Mr. Rumbaugh typed

15   in that ID number?

16              MS. RUBAIN:  Objection.

17              THE COURT:  I'll overrule it.

18              THE WITNESS:  What would happen?  They would have

19   access to his profile.

20   BY MR. CHUT:

21   Q.    And how would that show up on the records?

22   A.    It would show under Mr. Rumbaugh's user ID or

23   profile -- user ID.

24   Q.    So the program would not -- would the program show that

25   someone else besides him physically typed it in?

1   A.    No, it would not.

2   Q.    Is it fair to say that SAP only reveals that a

3   particular profile was entered?

4   A.    Correct.

5   Q.    For normal transactions, is that profile accepted by BD

6   for authority?

7   A.    Yes.

8   Q.    You don't go any further than just double check the

9   person actually entering it?

10  A.    Right.

11  Q.    So someone that had Mr. Rumbaugh's profile and password

12  could enter it into the computer?

13          MS. RUBAIN:   Objection.

14          THE COURT:   Well, let me see counsel at the side.

15          (Bench conference concluded.)

16          THE COURT:   Basis?

17          MS. RUBAIN:   He's asked two questions causing him

18  to speculate as to what would happen if someone entered

19  Rumbaugh's user ID and password, I guess making the argument

20  that she must have had his ID and password.  That question

21  was not posed to Mr. Rumbaugh.

22          THE COURT:   I think the question is:  What's the

23  relevance at this point?  Is there some evidence that she

24  was using his password and ID?

25          MR. CHUT:   Well, Your Honor, the evidence is

1    Mr. Rumbaugh said he didn't authorize it, and he's testified

2    that in the system -- the system is simply a number.  The

3    number shows up.  It's not Mr. Rumbaugh saying he authorized

4    it.  It's just a number.  And it's like any PIN number or

5    identity situation.  I mean, this a situation where the

6    manager has stood in this court and said he did not

7    authorize these transactions.  He has explained that.  And

8    he's a user of the system and understands it.  But the

9    system just looks at a PIN number and a profile number, and

10   if that's entered -- I mean, he's already testified to it.

11             MS. RUBAIN:  But what's the relevance to the

12   hypothetical?

13             THE COURT:  Yeah, I think there's some basis to

14   get an explanation as to how the PIN number -- I mean, how

15   the system works, how you use the PIN number, what are the

16   security measures in relation to the PIN number?  I think

17   when you get past -- and then once that's established, I

18   think you can argue whatever you want to argue to the jury

19   with respect to that.

20             MR. CHUT:  Okay.

21             THE COURT:  But I think here if somebody could

22   have used Rick Rumbaugh's PIN number and gotten into the

23   system and would have appeared as being Rick Rumbaugh, I

24   don't think that illustrates it any further.  I think that

25   gets into argument rather than fact.

 1              MR. CHUT:  Then I'll move on, Your Honor.  Thank

 2   you, Your Honor.

 3              THE COURT:  I don't want to unfairly mislead you

 4   either.  At this point I don't see that there's any -- I

 5   think there is, as you say, evidence Mr. Rumbaugh didn't

 6   authorize all this, but I'm not sure there's any evidence

 7   that anybody had access to or could have gotten to his PIN

 8   number.

 9              So when I say you can argue what the facts show, I

10   don't mean to mislead you on that.  I'm not sure what the

11   facts show.  I'll have to think about that a little bit at

12   this point.

13              MR. CHUT:  Yes, Your Honor.

14              (Bench conference as follows:)

15              THE COURT:  I'll sustain the objection.  You may

16   continue, Mr. Chut.

17   BY MR. CHUT:

18   Q.   In your review of the American Express gift card

19   program, did you review the logs of the various employees?

20   A.   Yes.

21   Q.   And did you match the logs to the cheques?

22   A.   Yes.

23   Q.   And did you check Ms. Stewart's lag?

24   A.   Yes.

25   Q.   Did they match the cheques?

1    A.    Yes.

2    Q.    And did the other employees' logs match the cheques?

3    A.    Aside from Robin Snipes?

4    Q.    Yes, sir.

5    A.    Yes.

6    Q.    Included in your investigation, were any steps taken as

7    to Ms. Perry's status at BD?

8    A.    She was --

9              MS. RUBAIN:  Objection, Your Honor.

10             THE COURT:  Let me see counsel at the side.

11             (Bench conference as follows:)

12             THE COURT:  I'll tell you what, this is getting

13   very difficult here.

14             MR. CHUT:  I'm sorry, Your Honor.

15             THE COURT:  I'm not completely sure I understand

16   his status, but he came in and took some position in

17   November of 2006 --

18             MR. CHUT:  I said Ms. Perry's status, Your Honor.

19             THE COURT:  I understand, but hear me out in why

20   there's some confusion here.

21             The interview he describes took place -- he says

22   it took place in 2007, and she was still employed at that

23   time.  Now, if this interview is the same one in the book,

24   it took place in 2006 not in 2007.  So I'm all over the

25   board on facts as to what he knows and what he's testified

1    about and who did what when.

2              So I'm going to sustain the objection, but it's

3    just because there is a lot of confusion about what he knew

4    directly about it at this point at any particular time.

5              MR. CHUT:  Yes, sir.

6              (Bench conference concluded.)

7              THE COURT:  I'll sustain the objection.

8              MR. CHUT:  No further questions, Your Honor.

9              THE COURT:  Any recross?

10             MS. RUBAIN:  Yes, Your Honor, very briefly.

11              R E C R O S S - E X A M I N A T I O N

12   BY MS. RUBAIN:

13   Q.   Mr. Chice, with respect to the gift cheque program, who

14   had authority to countersign the gift cheques?

15   A.   Countersign the gift cheques?

16   Q.   Yes, handing them out to someone.  I believe they had

17   to be signed and countersigned.

18   A.   It would've been a manager.

19   Q.   Did administrative coordinators have the authority to

20   countersign the cheques?

21   A.   Not to my knowledge, no.

22   Q.   Could a manager have delegated that authority to an

23   administrative coordinator?

24   A.   Could have?

25   Q.   Yes.

1   A.    Um --

2             MR. CHUT:  Objection, Your Honor.

3             THE COURT:  Well, if you know.  If you don't

4   know --

5             THE WITNESS:  I don't know.

6   BY MS. RUBAIN:

7   Q.    Now, Mr. Chut asked you whether you reviewed all of the

8   order forms submitted by all of the administrative

9   coordinators in the IT Department, correct?

10  A.    Correct.

11  Q.    And you did that?

12  A.    Correct.

13  Q.    And I believe you testified that after reviewing all of

14  those order forms, you did not determine that any other

15  administrative coordinator had ordered tens of thousands of

16  dollars of American Express Gift Cheques, is that correct?

17  A.    Correct.

18  Q.    Now, you recall when I asked you about a particular

19  exhibit with respect to Ms. Stewart?

20  A.    Right.

21  Q.    And Ms. Stewart, in fact, ordered American Express Gift

22  Cheques totaling $14,025 on November 7, 2005?

23  A.    Right.

24  Q.    Correct?

25  A.    Yes.

1  Q.   So there were instances where other administrative

2  coordinators at one fell swoop ordered tens of thousands

3  dollars worth of cheques?

4  A.   Right.

5  Q.   Now, based upon your review of all the gift cheque

6  order forms that were issued, how much did Ms. Stewart

7  order, do you know?

8  A.   I do not.

9  Q.   Do you know how much Ms. Tingen ordered?

10 A.   No.

11          MS. RUBAIN:  Your Honor, that's all I have.

12          THE COURT:  Mr. Chut?

13          MR. CHUT:  One quick question, Your Honor.

14             R E D I R E C T   E X A M I N A T I O N

15 BY MR. CHUT:

16 Q.   Based on your review of the program, who ordered the

17 most gift cheques of the administrative assistants?

18          MS. RUBAIN:  Objection.

19          THE COURT:  Well, let me see counsel at the side.

20          (Bench conference as follows:)

21          THE COURT:  I may have misunderstood, but I

22 thought he didn't know how much Ms. Stewart and Ms. Tingen

23 ordered.  So he's comparing one known to two unknowns.  I

24 don't know how he can make that comparison.

25          MR. CHUT:  I think he's already testified, Your

1   Honor, that she had ordered more.  She just asked him about

2   whether there was an unusually large order for this

3   particular time, he said yes, and the question is following

4   that up.  I think he could answer that he's reviewed the

5   cheques.  I think he's testified that she had --

6           THE COURT:  Yeah, there may be something in there

7   already.  But in response to what came out on recross, I

8   mean, I thought he clearly said he didn't know how much

9   Stewart and Tingen ordered.  And so saying "how much," it

10  seems to me, opens that up to more I'm going to sustain as

11  to that .

12          MR. CHUT:  Yes, Your Honor.

13          (Bench conference concluded.)

14          MR. CHUT:  I have no further questions, Your

15  Honor.

16          THE COURT:  You may step down, Mr. Chice.

17          (At 4:28 p.m., witness excused.)

18          THE COURT:  You may call your next witness,

19  Mr. Chut.

20          MR. CHUT:  The United States calls Susan Luthy.

21  We'd ask to release Mr. Chice also.

22          THE COURT:  Any objection?

23          MS. RUBAIN:  Your Honor, I would like to explore

24  the opportunity of re-calling him.  If we could give him the

25  same instruction you gave to Mr. Rumbaugh.

```
 1                    MR. CHUT:  Your Honor --

 2                    THE COURT:  Let me see counsel at the side.

 3                    (Bench conference as follows:)

 4                    MS. RUBAIN:  Your Honor, I'm not going to need to

 5       re-call him, so we can go ahead --

 6                    THE COURT:  He's not from around here.

 7                    MR. CHUT:  He's from Franklin Lakes, New Jersey,

 8       Your Honor.

 9                    MS. RUBAIN:  That's fine.  I'm probably not going

10       it go through anything else with him.

11                    THE COURT:  He's not leaving town, so if we needed

12       to, we could get him back --

13                    MS. RUBAIN:  He might, and that's fine.

14                    MR. CHUT:  He would be going to Franklin Lakes.

15                    THE COURT:  Oh.  He's released, okay.

16                    (Bench conference concluded.)

17                    MR. CHUT:  May the witness be released, Your

18       Honor?

19                    THE COURT:  He may.

20                    MR. CHUT:  And the United States would call Susan

21       Luthy, Your Honor.

22                    THE CLERK:  Please come forward and be sworn.  Do

23       you solemnly swear that all the testimony you're about to

24       give in the case now before the Court will be the truth, the

25       whole truth, and nothing but the truth so help you God?
```

1          MS. LUTHY:  Yes.

2                        SUSAN M. LUTHY,

3      Being first duly sworn at 4:30 p.m., testified under

4      oath as follows:

5                D I R E C T   E X A M I N A T I O N

6  BY MR. CHUT:

7  Q.   Ms. Luthy, please state your full name for the Court.

8  A.   Susan Margo Luthy.

9  Q.   And how are you employed, ma'am?

10 A.   I'm employed at BD.

11 Q.   And how long have you been employed at BD?

12 A.   Nineteen years.

13 Q.   And what is your current position at BD?

14 A.   I'm the vice-president of Human Resources for the

15 corporate functions.

16 Q.   And were you involved with BD in 2006?

17 A.   Yes.

18 Q.   And what was your position at BD in 2006?

19 A.   Then I was the Director of Human Resources for Finance

20 and IT.

21 Q.   And was a Robin Snipes Perry employed at BD in 2006?

22 A.   Yes, she was.

23 Q.   And when was Ms. Perry hired by BD?

24 A.   I don't know the exact date.  I think she worked for

25 the company for about 4 1/2 years or so.

1    Q.    And when she was hired, what name was she hired under?

2    A.    She was Robin Snipes.

3    Q.    And that was her maiden name?

4    A.    I don't know what that was.

5    Q.    But that was the name she was hired under?

6    A.    Yes.

7    Q.    Now, you had the opportunity to review what awards were

8    made to Ms. Snipes?

9    A.    I did, yes, have that opportunity.

10   Q.    Let me back up.  Did -- in 2006, did BD have an awards

11   program in place?

12   A.    Yes, we have multiple award programs.

13   Q.    Was there an award program -- strike that.  What

14   programs did BD have in 2006?

15   A.    There are award programs that are typically run by

16   site, so it's where the associates are located.  They have

17   certain guidelines about the recognition that's provided to

18   associates.

19   Q.    And was one of those programs an American Express

20   Program?

21   A.    Yes.

22   Q.    And what was the nature of that program?

23   A.    In our Research Triangle Park facility, there was a

24   program that would acknowledge associates with 25, 50, maybe

25   $100 American Express Gift Cheques to acknowledge their

1    accomplishments.

2    Q.    And who administered that program?

3    A.    It was administered locally in Research Triangle Park.

4    Q.    And what was -- did BD have a facility in Research

5    Triangle Park?

6    A.    Yes.

7    Q.    And what was the nature of that facility?

8    A.    The facility is mostly technology research people

9    developing new product ideas, and also there were some IT

10   people who were located there, and I was accountable for the

11   IT side of it at that time.

12   Q.    Who was the HR -- strike that.  Was there an HR person

13   on site at RTP?

14   A.    Yes, John Dowd was the site HR manager.

15   Q.    And what were Mr. Dowd's responsibilities as an HR

16   manager on site?

17   A.    So as the manager on site, he was accountable for

18   attracting, hiring, developing, and retaining associates,

19   working with managers and leaders to develop the talent and

20   the organization for that site.  So he was the person who

21   people would come to for Human Resources related activities.

22   Q.    Now, how were awards made in the American Express gift

23   program at the RTP site?

24   A.    I don't know that firsthand because I'm not accountable

25   for running the program at that particular site.  That was

1    something John would do and the folks there.

2    Q.    Over the course of Ms. Perry's employment, did she

3    receive any awards?

4    A.    Yes, she did.

5    Q.    From BD?

6    A.    Yes.

7    Q.    And what was the amount of those awards in total?

8    A.    I don't know the specific amount.  That would be

9    something that again was administered in Research Triangle

10   Park by the group of folks who were there.

11   Q.    Did you have an opportunity to review Ms. Perry's

12   personnel file before coming to court today?

13   A.    I did, yes.

14   Q.    And what did that file indicate?

15   A.    It indicated somewhere around $5,000 worth of awards.

16   I don't know exactly over the course of her employment.  So

17   a number of years.

18   Q.    In any BD award program, are employees authorized to

19   make awards to themselves?

20   A.    No.

21   Q.    Is there a nomination -- strike that.  Are BD employees

22   authorized to -- are they authorized to -- strike that.  Who

23   normally is authorized to make an award?

24   A.    Anyone who observes outstanding performance or

25   contributions.  So other leaders in the organization and

1    other associates can nominate another associate, but no one

2    can nominate themself for doing something outstanding.  It's

3    done by the observation of other people.

4    Q.   And what are the typical amounts of awards made under

5    the BD awards program?

6             THE COURT:  Let me see counsel at the side.

7             (Bench conference as follows:)

8             THE COURT:  I realize a lot of time has passed,

9    but I thought she just testified she didn't know how the

10   program was administered at RTP.  So I'm not sure what the

11   relevance is within the global company at this point in

12   time.

13            MR. CHUT:  Yes, Your Honor.

14            (Bench conference concluded.)

15            THE COURT:  I'll sustain an objection to that

16   question.

17   BY MR. CHUT:

18   Q.   In 2006, Ms. Luthy, were you involved in an

19   investigation involving the gift program at the RTP site?

20   A.   Yes, I was.

21   Q.   And what was the nature of your involvement in the

22   investigation?

23   A.   So as the Director of HR for IT, I was brought in to a

24   meeting room with David Chice and Tom Valenti who told me

25   that there was --

1            MS. RUBAIN:  Objection.

2            THE COURT:  Hold on just a second.  Ladies and

3    gentlemen, let me ask you to step back to the jury room for

4    just a moment, please.

5            (At 4:37 p.m., jurors excused.)

6            THE COURT:  Tom Valenti is going to testify?

7            MR. CHUT:  Yes, Your Honor.

8            THE COURT:  All right.  The basis for the

9    objection?

10           MS. RUBAIN:  Your Honor, I don't believe Mr. Chice

11   testified about any meeting that he had with Ms. Luthy and

12   Mr. Valenti.  The only testimony that he gave about some

13   involvement with her was this telephone conference that he

14   and she were part of with Mr. Valenti and Mr. Dowd.

15           THE COURT:  Ms. Luthy, let me ask you to finish

16   your answer at this point in time.  You were asked -- now I

17   can't even remember the question.  You were asked about the

18   nature of your involvement in the investigation.  You

19   started out with you were brought to a meeting room with

20   David Chice and Tom Valenti.  And the way you phrased it, I

21   understand Tom Valenti informed you of something.  So if you

22   could go ahead and finish your answer.

23           THE WITNESS:  Yes, I was informed that there was

24   some irregularity in the use of American Express Gift

25   Cheques, and we discussed how to investigate that

1   irregularity.  And we determined what interviews would take

2   place, who would conduct the interviews, those kinds of

3   things, and then it was my role to conduct some of the

4   interviews.

5           THE COURT:  Okay.  Who did you interview?

6           THE WITNESS:  I interviewed some admins on site at

7   RTP, Betty Stewart and Linda Tingen, and some leaders.  I'm

8   trying to think; they were on the research side.  And John

9   Dowd.  I interviewed John Dowd and asked him to outline and

10  describe the program that was being run at Research Triangle

11  Park.

12          THE COURT:  And did Mr. Chice participate in this

13  discussion, too, at that time?  I'm back to the original

14  meeting between you and Tom Valenti and David Chice.

15          THE WITNESS:  So he did not, but I do recall I

16  also interviewed Rick Rumbaugh, and Tom Valenti participated

17  in that interview with me.

18          THE COURT:  Okay.  But I'm going back to your --

19  you find out there's a problem at RTP, so you had this

20  meeting with -- was it Tom Valenti and David Chice?

21          THE WITNESS:  Yes.

22          THE COURT:  And did Mr. Chice participate in the

23  discussion during the course of that meeting?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Let me ask you to step to the

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  hallway just a moment, please.  Let me see counsel at the

2  side.

3                  (Witness steps out of the courtroom.)

4                  (Bench conference as follows:)

5                  THE COURT:  I don't have any problem with her

6  testifying about what happened during the course of the

7  meeting, but it does concern me a little bit to release

8  Mr. Chice before we -- I don't know whether you knew that

9  this testimony was coming or not --

10                 MS. RUBAIN:  I did not.

11                 THE COURT:  -- about this meeting.  So I'm going

12 to take -- we'll take five quick minutes.  Just tell

13 Mr. Chice to stay until we can hear this testimony and

14 figure out -- tell him not to get on a plane until we hear

15 what happens and sort out where we're going.

16                 MR. CHUT:  Yes, Your Honor.

17                 (Bench conference concluded.)

18                 THE COURT:  We'll stand in recess for five

19 minutes.

20                 (At 4:42 p.m., break taken.)

21                 (At 4:46 p.m., break concluded.)

22                 THE COURT:  All right.  Word came up to chambers

23 that Mr. Chice is on his way to the airport.  I really am --

24 I don't -- he doesn't need to sit around this courtroom

25 right now, but I think based on what -- I've heard Mr. Chice

1   was released before it appears the defendant -- or at least

2   counsel realized there was another meeting that may be

3   relevant as to this matter, and it may be at the end of the

4   testimony it doesn't really matter anyway.  I know Tom

5   Valenti was there, too, apparently.

6           But in any event, I'm going to -- I don't want to

7   release Mr. Chice just yet.  He can get on the plane and fly

8   back to New Jersey, but he might be returning back here

9   Thursday morning at 9:30 to testify.  I don't mean to take a

10  hard line on that, but it seems to me that if a witness is

11  going to be released, in fairness to both sides, that I

12  don't want anybody to get hit with anything by any surprise.

13          MR. CHUT:  Your Honor, there was certainly no

14  intention on part of the Government.  It was my

15  understanding she was going say I had a meeting, and then

16  she was going to discuss her role in it, and that's the end

17  of it.  Certainly, there was no intention of ambushing

18  anyone or getting into that or to say something else.  So,

19  Your Honor, I apologize, Your Honor.  There was certainly no

20  intention --

21          THE COURT:  There's no apology necessary.  I think

22  everybody was as surprised as defendants were.

23          But at this point in time, just make it clear to

24  Mr. Chice that I'm not releasing -- he's not released.  He

25  may have returned, and I'll let -- Becton Dickinson can make

1  their own decision about whether they want to send him back,

2  fly him back, or how ever they want to handle it at this

3  point in time.  If they want him to stay and catch another

4  flight just to see, that's an option, too.  But he does not

5  need to be here at the courthouse at this point.

6          All right.  Let me -- a couple more things -- or

7  one thing before the jury comes back in.  I don't know where

8  we stand on time.  But if we don't finish Thursday, that's

9  okay.  Examination, by both sides, Ms. Rubain and Mr. Chut,

10 needs to slow down a beat.  It's very hard to follow this,

11 and there's some -- there's some back and forth in the order

12 of the examination that even I'm having some trouble keeping

13 up with what's going on.  So you don't need to slow down as

14 slow as I talk, that's for sure, but you need to slow down

15 just a little bit so we can all keep up.

16          Anything further, Mr. Chut?

17          MR. CHUT:  No, Your Honor.

18          THE COURT:  Anything further, Ms. Rubain?

19          MS. RUBAIN:  No, Your Honor.

20          THE COURT:  All right.  Let's see.  Who was this

21 witness again?  This was Ms. Luthy.

22          MR. CHUT:  Ms. Luthy, Your Honor.

23          THE COURT:  Let's bring Ms. Luthy back in.

24          MR. CHUT:  If I may step out, Your Honor, and get

25 her.

1          THE COURT:  Ms. Luthy, you can come on back up

2   here.

3          (Ms. Luthy returns to the witness stand.)

4          THE COURT:  All right.  There was a meeting

5   between David Chice and Tom Valenti.  David Chice has

6   testified.  Tom Valenti is on the witness list and will be

7   here to testify as a witness.  It sounds like Ms. Luthy is

8   going to say as a result of that meeting and our concern

9   about some irregularities, we decided to conduct an

10  investigation, and here's what I did.

11         Based on what you've heard so far, Ms. Rubain, is

12  there anything further that I need to address before the

13  jury comes back?

14         MS. RUBAIN:  No, Your Honor.

15         THE COURT:  All right.  Mr. Caple, you may bring

16  the jury back in.

17         (At 4:51 p.m., jurors arrive.)

18         THE COURT:  All right.  Mr. Chut, you may

19  continue.

20         MR. CHUT:  Yes, Your Honor.

21  BY MR. CHUT:

22  Q.   Ms. Luthy, did you conduct an investigation at RTP into

23  the American Express Gift Cheque Program at that location.

24  A.   Yes.

25  Q.   And what was the nature of the investigation?

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    A.    I interviewed several leaders, some admins, John Dowd,

2    and Rick Rumbaugh.

3    Q.    And what were you investigating?

4    A.    I was investigating the recognition process and the

5    adherence to those process guidelines and the practices

6    there.

7    Q.    Did your investigation involve Robin Snipes Perry?

8    A.    You mean did I -- could you --

9    Q.    The investigation, in general.

10   A.    Yes.

11   Q.    And what were you investigating in regard to Ms. Perry?

12   A.    We were investigating the process by which she handled

13   American Express gift cheques and the extraordinary number

14   of gift cheques that went through her activity to herself.

15   Q.    And did you investigate whether these -- strike that.

16   Did your investigation involve a Mr. Rumbaugh?

17   A.    We did interview Rick -- Mr. Rumbaugh, yes.

18   Q.    And did you ask him whether he had authorized

19   Ms. Snipes' gift cheque purchases?

20   A.    Yes.

21            MS. RUBAIN:   Objection.

22            THE COURT:   Hold on just a second.   When there's

23   an objection, hold on, Ms. Luthy, before you answer.   Let me

24   see counsel at the side.

25            (Bench conference as follows:)

1          THE COURT:  Did you ask him whether he had

2   authorized a gift cheque approval?  What did he say this

3   morning?

4          MR. CHUT:  He said he did not approve them.  He

5   did not approve them in large numbers.

6          THE COURT:  The actual purchases of the cheques is

7   what I understand you asked him.

8          MR. CHUT:  Yes, Your Honor.  Ordering the cheques,

9   yes.

10          THE COURT:  And the basis for the objection?

11          MS. RUBAIN:  The form, No. 1.  No. 2, Mr. Rumbaugh

12   was not asked whether he spoke to Ms. Luthy and what

13   information he gave to her.

14          MR. CHUT:  And I would argue that's not necessary

15   for this to be a corroborating statement, Your Honor.

16          MS. RUBAIN:  It wouldn't corroborate what he told

17   to her.

18          THE COURT:  Essentially, the Government -- seems

19   to me, you're offering it as a prior consistent statement --

20          MR. CHUT:  Yes, Your Honor, that's correct.

21          THE COURT:  -- of Mr. Rumbaugh.  So the question

22   is:  Is his credibility put at issue in this case?  I

23   think -- it seems to me, Ms. Rubain, at least just

24   generally, that the challenge to the question of whether or

25   not there was or wasn't authority in this thing -- what's

1    the prior consistent statements.  I think the rule -- it

2    seems to me his credibility has been put at issue over this

3    authorization question, especially with the -- (reading)

4    "...is consistent with the declarant's testimony and is

5    offered to rebut an express or implied charge against the

6    declarant of recent fabrication or improper influence or

7    motive."

8              It's pretty close, but I think it comes in.

9              MS. RUBAIN:  Your Honor, I don't believe that he

10   testified that he spoke to Ms. Luthy and told her that he

11   did not give her authority.

12             THE COURT:  I don't think under this rule --

13             MS. RUBAIN:  That that's required?

14             THE COURT:  -- that he has to be asked about it.

15   I think that's the prior inconsistent statement rule that he

16   has to be asked.

17             I'm going to overrule the objection, and we've

18   got -- this jury, I think, is really paying attention as to

19   what I sustain or overrule.  So if we need to go back and

20   revisit it, we will.

21             (Bench conference concluded.)

22             THE COURT:  I'll overrule the objection.

23             MR. CHUT:  You may answer.

24             THE WITNESS:  I'm sorry, could you say it again?

25   BY MR. CHUT:

1  Q.    You interviewed Mr. Rumbaugh?

2  A.    Yes, I did.

3  Q.    Did you ask him if he had authorized Ms. Perry's cheque

4  purchases?

5  A.    I did.

6  Q.    And what was his response?

7  A.    He was surprised when we presented him with the amount

8  of recognition that was awarded to her.  He did acknowledge

9  giving her some recognition, but he was very surprised.

10 Q.    Had -- did he tell you he had authorized it?

11 A.    He had not authorized all of the recognition that she

12 had received.

13 Q.    What else did you ask Mr. Rumbaugh about in regard --

14         THE COURT:  Hold on a second.  Let me see counsel

15 at the bench.

16         (Bench conference as follows:)

17         THE COURT:  All right.  We've got cheque

18 purchases, which I understand to be what was bought from

19 American Express.  Then we have the awards, which are the

20 cheques that are given to the employees.

21         MR. CHUT:  Yes.

22         THE COURT:  And you asked her about cheque

23 purchases and whether she -- I thought whether he had

24 authorized the cheque purchases, and she said -- the way she

25 answered, I think she was saying that he hadn't authorized

```
 1  the awards and didn't say anything about the purchases.
 2  Now, I don't remember what he said about what he had
 3  authorized.  But I think he said he authorized 5,000.
 4  Somewhere I got this 4,500 to $5,000 figure.
 5              MR. CHUT:  That's the total amount of award she
 6  received overall, Your Honor.
 7              THE COURT:  Has he testified as to what he
 8  authorized in terms of awards to her?
 9              MR. CHUT:  Yes, Your Honor.  Ms. Rubain is shaking
10  her head, but I think, in fact, the testimony is that he
11  made one large -- that she was part of the one large one
12  where they made a thousand, but he otherwise made small spot
13  awards to her.  So I think that was his testimony.
14              MS. RUBAIN:  I don't believe that was his
15  testimony.  He said that he made the award of one $1,000
16  gift cheque, and that's all that he recalled.
17              THE COURT:  I thought he said some other small
18  ones, too.
19              MR. CHUT:  Your Honor, I think I can ask a
20  clarifying question, but these are award cheques.  So his
21  response to did you authorize it was he said he was
22  surprised that -- you know, by this recognition for her.
23  That's a consistent answer.  These are award cheques.
24              THE COURT:  But if he hadn't testified to it
25  already, then it's hearsay.  So I'm trying -- it's either --
```

1  he's testified.  So it's either prior consistent statement

2  or prior inconsistent statement --

3          MR. CHUT:  Correct, Your Honor.  He has --

4          THE COURT:  -- and I'm not sure -- I'm going to

5  send the jury home, and we'll figure this out.

6          MR. CHUT:  Your Honor, and I'll do what it takes

7  to streamline this, but she needs to be back in New Jersey

8  very badly, if I can just wrap her up before we close, Your

9  Honor.  I realize it's been a very long afternoon, but in

10  terms of logistics of --

11         THE COURT:  Did Mr. Rumbaugh authorize these

12  cheques?  What did he tell you during the interview?

13         MR. CHUT:  I think that's his -- a consistent

14  statement to what he testified to, Your Honor.  I think that

15  he testified he made a small award and the issue involving

16  the thousand dollar award.  He did not award her these large

17  amounts.  If I have to order the transcript, Your Honor, of

18  earlier today --

19         THE COURT:  Well, here's the thing at this point,

20  Frank.  I can't say whether it's consistent or inconsistent

21  with what he said earlier today.  So I'll advise -- I have

22  to make a ruling today based on my best recollection of his

23  testimony.  I think he gave some kind of amounts, but I

24  don't know what she's talking about in terms of amounts at

25  this point.  So did he authorize this, I can't tell whether

1   we're comparing apples to oranges; and because of that, I

2   can't figure out if it's a prior inconsistent statement or

3   prior consistent statement and that the door's been open on

4   that.  So I'm going to sustain --

5              MR. CHUT:  Well, Your Honor he has testified he

6   was not aware that she was getting these cheques, and that's

7   consistent with what she said, that he was surprised when I

8   asked him about it.  I think that's consistent, Your Honor.

9              THE COURT:  I'm going to let this answer stand at

10  this point in time, but we're not -- that's it on this.

11             MR. CHUT:  Understood, Your Honor.

12             (Bench conference concluded.)

13             THE COURT:  All right.  I'll overrule the

14  objection.  Any further questions, Mr. Chut?

15             MR. CHUT:  Not on that topic, Your Honor; just

16  very briefly, otherwise.

17             THE COURT:  All right.  Let me see counsel up here

18  very quickly.

19             (Bench conference as follows:)

20             THE COURT:  We now have a question from a juror.

21  I just can't try this case for Ms. Luthy 's convenience.

22  I've either got to deal with this and send the jury back or

23  make a decision.  She may just have to come back in the

24  morning.

25             MR. CHUT:  Could I have five minutes, Your Honor,

1   and I'll get her out of here, and that will be the end of

2   Ms. Luthy?  If that's okay with you, Ms. Rubain?

3           THE COURT:  Ms. Rubain is entitled to some

4   cross-examination.

5           MS. RUBAIN:  Right, and, you know, I don't want to

6   keep people here who aren't happy to be here.

7           THE COURT:  The question is: "I am confused.  If

8   management must approve all the cheque POs, who approved the

9   POs in question in this case?"

10          The jury's question again points us back to these

11  statements by Mr. Rumbaugh.  I'm not sure whether I --

12  frankly, I'm not sure whether I'm right or wrong on this.

13  Let me do this.

14          (Bench conference concluded.)

15          THE COURT:  All right.  Ladies and gentlemen, I'm

16  going to excuse you back to the jury room for five minutes.

17  And what I want you to do is make a decision, and it's got

18  to be unanimous, but what time do you need to stop today?

19  Can you go until 5:30, or can you proceed a little past

20  5:30, that is, until about 5:45?

21          Now, as I told you in my earlier comments, if even

22  one of you needs to leave at 5:30, then please everybody

23  respect that, because everybody is traveling from some long

24  distances.  But I need just a couple of minutes to resolve

25  an issue before we can proceed.  And so I want to -- if you

 1   will, step back to the jury room, take five minutes, and

 2   just send a note out through Mr. Caple as to which time you

 3   need to finish today.  The jury is excused for five minutes.

 4                (At 5:03 p.m., jurors excused.)

 5                THE COURT:  Ms. Luthy, you can remain right there,

 6   or you can have a seat back in the gallery, wherever you're

 7   most comfortable.  All right.  What did Mr. Rumbaugh say?

 8   Here are at least the pieces of the puzzle as nearly as I

 9   can put them together.

10                One, I think twice during his examination

11   Mr. Rumbaugh said that his authority was $5,000, not

12   $50,000, at least according to my notes.

13                He did say -- he did testify that in 2005 to 2006,

14   he did not authorize Ms. Perry to order large amounts, and

15   then you took him -- you, Mr. Chut, took him through May,

16   August, September, December, and January amounts, and he

17   said he did not authorize Perry to order large sums, $5,000

18   to $9,000.

19                I don't know where we end up as far as the

20   testimony.  I haven't been able to find in my notes what he

21   said about the gifts that he had approved.  But with respect

22   to the question of his authority and what he had authorized

23   her to purchase, to order, which is what I understood that

24   testimony that I just described to be related to in those

25   various months, he did testify this morning that he did not

1   authorize those large amounts.

2          So I think then the question becomes, where do

3   we -- where does that leave us with respect to the rules?

4   Ms. Luthy has been tendered as a witness who spoke to

5   Mr. Rumbaugh at some time around the time of the

6   investigation, and he gave a statement to her that -- and

7   we'll get to clarifying Ms. Luthy's response in just a

8   moment.  But as I understood her testimony he gave a

9   statement that he did not authorize these large amounts.  I

10  think there are two ways that his statement to Ms. Luthy --

11  well, one way.  It's consistent with Mr. Rumbaugh's

12  testimony.  The question is:  Is it offered to rebut an

13  express or implied charge against the declarant of recent

14  fabrication or improper influence or motive?

15         I think at this point that there has been enough

16  suggestion of this question of authority in Mr. Rumbaugh's

17  role in this that his testimony about what he did or did not

18  authorize is at least a part, it may not be a large part,

19  but at least a part -- or related to a question of what his

20  motives are presently or how this whole series of

21  transactions has influenced him.  So his prior consistent

22  statements would be admissible, it seems to me, to come in

23  to rebut -- maybe at this point it's implied, but at least

24  an implied charge of either recent fabrication or improper

25  influence or motive, that is, testifying a certain way to

1    cover up his own actions.

2           The trick is did it arise before -- the timing of

3    these things is important under application of the rule, and

4    I think with this termination -- his resignation that he's

5    testified to I think showing that his testimony is

6    consistent before he left and after he left is admissible

7    under Rule 801(d)(1).

8           Now, Ms. Luthy, I wasn't sure I understood your

9    response.  You were asked about whether or not you had asked

10   Mr. Rumbaugh about whether or not he authorized the purchase

11   of some cheques, and I wasn't sure whether you were

12   saying -- you were responding in relation to purchase of the

13   cheques from American Express or whether you were responding

14   in relation to the awards that appear to have been given to

15   Ms. Perry.  Do you understand my question?

16           THE WITNESS:  Yes.

17           THE COURT:  Which way were you responding?

18           THE WITNESS:  I had thought the question was about

19   the awards for her, and I could answer either one that you

20   prefer.

21           THE COURT:  All right.  Well, at this point where

22   do we land on the awards?  I kind of understood

23   Mr. Rumbaugh's testimony to be that he -- that she more or

24   less kept the records of the program, and I don't know that

25   he knew how much he had awarded anybody.  Mr. Chut?  I'm

1   looking at two different issues.  One is in relation to

2   purchasing the cheques from AmEx, and then the other is in

3   relation to what awards were authorized and in what amount.

4           MR. CHUT:  Your Honor, if I could ask her a

5   clarifying question.  I think the issue here is there's some

6   confusion because these are award cheques; and because

7   Ms. Snipes wrote large numbers of cheques to herself from

8   the awards program, these issues then become sort of merged.

9   If I could ask a question that may sort that out.

10          Did you ask -- if I may, Your Honor?

11          THE COURT:  Um-hum.

12  BY MR. CHUT:

13  Q.   Ms. Luthy, did you ask Mr. Rumbaugh how many awards he

14  had made to Ms. Perry?

15  A.   Not explicitly.

16  Q.   Based on your investigation, approximately how many

17  cheques had Ms. Snipes obtained for her own use?

18  A.   In total?

19  Q.   Yes, just approximately.

20  A.   About $170,000 worth.

21  Q.   Did you ask Mr. Rumbaugh if he had authorized purchase

22  of those cheques?

23  A.   Yes.

24  Q.   And what was his response?

25  A.   He was surprised and said no.

1  Q.   Did you ask him if he made awards in that amount to

2  Ms. Snipes -- or to Ms. Perry, excuse me?

3  A.   I don't understand the difference between that question

4  and the previous question.

5  Q.   Okay.  I think that -- why don't you understand the

6  difference.  Why is there no distinction in your mind

7  between the awards and the ordering of the cheques?

8  A.   They're the same -- they're one in the same.  The

9  cheques are the award, the recognition; and when he was

10 presented with the total amount, he said he did not

11 authorize that.

12        THE COURT:  What didn't he authorize?

13        THE WITNESS:  He did not authorize $176,000 worth

14 of recognition cheques to be awarded to Robin Snipes Perry.

15        THE COURT:  Did you actually look at the cheques

16 and calculate them yourself, or are you figuring -- the

17 $175,000 figure, are you relying on what somebody else told

18 you about that figure?

19        THE WITNESS:  I saw the cheques, and I did not

20 total them myself.  I was relying on David Chice's report.

21        THE COURT:  Okay.  And he's testified to that.

22 Any voir dire, Ms. Rubain?

23        MS. RUBAIN:  Your Honor, if I may very briefly.

24 Ms. Luthy, when did you interview Mr. Rumbaugh?

25        THE WITNESS:  I believe it was in February, in the

1    February time frame, of 2006.

2            MS. RUBAIN:  And were you made aware of the total

3    amount of the cheques by way of Mr. Chice before you

4    interviewed Mr. Rumbaugh?  Did you know the total amount of

5    the cheques prior to your interview of Mr. Rumbaugh?

6            THE WITNESS:  I don't know exactly.  I know there

7    were a number of factors that were presented to me.  There

8    were -- the amount of cheques, I know there was some work

9    that was being done with American Express; and what I

10   presented to Rick was what was presented to me.  I asked him

11   about it, and he said that was not something that he had

12   authorized.

13           MS. RUBAIN:  But do you know what you exactly

14   presented to Mr. Rumbaugh?

15           THE WITNESS:  Yes, I believe that there was a

16   total of about a quarter of million dollars worth of

17   expenses in a variety of different vehicles.

18           MS. RUBAIN:  Explain to me what the variety of

19   different vehicles -- how did you -- what encompasses a

20   $250,000 set of expenses?

21           THE WITNESS:  There were computers that she

22   purchased.  There were gift cards, American Express Gift

23   Cards, and, you know, there were a variety of things that as

24   we presented each one of those things to him, he said he did

25   not authorize them.

1              MS. RUBAIN:  Ms. Luthy, you mentioned that

2    Mr. Rumbaugh did tell you that he did award some recognition

3    awards to Ms. Perry, correct?

4              THE WITNESS:  Yes.

5              MS. RUBAIN:  Do you recall how much he told you

6    that he awarded her?

7              THE WITNESS:  He acknowledged a thousand dollar

8    gift card that was part of a team, although $2,000 -- she

9    awarded herself $2,000, so he only acknowledged one of the

10   two.  And then he acknowledged some other awards, but not

11   specifically what they were.

12             MS. RUBAIN:  And did you review any nomination

13   awards that correlated to those smaller awards that

14   Mr. Rumbaugh told you that he had awarded Ms. Perry?

15             THE WITNESS:  No.

16             MS. RUBAIN:  In your investigation did you ever

17   see any nomination forms that Mr. Rumbaugh submitted to HR?

18             THE WITNESS:  No.

19             MS. RUBAIN:  And is it your testimony that when

20   you interviewed Mr. Rumbaugh in February of 2006, you all

21   had all cheques ordered by Ms. Perry from American Express?

22             THE WITNESS:  I don't know that.

23             MS. RUBAIN:  Your Honor, that's all.

24             THE COURT:  They can stay until 5:45.

25             All right.  This is the way I land.  It seems to

1   me that there is some prior consistent statement value to --

2   value -- admissibility under Rule 801(d)(1) for the reasons

3   that I've outlined.

4           It also seems to me that Ms. Luthy has got the

5   ordering of the cheques and disbursement of the cheques all

6   more or less as a joint transaction, treating them as more

7   or less the same.  But I think that's a matter for the --

8   that can be sorted out as a matter of evidence.  But

9   certainly his statements to them at that time are consistent

10  with the statements that he has made throughout the course

11  of his testimony.  There are some real issues with respect

12  to his authority, what he did, in fact, authorize Ms. Perry

13  to do.

14          So I think at least to a limited degree, those

15  statements are admissible for purposes of rebutting any

16  suggestion of an improper motive on his part with respect to

17  his present testimony as regards his -- the authority of

18  what he had authorized with respect to these cheques.

19          So I will admit that statement.  Mr. Chut, if we

20  go much past that, I'm really getting in a very difficult

21  area.  I think that that puts admissibility I'm- not clear

22  on anything past that.  So I'll let you --

23          MR. CHUT:  Yes, Your Honor.

24          THE COURT:  I guess that testimony is in at this

25  point?

1              MR. CHUT:  Yes, Your Honor.

2              THE COURT:  I can't remember whether Ms. Luthy's

3    testified in front of the jury now.

4              Okay.  So she has testified in front of the jury:

5              "He was surprised when I presented him with the

6    amount.  He did acknowledge giving her some recognition, but

7    he was very surprised.

8              Did he tell you he had authorized it?

9              He had not authorized all of the recognition she

10   had received."

11             So I think -- I guess I'm overruling the

12   objection, and the answer stands at this point.

13             Anything further, Mr. Chut?

14             MR. CHUT:  No, Your Honor.

15             THE COURT:  Ms. Rubain?

16             MS. RUBAIN:  No, Your Honor.

17             THE COURT:  All right.  The jury says they can

18   stay until 5:45.  Ms. Luthy, I understand you have some

19   responsibilities and need to leave and go back to New

20   Jersey, but the jury comes first.  So we'll see where we end

21   up at the end.

22             THE WITNESS:  I understand.

23             THE COURT:  Mr. Caple?

24             (At 5:21 p.m., jurors arrive.)

25             THE COURT:  All right.  I have overruled the

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    objections.  Ladies and gentlemen, I got your note with

2    respect to 5:45.  Thank you for your consideration on that.

3    We'll stop promptly today at 5:45.

4              Mr. Chut, you may continue.

5              MR. CHUT:  Thank you, Your Honor.

6    BY MR. CHUT:

7    Q.   Outside of your interview with Mr. Rumbaugh, what was

8    your role in the investigation?

9    A.   Beyond what I've already stated?

10   Q.   Yeah, besides interviewing Mr. Rumbaugh.

11   A.   I reviewed the material as it came to light, and I

12   worked with John Dowd to invite Robin back into meet with us

13   to explain her side of the story, and I tried to help John

14   reach her and invite her back.

15   Q.   Did you physically travel down to RTP to conduct your

16   part of the investigation?

17   A.   Some of the interviews I did in person, and some on the

18   telephone.

19   Q.   Did you interview Mr. Rumbaugh in person?

20   A.   I did, yes.

21   Q.   And where did you interview him?

22   A.   I interviewed him twice.  One was in some offices off

23   site, and one was in the office in Franklin Lakes, New

24   Jersey.

25   Q.   And is Mr. Rumbaugh still employed by BD?

1  A.    No, he's not.

2  Q.    And when did he cease working with BD?

3  A.    I believe it was in March of '06, in that time period,

4  and I did have a conversation with him at that time.  One of

5  my roles was to have the final conversation with him.

6           MR. CHUT:  No further questions, Your Honor.

7           THE COURT:  Cross-examination?

8           MS. RUBAIN:  Thank you, Your Honor.

9                C R O S S - E X A M I N A T I O N

10  BY MR. CHUT:

11  Q.    Ms. Luthy, now, prior to February 2006, you had no

12  information concerning how the RTP site ran the American

13  Express Gift Cheque Program, correct?

14  A.    Yes, that's correct.

15  Q.    And you never supervised Ms. Perry, correct?

16  A.    That's correct.

17  Q.    And you weren't Mr. Rumbaugh's supervisor as well?

18  A.    No, I was not his supervisor.

19  Q.    Now, were you Mr. Dowd's supervisor?

20  A.    No, I was not.

21  Q.    And did you supervise anyone at the RTP branch of BD?

22  A.    No.

23  Q.    Now, you were brought in, I believe, by your testimony

24  some time around February of 2006 to work with Mr. Valenti

25  and Mr. Chice and Mr. Dowd regarding investigating the gift

1    cheque program at the RTP site, correct?

2    A.    Yes.

3    Q.    Now, when was the first time that you met with

4    Mr. Rumbaugh?

5    A.    Some time during that period between February and

6    March.  I don't know exactly when that was.

7    Q.    And I believe you testified that first meeting occurred

8    off-site in the Raleigh area, is that correct?

9    A.    I don't remember the facility exactly.  I'm sorry.

10   Q.    Was it a BD facility?

11   A.    I'm just trying to recall which one -- I recall two

12   meetings with him.  One was on-site, one was off-site.  I

13   don't recall which was first and which was second.

14   Q.    Now, the on-site meeting occurred at your corporate

15   offices in Franklin Lakes, is that correct?

16   A.    Yes.

17   Q.    And had Mr. Rumbaugh been flown up there to meet with

18   you?

19   A.    He ordinarily did business.  He was a member of the

20   same leadership team that I was a member of at that time, so

21   he -- I don't believe he came up just for that purpose.  He

22   may have come up for business.

23   Q.    And how often did you have occasion to interact with

24   Mr. Rumbaugh at the Franklin Lakes corporate office?

25   A.    Maybe a few times per year.

1   Q.   If you had to approximate, how many times per year?

2   A.   Maybe two or three times a year.

3   Q.   Did you all speak on the telephone?

4   A.   There may have been a meeting that I was a member of

5   that he would be on the phone for calling in from wherever

6   he was at the time.

7   Q.   You never had any personal telephone conversations with

8   Mr. Rumbaugh?

9   A.   No.

10  Q.   Would you characterize your relationship with him as

11  friendly?

12          MR. CHUT:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  I'm sorry?  Did you say "overruled"?

15          THE COURT:  I overruled.  You may answer the

16  question.

17          THE WITNESS:  He was a peer of mine.

18  BY MR. CHUT:

19  Q.   And would you characterize your relationship as

20  friendly?

21  A.   We were not social on any level; nothing other than a

22  professional relationship.

23  Q.   How many times prior to February 2006 had you ever

24  visited the RTP location?

25  A.   In my 19 years with the company?

1  Q.    Let me narrow it down to between 2003 and 2006.

2  A.    Probably during leadership team meetings, maybe once a

3  year; perhaps twice a year, if that happened.

4  Q.    And what were those leadership team meetings?  What

5  would that entail?

6  A.    I'm actually thinking about it now to correct that once

7  or twice a year.  I wasn't in that role for that entire

8  time.  So for a short period of time while I was on the

9  leadership team, I would go once or twice a year for

10  leadership team meetings.

11  Q.    And how long were you on the leadership team?

12  A.    Maybe two or three years.

13  Q.    And was Mr. Rumbaugh on the leadership team with you

14  during that period of time?

15  A.    I think there was a period of time that he was on and a

16  period of time that he was off.  There were different

17  formations of teams depending on the seniority of the folks.

18  Q.    Did you ever call to speak to Mr. Rumbaugh and

19  Ms. Perry answered the telephone?

20  A.    Possibly.  I don't recall.  I don't recall.

21  Q.    Now, the interview you had with Mr. Rumbaugh, the two

22  interviews, it's your testimony that he told you that he

23  authorized certain recognition awards for Ms. Perry; is that

24  correct?

25  A.    Yes.

1  Q.    Did he -- I'm speaking in terms of the gift cheques,

2  did he tell you how many gift cheques he authorized

3  Ms. Perry to receive from 2005 to 2006?

4  A.    No.

5  Q.    Now, you had an opportunity to review Ms. Perry's

6  personnel file, correct?

7  A.    Yes.

8  Q.    And you've had an opportunity to review all of the

9  American Express Gift Cheques and order forms that she

10  submitted, correct?

11  A.    That she submitted?

12  Q.    Um-hum.

13  A.    All of the gift cheque order forms that she submitted

14  were not in her personnel file.

15  Q.    But you reviewed the cheques?

16  A.    I reviewed the cheques themselves; I did not see order

17  forms.

18  Q.    Now, in her personnel file, were there any nomination

19  forms for gift cheque awards from Mr. Rumbaugh?

20  A.    You know, not that I recall specifically.

21  Q.    So when Mr. Rumbaugh told you that he did make gift

22  cheque awards to Ms. Perry, you were unable to verify that

23  through looking at nomination forms that he had submitted to

24  HR, is that correct?

25  A.    I didn't specifically look for that; that's correct.

1  Q.    How did you verify the information that Mr. Rumbaugh

2  told you with respect to what he authorized Ms. Perry to

3  receive?

4  A.    I did not take another step beyond interviewing him to

5  confirm his responses.

6  Q.    Now, at the time you interviewed Mr. Rumbaugh, he was

7  still employed with Becton Dickinson, correct?

8  A.    Yes.

9  Q.    And you're still employed by Becton Dickinson, and

10  you're now in a position of Director of HR?

11  A.    No, I'm one of several vice-presidents of Human

12  Resources.

13  Q.    And lastly, Ms. Luthy, with respect to the final

14  meeting that you had with Ms. Perry -- I'm sorry,

15  Mr. Rumbaugh -- what was the nature of that meeting?

16  A.    We reviewed our conclusions that Ms. Perry had awarded

17  herself a significant number of American Express Gift

18  Cheques, more than we had ever seen before, and he

19  acknowledged that -- he actually -- he -- his reaction was

20  to say she was his friend, and he trusted her.

21            MS. RUBAIN:   Objection, Your Honor.

22            THE WITNESS:   I'm sorry?

23            THE COURT:   I think that's an open-ended question

24  there, but I'll -- I'm going to overrule the objection, but

25  let's move on to the next question.

1   BY MS. RUBAIN:

2   Q.   Did you have an exit interview with Mr. Rumbaugh before

3   he left his employment with Becton Dickinson?

4            MR. CHUT:  Your Honor, objection.  I think she was

5   in the middle of answering that question.  If I understand,

6   you overruled the question.  Can she finish her answer, Your

7   Honor?

8            THE COURT:  Let me see counsel at the side.

9            (Bench conference as follows:)

10           THE COURT:  I know Ms. Rubain opened the door, and

11  there's a lot of it that got in, but we don't need to go

12  down this road any further.

13           MR. CHUT:  Yes, Your Honor.

14           THE COURT:  He was a friend; he trusted her.

15           MR. CHUT:  Yes, Your Honor, I understand.

16           (Bench conference concluded.)

17           THE COURT:  I'll overrule the objection.  You may

18  continue, Ms. Rubain.

19  BY MS. RUBAIN:

20  Q.   Ms. Luthy, did you have anything else to finish that

21  question -- your answer?  Did you finish your answer?

22  A.   In that meeting, he asked to resign.

23  Q.   I'm sorry, he asked to resign?

24  A.   Yes.

25  Q.   Now, did you have a separate exit interview with him?

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1   A.    No.

2   Q.    Were you the individual that accepted his resignation?

3   A.    Yes.

4   Q.    And was Mr. Rumbaugh also awarded $80,000 severance as

5   part of that resignation?

6   A.    I'm not aware of that.

7              THE COURT:  Ladies and gentlemen, I will remind

8   you that attorneys' questions are not evidence in the case.

9   You may continue, Ms. Rubain.

10              MS. RUBAIN:  Your Honor, no further questions of

11   Ms. Luthy.

12              THE COURT:  Redirect?

13              MR. CHUT:  Very briefly, Your Honor.

14              R E D I R E C T   E X A M I N A T I O N

15   BY MR. CHUT:

16   Q.    Ms. Luthy, you testified that you reviewed the cheques?

17   A.    Yes, I did.

18   Q.    And these are cheques involved -- gift cheque program

19   awarded to or awarded by Ms. Perry?

20   A.    Yes.

21   Q.    Did you see any cheque that was signed -- that was

22   signed by Mr. Rumbaugh?

23   A.    Not that I recall.

24   Q.    Did you see any cheques made out to Mr. Rumbaugh?

25   A.    No, none.

1  Q.   What evidence did you find that Mr. Rumbaugh had

2  financially benefited from the cheques ordered or awarded to

3  Ms. Perry?

4            MS. RUBAIN:  Objection.

5            MR. CHUT:  Your Honor, I'll just rephrase.

6            THE COURT:  I'll strike that -- I'll sustain that

7  objection.

8  BY MR. CHUT:

9  Q.   Did you find any evidence Mr. Rumbaugh had benefited

10 from the cheques?

11 A.   No.

12           MR. CHUT:  No further questions, Your Honor.

13           MS. RUBAIN:  Nothing further.

14           THE COURT:  You may step down, Ms. Luthy.

15           (At 5:34 p.m., witness excused.)

16           MR. CHUT:  And I would ask to release Ms. Luthy,

17 Your Honor.

18           THE COURT:  We'll address that in just a minute.

19           Ladies and gentlemen, I appreciated your patience

20 with me today.  I will tell you that I do anticipate these

21 interruptions when I tell you what a schedule is.  These

22 kind of things are normal.  I apologize for some of my

23 interruptions today.  But as far as I can tell, we're still

24 on the same schedule that I gave you.  This is not

25 unexpected to have these various interruptions where I send

1    the jury out.

2            Thank you for your patience today.  I will now

3    excuse the jury until tomorrow morning at 9:30.  Please --

4    two things.  No. 1, I did receive the other question in

5    response to that question.  Now I'll simply tell you to

6    continue to listen carefully to the evidence in the case.

7    The evidence has not been completed at this time.

8            The other thing I will remind you, do not do any

9    investigation or discuss -- do not do any investigation on

10   your own by internet, electronic or otherwise, and do not

11   discuss the case with anyone or permit anyone to discuss it

12   with you.  I reiterate that warning because use of the

13   internet has become so commonplace now that it's easy,

14   sometimes without even thinking about it, to try to do

15   internet research, and that causes a significant problem in

16   our judicial system.  So please follow my instructions on

17   that very carefully, and we will see you tomorrow morning at

18   9:30.  The jury is excused until 9:30.

19            (At 5:36 p.m., jurors excused.)

20            THE COURT:  This came up at the bench while we

21   were in the midst of doing 15 other things, but the question

22   a juror sent is:  "I am confused.  If management must

23   approve all cheques POs, who approved all POs in question in

24   this case?"

25            Obviously, I'm not going to -- this is not a

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1  question and answer session, and I'm not inclined to give

2  any instruction other than what I just said, which is it

3  would be the same whether the question came or not.  But to

4  the extent the parties want to consider that in their

5  presentation of evidence, you are aware of the question.

6          All right.  Anything, Mr. Chut, we need to take up

7  before we come back tomorrow?

8          MR. CHUT:  Just release of Ms. Luthy, Your Honor.

9          THE COURT:  Any objection to that, Ms. Rubain?

10          MS. RUBAIN:  Your Honor, not knowing what

11  Mr. Chice might say, I would have to --

12          THE COURT:  Or Mr. Valenti.

13          MS. RUBAIN:  Or Mr. Valenti.

14          THE COURT:  All right.  This is what I'm going to

15  do, Mr. Chut.  I know Becton Dickinson is the victim in this

16  case, and you are doing everything in your power to

17  accommodate the various schedules of busy corporate

18  individuals.  Ms. Luthy does not need to remain here today.

19  I'm not -- so she can return.  I'm not going to release her

20  from the subpoena; and if we get into Thursday and we need

21  her back here, she may have to hop on a plane and fly back

22  to Greensboro if she's needed.

23          MR. CHUT:  Yes, Your Honor.

24          THE COURT:  She can return today, and hopefully we

25  won't need to recall her.  But I won't release her from the

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    subpoena at this time based on the defendant's request.  But

2    she can leave the courthouse.

3           How do you think we are doing as far as the

4    schedule goes, Mr. Chut?  I don't think I'll tell the jury

5    anything tomorrow, but this feels like the kind of case

6    where there are several fairly lengthy witnesses, and then

7    there'll be several short witnesses.  But I may be wrong

8    about that.

9           MR. CHUT:  Your Honor, I think that's correct.

10   Remaining is John Dowd who I think will be fairly quick,

11   Your Honor.  Maybe a little lengthier than some of the

12   others.  Tom Valenti.  Linda Tingen will testify.  She'll be

13   fairly brief, Your Honor.  Ken Matthews will testify at a

14   little more length.  He's a summary witness.  And there's a

15   possibility I'll re-call Mr. Rumbaugh briefly just to

16   address one particular issue, Your Honor.

17          THE COURT:  Okay.  So we've got Dowd, Valenti,

18   Matthews, and Tingen are the witnesses you anticipate

19   calling tomorrow?

20          MR. CHUT:  Yes, Your Honor.

21          THE COURT:  And then -- well, how do you feel

22   about where we are on the schedule, Ms. Rubain, Mr. Quander?

23   You think we're still on track to perhaps finish by

24   Thursday.

25          MS. RUBAIN:  Your Honor, I'm very hopeful that we

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

```
 1   might.  I don't anticipate calling possibly just one brief
 2   witness, at the most two, and they would be fairly short.
 3            THE COURT:  All right.  Do you anticipate
 4   finishing your evidence tomorrow, Mr. Chut?
 5            MR. CHUT:  Yes, Your Honor, I would hope to, Your
 6   Honor.  I think, Your Honor, with a full day, I think we
 7   would, Your Honor.
 8            THE COURT:  All right.  Ms. Rubain, you might want
 9   to have your witnesses on standby ready to go late tomorrow
10   afternoon as a possibility we'll keep going; and if you'll
11   let Mr. Chut -- so he has a chance to prepare, let him know
12   who the witnesses -- you make your own decision about
13   Ms. Perry.  I'm not suggesting you do anything on that, but
14   I would like to keep things moving.
15            But in suggesting that we keep things moving, the
16   pace of the questions slowed down to a reasonable pace, and
17   I think it was much easier to follow the evidence for
18   everyone.  So I appreciate the parties' consideration on
19   that.  I may have some preliminary instructions ready that
20   we can use as a guide some time tomorrow around lunchtime.
21            You've got a summary witness.  Are you going to
22   present any expert testimony?
23            MR. CHUT:  No, Your Honor.
24            THE COURT:  So I don't have to -- all right.  I'll
25   start working on the final instructions so we can have those
```

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

1    to discuss.

2              Anything further, Ms. Rubain?

3              MS. RUBAIN:  No, Your Honor.

4              THE COURT:  All right.  We'll stand in recess

5    tomorrow morning until 9:30.

6              (At 5:41 p.m., break taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

US v. PERRY - TRIAL, DAY 2 - July 27, 2010

```
 1                        *  *  *  *  *

 2                    C E R T I F I C A T E

 3

 4       I, JOSEPH B. ARMSTRONG, RMR, FCRR, United States

 5   District Court Reporter for the Middle District of North

 6   Carolina, DO HEREBY CERTIFY:

 7           That the foregoing is a true and correct transcript of

 8   the proceedings had in the within-entitled action; that I

 9   reported the same in stenotype to the best of my ability;

10   and thereafter reduced same to typewriting through the use

11   of Computer-Aided Transcription.

12

13

14

15   Date:   09/01/11        _____
                             Joseph B. Armstrong, RMR, FCRR
16                           United States Court Reporter
                             324 W. Market Street
17                           Greensboro, NC  27401

18

19

20

21

22

23

24

25
```

US v. PERRY - TRIAL, DAY 2 - July 27, 2010